**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| FN HERSTAL, S.A., and<br>FN AMERICA, LLC,<br><br>     Plaintiffs,<br><br><br>v.<br><br>STURM, RUGER & CO., INC.,<br><br>     Defendant. | Civil Action No.: 1:24-cv-218 -LCB-JEP |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.  INTRODUCTION AND NATURE OF THE CASE ........................................................ 1

II. QUESTION PRESENTED ......................................................................................... 2

III. UNDISPUTED FACTS ............................................................................................. 2

    A.    Ruger's History ............................................................................................. 2

    B.    FN's Military Heritage ................................................................................... 4

    C.    USSOCOM's SCAR Acronym ...................................................................... 5

        1.    Recognition of the SCAR Abbreviation .......................................... 5

        2.    FN's Promotion of the SCAR Acronym .......................................... 5

    D.    Military Ties to FN's Commercial SCAR ..................................................... 6

    E.    FN in SCAR Advertising ............................................................................... 9

    F.    Pricing of FN's SCAR ................................................................................. 11

    G.    Ruger's SFAR ............................................................................................. 12

        1.    Differences Between the Products .................................................. 14

        2.    Advertising of the Ruger SFAR ..................................................... 15

        3.    Pronunciation of SFAR ................................................................... 19

            a.    FN's Pronunciation Investigation ....................................... 20

    H.    The High Care for Firearm Purchases ........................................................ 20

    I.    Similar Third-Party Uses ............................................................................. 22

    J.    FN's Delay .................................................................................................. 22

    K.    Consumer Survey Showing No Confusion .................................................. 23

IV. ARGUMENT ........................................................................................................... 24

    A.    The Material Facts Are Undisputed and/or Indisputable ............................ 24

    B.    Ruger Is Entitled to Summary Judgment .................................................... 25

        1.    The Marks Are Dissimilar ............................................................... 26

i

2.      SCAR Is Entitled to Limited Protection ...................................................... 32

3.      Firearm Buyers Are Sophisticated and Careful .......................................... 33

4.      Ruger's Survey Shows No Likely Confusion, and There Is None
        After Two-and-a-Half Years........................................................................ 35

5.      The Parties' Goods Differ........................................................................... 38

6.      Ruger Acted in Good Faith ......................................................................... 40

7.      The Good Quality of Ruger's SFAR Is Irrelevant ..................................... 40

V.      CONCLUSION.................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Foundation of America*,
307 F. Supp. 3d 260 (S.D.N.Y. 2018) ...................................................................37

*AMP, Inc. v. Foy*,
540 F.2d 1181 (4th Cir. 1976) ...............................................................................25

*B.V.D. Licensing Corp. v. Body Action Design, Inc.*,
846 F.2d 727 (Fed. Cir. 1988) ...............................................................................31

*Basic American Medical, Inc. v. American Medical Int'l, Inc.*,
649 F. Supp. 885 (S.D. Ind. 1986) .........................................................................31

*CareFirst of Maryland., Inc. v. First Care, P.C.*,
434 F.3d 263 (4th Cir. 2006) ........................................................................ *passim*

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...............................................................................................24

*CFA Inst. v. Am. Soc'y of Pension Pros. & Actuaries*,
No. 3:19-CV-00012, 2020 WL 6507391 (W.D. Va. Nov. 5, 2020) .................24, 32

*Colt Defense LLC v. Bushmaster Firearms, Inc.* (*Colt Defense*)
No. 04-cv-240, 2005 WL 1293909 (D. Me. Sept. 20, 2005) .......................... *passim*

*Customer Co. v. E-Commerce Today, Ltd.*,
106 F. Supp. 2d 869 (W.D. Va. 2000) ...................................................................25

*Easy Spirit, LLC v. Skechers U.S.A., Inc.*,
571 F. Supp. 3d 185 (S.D.N.Y. 2021) ...................................................................35

*Florida Int'l Univ. Bd. of Trustees v. Florida Nat'l Univ., Inc.*,
830 F.3d 1242 (11th Cir. 2016) .............................................................................31

*FN Herstal v. Clyde Armory, Inc.*,
123 F. Supp. 3d 1356 (M.D. Ga. 2015), *aff'd* 838 F.3d 1071 (11th Cir. 2016).....32

*Fuel Clothing Co. v. Nike, Inc.*,
7 F. Supp. 3d 594 (D.S.C. 2014).................................................................27, 38, 39

*George & Co., LLC v. Imagination Entertainment Ltd.*,
No. 1:07-cv-0498, 2008 WL 2883771 (E.D. Va. July 25, 2008), *aff'd*, 575
F.3d 383 (4th Cir. 2009) ........................................................................................35

iii

*George & Co. v. Imagination Entm't Ltd.*,
575 F.3d 383 (4th Cir. 2009) ............................................ *passim*

*Georgia Pacific Consumer Products v. Von Drehle Corp.*,
618 F.3d 441 (4th Cir. 2010) ............................................25

*Georgia-Pacific Corp. v. Great Plains Bag Co.*,
614 F.2d 757 (C.C.P.A. 1980) ...........................................36

*Henri's Food Prods. Co. v. Kraft, Inc.*,
717 F.2d 352 (7th Cir. 1983) ...........................................36

*Hodgdon Powder Co. v. Alliant Techsystems, Inc.*,
497 F. Supp. 2d 1221 (D. Kan. 2007)....................................34

*Hornady Manufacturing. Co. v. Doubletap, Inc.*,
746 F.3d 995 (10th Cir. 2014) ..........................................33

*Inc. Publishing Corp. v. Manhattan Magazine, Inc.*,
616 F. Supp. 370 (S.D.N.Y. 1985), *aff'd* 788 F.2d 3 (2d Cir. 1986)......36

*La Terra Fina USA, LLC v. TerraFina, L.L.C.*,
No. 17-cv-03613 NC, 2017 WL 4284167 (N.D. Cal. Sept. 27, 2017) .......37

*Lang v. Retirement Living Publ'g Co.*,
949 F.2d 576 (2d Cir. 1991) ............................................37

*Luigino's, Inc. v. Stouffer Corp.*,
170 F.3d 827 (8th Cir. 1999) ...........................................29

*Mushroom Makers, Inc. v. R.G. Barry Corp.*,
441 F. Supp. 1220 (S.D.N.Y. 1977), *aff'd*, 580 F.2d 44 (2d Cir. 1978)...35

*NEC Electronics v. New England Circuit Sales, Inc.*,
722 F. Supp. 861 (D. Mass. 1989) ...................................31, 35

*New Colt Holding Corp*,
312 F. Supp. 2d at 225 ..................................................34

*Passport Health, LLC v. Avance Health System, Inc.*,
823 F. App'x 141 (4th Cir. 2020) .......................................39

*Perini Corp. v. Perini Constr., Inc.*,
915 F.2d 121 (4th Cir. 1990) .........................................25, 33

*Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*,
130 F.3d 88 (4th Cir. 1997) ..........................................32, 38

iv

*Pignons S. A. de Mecanique de Precision v. Polaroid Corp.*,
   657 F.2d 482 (1st Cir. 1981) ......................................................................34

*Primepoint, L.L.C. v. PrimePay, Inc.*,
   545 F. Supp. 2d 426 (D.N.J. 2008) ..............................................................37

*Sara Lee Corp. v. Kayser-Roth Corp.*,
   81 F.3d 455 (4th Cir. 1996) ........................................................................36

*Sno-Wizard Manufacturing., Inc. v. Eisemann Products. Co.*,
   791 F.2d 423 (5th Cir. 1986) ......................................................................36

*Streamline Production Sys., Inc. v. Streamline Manufacturing., Inc.*,
   851 F.3d 440 (5th Cir. 2017) ......................................................................37

*Swatch AG v. Beehive Wholesale*,
   LLC, 739 F.3d 150 (4th Cir. 2014) ..............................................................31

*U.S. Search, LLC v. U.S. Search.com, Inc.*,
   300 F.3d 517 (4th Cir. 2002) ......................................................................25

*Valador, Inc. v. HTC Corp.*,
   241 F. Supp. 3d 650 (E.D. Va.), *aff'd*, 707 F. App'x 138 (4th Cir. 2017) .................25, 27, 32

*Visa International Service Ass'n v. Eastern Financial Credit Union*,
   24 USPQ2d 1365 (9th Cir. 1992) ................................................................36

*Wag'N Enters., LLC v. United Animal Nations*,
   No. 1:11-cv-955, 2012 WL 1633410 (E.D. Va. May 9, 2012) ..............................35

*What-a-Burger of Virginia. v. Whataburger, Inc.*,
   357 F.3d 441 (4th Cir. 2004) ......................................................................26

*Worsham Sprinkler Co. v. Wes Worsham Fire Protection, LLC*,
   419 F. Supp. 2d 861 (E.D. Va. 2006) ..........................................................37

**Federal Statutes**

Lanham Act § 32(1) ......................................................................................25

Lanham Act § 43(a) ......................................................................................25

**Other Authorities**

5 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
   § 32:137 (5th ed.) ....................................................................................36

Case 1:24-cv-00218-LCB-JEP    Document 39    Filed 04/11/25    Page 6 of 48

# I.   INTRODUCTION AND NATURE OF THE CASE

Founded in 1949, Sturm, Ruger & Co. ("Ruger") is one of the largest American firearm manufacturers. In 2017, Ruger began developing a rifle chambered in larger calibers typical of an AR-10-style rifle, but with the size and weight of a smaller modern sporting rifle ("MSR"). After considering various names, Ruger selected an initialism that aptly described the key features of its **S**mall-**F**rame **A**utoloading **R**ifle, or SFAR. A year-and-a-half after Ruger launched the SFAR, FN Herstal, S.A. and FN America, LLC ("FN") sued, claiming that Ruger's descriptive initialism violates FN's SCAR moniker, which itself is a descriptive acronym for **S**pecial Operations Forces **C**ombat **A**ssault **R**ifle—coined *not* by FN, but by U.S. Special Operations Command ("USSOCOM"). FN cannot prove a likelihood of confusion between these two descriptive names.

***First***, the names look different in the marketplace, are pronounced differently ("scar" vs. S-F-A-R), have different meanings, and are displayed with the parties' well-known housemarks— FN and RUGER—ensuring nobody confuses them

***Second***, the products differ. Ruger's SFAR is a large-caliber MSR in a compact frame. FN's SCAR is a premium battle rifle originally designed for the military. These differences are reflected in the parties' advertising, with FN promoting the military heritage of its FN SCAR and Ruger focusing on key features and specifications of the SFAR.

***Third***, the products are not impulse purchases; they are expensive, serious items that require thorough consideration before purchase. Knowledgeable and informed firearm consumers have specific tastes and make informed purchases—ensuring no confusion.

***Finally***, despite years of opportunities, nobody has actually been confused. Ruger retained a well-respected expert to test this, and no respondents confused the parties' names. FN did not offer a survey or proffer an expert to criticize Ruger's. nor has it produced any evidence showing actual confusion between these sophisticated and expensive firearms.

1

Ruger is thus entitled to summary judgment.

## II.    QUESTION PRESENTED

1.    Whether Ruger's use of the descriptive initialism SFAR (for **S**mall-**F**rame **A**utoloading **R**ifle) for an AR-style rifle is likely to cause confusion with FN's SCAR acronym (for **S**pecial Operations Forces **C**ombat **A**ssault **R**ifle) for a battle rifle.

## III.    UNDISPUTED FACTS

### A.    Ruger's History

1.    Ruger is one of the most well-known firearms manufacturers in the world and an iconic American brand that offers high-quality, good-value firearms. (Ex. 1[1] at 15, 18; Declaration of Robert Werkmeister ("Werkmeister"), ¶ 2.) FN's witnesses acknowledge the quality of Ruger's products. (Exs. 2-4.)

2.    Ruger annually receives many thousands of communications from actual and potential customers. (Werkmeister, ¶ 5.)

3.    Roughly 95% of Ruger's sales are in the commercial market. (*Id.*, ¶ 3.) Ruger has infrequently sold firearms to the military and does not promote its products as having a military heritage or connection. (*Id.*)

4.    Ruger's marketing emphasizes the company's traditional values and roots:

---

[1] Exhibits 1-170, cited herein, are exhibits to the Declaration of Patrick Rodgers ("Rodgers") and are separated out by Fact for the Court's convenience.



(*Id.*, ¶ 6, Exs. A-C[2]; Ex. 1 at 15-17.)

     5.    Ruger's advertising also highlights its "innovative designs and product specifications" without "sensationalizing[ing] the product or its use." (Werkmeister, ¶ 7, Ex. D.) Ruger's commitment to safety and responsibility is reflected in its tagline "Arms Makers for Responsible Citizens." (*Id.*)

     6.    From its history, advertising, and industry attention, the RUGER brand is highly recognized and trusted. (Ex. 1 at 18.) FN's witnesses agree that Ruger is well-known. (Exs. 5-9; Ex. 171.)

---

[2] Exhibits A-W, cited herein, are exhibits to the Declaration of Robert Werkmeister ("Werkmeister").

### B.    FN's Military Heritage

7.      FN's roots lie in the military. FN's Belgian parent began in 1889 as Fabrique Nationale d'Armes de Guerre (National Factory of War Weapons) to make rifles for the Belgian government. (Ex. 1 at 19; Ex. 10.)

8.      FN began manufacturing in the United States mainly to compete for government contracts and has since received U.S. military contracts for numerous firearms, including FN SCARs. (Ex. 1 at 19.)

9.      FN capitalized on its military operations by making commercial versions of military firearms (including the FN SCAR) and promoting their military roots. (*Id.*) FN also made a "Military Collectors Series"—civilian-legal clones of FN military guns. (*Id.*)

10.      FN has emphasized its military connection in advertising, on its website, in catalogs, and at trade shows. (Facts 19-29.)



### C. USSOCOM's SCAR Acronym

11. In 2004, USSOCOM solicited bids for a new military combat assault rifle. (Exs. 11-12.)

12. The solicitation described the type of rifle sought, and the program as, SCAR, or **S**pecial Operations Forces **C**ombat **A**ssault **R**ifle. (Exs. 12-16.)

13. In November 2004, FN won the SCAR contract. (Ex. 17.) The guns were designated the Mark 16 and 17—both "of the SCAR design." (Ex. 18.)

#### 1. Recognition of the SCAR Abbreviation

14. USSOCOM's SCAR program generated media attention. Numerous articles recount the program's history—referring to SCAR as an abbreviation for **S**pecial Operations Forces **C**ombat **A**ssault **R**ifle (Ex. 19) and to other manufacturers' submissions as SCARs as well. (Exs. 20-23.)

#### 2. FN's Promotion of the SCAR Acronym

15. FN revealed its military-grade SCAR prototypes to the public at the 2006 SHOT Show.[3] (Ex. 16 at 5; Ex. 18.)

16. Shortly after, in a press release, FN referenced SCAR as an abbreviation for "SOF Combat Assault Rifle," USSOCOM's competition as the "SCAR program," and repeatedly used SCAR descriptively to identify the type of rifle sought through the SCAR program. (Ex. 16; Exs. 25-26.)

17. FN also promoted the SCAR meaning in brochures and magazines. (Ex. 27.)

18. Many in the industry continue to reference the descriptive meaning of the SCAR acronym. (*See* Exs. 28-30.).

---

[3] SHOT Show is the largest and most comprehensive trade show for professionals in the firearms industry. (Ex. 24.)

### D. Military Ties to FN's Commercial SCAR

19. In 2008, FN converted its military SCAR into a commercial version. (Exs. 32-33.)

20. The first commercial FN SCARs were designated the SCAR 16S and 17S—combining the military designations Mark 16 and 17 with SCAR. (*Id.*, Ex. 34.) FN did this "to tie … the commercial version [to] its military counterpart by using the same name." (Ex. 35.)

21. A selling point of the FN SCAR 16S and 17S was that they were virtually identical to their military counterparts. (Exs. 36-37.)

22. FN has heavily promoted its military reputation and the military origins of its commercial SCAR. (Ex. 38.)

23. In a 2016 press release, FN touted its "Battle-Proven Military Heritage" at the SHOT Show, where FN "display[ed] the company's full product line," including the "FN SCAR." (Exs. 39-40.) This was done to promote FN's "military roots." (Ex. 41.)

24. Through at least November 2020, FN's corporate tagline, used for FN's SCAR, was "The World's Most Battle-Proven Firearms." (Ex. 40; Ex. 42.) This conveyed that FN "started off in the military" (Ex. 43) and was used in all facets of FN's business, including products, stickers, patches, and catalogs (Ex. 1 at 20, 22-23).





*2018*





*2019*

7

25.     FN has promoted other taglines conveying its military heritage, like "Military-Born, Forged by the Battlefield" and "Forged From Freedom, Born on the Battlefield." (Exs. 44-45.)

26.     In 2017, FN released its "FN Anthem" marketing video, which is still publicly available on FN's YouTube channel. (Ex. 46.) The video—promoted at important events, including the NRA and SHOT shows (Ex. 1 at 21)—showcases FN's military history, including related to the FN SCAR, and features the "World's Most Battle-Proven Firearms" tagline. (*See id.*; Ex. 47.)



27.     In 2017, FN boasted its "New, Responsive Website to Showcase Battled-Proven Products" for "customers to know that FN currently supplies the majority of the U.S. military's small arms and applies the same level of pride, craftsmanship and quality control standards to all of our firearms." (Ex. 1 at 22; Ex. 48.)

28.     Still today, with its new tagline—Carry the Future—FN promotes its military connection, categorizing its "calling" as:

8

From a lone U.S. soldier hidden on a hilltop somewhere behind enemy lines to the young mom in a suburban home who's just put her children to bed to the officer heading out on a call in the dark of night, at FN America, we understand every mission is unique.

(*Id.*, Ex. 1 at 23; Ex. 49.)

29. FN's current catalog touts its firearms' durability given their military heritage: "Built to Handle The Battlefront and now available on the home front, FN firearms are as tough, accurate, and reliable in your hands as they are in the hands of our nation's protectors." (Ex. 50; Ex. 51 at 5; Ex. 1 at 24.) FN promotes its commercial FN SCAR with military imagery:



(Ex. 51 at 65-66; Ex. 1 at 24.)

### E. FN in SCAR Advertising

30. FN's housemark (below) "helps people identify [FN]" (Ex. 55); is "representative of [its] brand, company, and products" (Ex. 52; Ex. 53 at 13); and is "the foundation to [FN's] identity and exists on a wide variety of media and marketing materials in all [of FN's] activities" (Ex. 54; Ex. 53 at 13).

9



31.     The housemark appears on every page of FN's website.[4] (*See* Ex. 56.) One page promotes different forms of FN's housemark. (Ex. 57.) There is no corresponding page for FN's product names.

32.     As shown below, FN promotes SCAR on its website in a lock-up with FN, as "FN SCAR." (Ex. 58; Ex. 56.) So too in FN's catalog. (Ex. 51 at 2, 61, 65, 67, 69.)





---

[4] FN controls and approves everything on its website. (Ex. 59.)

33.     FN has not produced *any evidence* where it has promoted SCAR *without* FN somewhere in the piece. (Ex. 60.)

34.     FN displays a "pretty big" FN logo on its industry-event booths because it is "important that people know FN" and "for them to see the FN brand and know that they're talking with FN." (Ex. 61.) FN's representatives wear FN-branded apparel at its booths. (Ex. 62; Ex. 63 at 16.)



(*Id.*, Ex. 1 at 21.)

35.     FN's SCARs are stamped with FN, as required by law, and have a tag bearing the FN mark. (Ex. 64.)

**F.     Pricing of FN's SCAR**

36.     FN's commercial SCAR is a "premium battle rifle" (Ex. 65) "striving to be a premium brand in the marketplace" (Ex. 66) and is "priced appropriately to that" (Ex. 65).

37.     People have called the FN SCAR "expensive." (Ex. 67.) It is "more expensive than other rifles that are also in the same segment." (Ex. 68.) FN's product manager regularly hears

11

people say, "they'd love to buy an FN SCAR, but they just can't afford it." (Ex. 69; Ex. 70.) FN's industry expert has heard the same. (Ex. 71.)

38.     The Manufacturer's Suggested Retail Price ("MSRP") for the FN SCAR ranges from $3,699-$4,999. (Ex. 72; Ex. 73 at 6.) Special-edition SCARs are more expensive. (Ex. 74; Ex. 75 at 1, 4, 10, 13, 22, 28.) The MSRP for the SCAR has generally increased over time. (*Compare* Ex. 73 *with* 75-80.)

39.     FN sets minimum advertised prices ("MAPs") for the FN SCAR. (Ex. 81-82.) This ensures "retailers don't compete against each other and create … a price war." (Ex. 83.) The MAPs for the FN SCAR range from $3,299-$4,499 and have also generally increased. (*Compare* Ex. 73 *with* 75-80.)

### G.     Ruger's SFAR

40.     Around 2017, Ruger began developing a rifle that chambers the smaller and lighter AR-15 frame in larger calibers typically reserved for the larger-framed AR-10s.[5] (Exs. 84-85; Werkmeister, ¶ 9.)

41.     Ruger considered and rejected various names for this rifle. (Exs. 87-88; Werkmeister, ¶ 10.) All the while, Ruger internally described the rifle as a small-frame AR (or autoloading rifle). (Exs. 89-90; Werkmeister, ¶ 10.)

42.     Ruger frequently uses "descriptive" product names and "often lean[s] on them being initialisms." (Ex. 91; Werkmeister, ¶ 8.)

---

[5] An AR-10 is a larger, heavier rifle chambered in more powerful calibers. The AR-15 shares characteristics of the AR-10, but is smaller, lighter, and chambered for smaller calibers. This key difference—cartridge size—makes the AR-10 larger, heavier, and better for long-range shooting and larger-game hunting, while the AR-15 is smaller, lighter, and better for smaller game, target practice, and close-to-medium range shooting. (Ex. 1 at 27; Ex. 86.)

12

43.     Following this practice, in late 2021, Ruger chose the name SFAR, or **S**mall-**F**rame **A**utoloading **R**ifle, for its new rifle to describe and extoll the firearm's most significant virtue— an *autoloading rifle* chambered for larger calibers but offered in the *small frame* of an AR-15. (Exs. 93-95; Werkmeister, ¶ 10.)

44.     Ruger promotes this meaning in advertising, as shown below. (*See* Werkmeister, ¶ 12, Exs. E-F.)



45.     Ruger never considered FN or the FN SCAR when choosing the SFAR name. (Werkmeister, ¶ 11.) Indeed, when identifying potential competitors to this rifle, Ruger did not list FN. (*Id.*; Ex. 96.)

46.     Ruger launched the Ruger SFAR on September 6, 2022. (Ex. 97; Werkmeister, ¶ 16, Ex. M.) Ruger initially offered two models, with different configurations released later. (Ex. 98; Werkmeister, ¶¶ 16-17, Ex. E.) For each, the foundation is the same—an MSR chambered for larger calibers with a frame comparable to the smaller, lighter AR-15. (Exs. 99-100; Werkmeister, ¶ 17.)

47.     The Ruger SFAR has an MSRP between $1,329-$1,399. (Ex. 93; Werkmeister, ¶ 18.)

### 1. Differences Between the Products

48. There are significant differences between the Ruger SFAR and FN SCAR—as recognized by both FN's product manager and industry expert. (Exs. 101-102.)

49. The FN SCAR and Ruger SFAR are different types of rifles. The FN SCAR is "a premium battle rifle" (Ex. 103) and is *not* an AR-style rifle like the Ruger SFAR. (Exs. 104-105.)

50. Further:

- The FN SCAR uses a short-stroke piston system; the Ruger SFAR uses a direct-impingement system. (Ex. 106; Ex. 1 at 55.)

- On the FN SCAR, the *upper receiver* is legally the firearm; on the Ruger SFAR, it's the *lower receiver*. (Exs. 107-108; Ex. 1 at 55.)

- The FN SCAR's one-piece upper receiver extends to comprise the handguard; the Ruger SFAR's handguard is attached to a smaller, separate upper receiver. (Exs. 109-110; Ex. 1 at 60.)

- The FN SCAR has a two-position gas block; the Ruger SFAR's gas block has three settings. (Exs. 111-112; Ex. 1 at 62.)

- The FN SCAR has a foldable stock; the Ruger SFAR does not. (Exs. 113-114; Ex. 1 at 57-58.)

- The FN SCAR's handguard is rectangular and only extends partially down to the barrel; the Ruger SFAR's handguard is octagonal and extends most of the length of the barrel. (Exs. 115-116; Ex. 1 at 61.)

- The FN SCAR's charging handle is in the middle of the receiver; the Ruger SFAR's is in the rear. (Ex. 117.)

14

### 2. Advertising of the Ruger SFAR

51.    Ruger's advertising of the SFAR is simple, informative, and feature-rich.

52.    Ruger prominently displays its well-known RUGER housemark either immediately before or above SFAR or somewhere in the advertisement. (Werkmeister, ¶ 21, Exs. F, O-P.)



*Website*



*Online*

15



*Print*



*Email*

16



*Instagram*

53.     The RUGER brand also appears on and with its firearm. Each Ruger SFAR is stamped with the RUGER name three times (Werkmeister, ¶ 22, Ex. Q), comes in a RUGER-branded box containing branded materials (*Id.*, ¶ 23, Exs. C, R-S), and comes with multiple tags prominently displaying the RUGER name and logo (*Id.*, ¶ 24, Ex. T).



54.     At trade shows, the RUGER name and logo appear in giant font on its booth, where representatives wear branded apparel and introduce themselves as working for Ruger. (*Id.*, ¶ 25, Ex. U.)

17



55.     Ruger's firearms, including the Ruger SFAR, are often displayed by retailers in "stores-within-stores"—separately branded RUGER sections featuring only Ruger's products:



(*Id.*, ¶ 26, Ex. V.) In all retail environments, Ruger's SFAR is prominently labeled with RUGER branding on the rifle and multiple product tags. (*Id*, ¶ 26, Ex. W.)

18



### 3. Pronunciation of SFAR

56.     Since SFAR is an initialism for Small-Frame Autoloading Rifle, it is properly pronounced as four letters—not a single word. (*Id.*, ¶ 12; Ex. 118.)

57.     In public introduction videos for the Ruger SFAR, Ruger's product manager demonstrates the proper pronunciation—S-F-A-R. (Werkmeister, ¶ 14, Exs. H-L; Ex. 119.)

58.     Ruger's verbal communications with distributors consistently reinforce the S-F-A-R pronunciation. (Werkmeister, ¶ 15; Ex. 120.)

59.     The public is also aware of the proper pronunciation, as shown in numerous videos of individuals reviewing Ruger's SFAR and pronouncing it S-F-A-R. (Exs. 121-128; Werkmeister, ¶ 13, Ex. G.)

### a. FN's Pronunciation Investigation

60.     FN contends that SFAR is pronounced as a single word. Other than one YouTube video, FN has not produced *any evidence* that anybody, beyond FN's own witnesses and lawyers, has pronounced "SFAR" as a single word.

61.     FN hired a private investigator to assess the pronunciation of SFAR. (Ex. 129.) After attending three trade shows and contacting eleven retailers who sell the Ruger SFAR, the investigator did not locate anyone who pronounced SFAR as a single word. (Ex. 130.) Rather, six people pronounced it as S-F-A-R, and the other six pronounced it as S-FAR. (Ex. 131.)

### H.     The High Care for Firearm Purchases

62.     According to FN, "[f]or most buyers, every firearm may be considered a luxury product or luxury purchase." (Ex. 132.) Firearms are "consumer-durable" products,[6] and FN notes "any consumer buying a durable good is going to do research before they make a purchase." (Exs. 134-36.) Indeed, "it's understandable for any consumer who buys a product that's … not a consumable good, that they may do substantial research before they make that purchase," and more so for firearms given their potential risks. (Ex. 137.)

63.      Research before a firearm purchase might involve multiple sources, like a "company's website, third-party websites, YouTube channels, reviewers, industry media, such as gun magazines, other nonprint media, web-based [material,] talking to people at gun shops, because that is someone they can talk to one-on-one who's in the industry," and more. (Ex. 138.)

64.     Numerous considerations go into firearm purchases. For example, consumers consider what type of firearm they are buying and the role it will fill (Ex. 139), their experience

---

[6] "Consumer-durable" products last long and are not intended to be bought often, e.g., cars. (Ex. 133.)

level (Ex. 140), brand reputation (Ex. 141), price (Ex. 142), type of action (Ex. 143), caliber (Ex. 144), and specific features (Ex. 145), among other things (Ex. 1 at 9-11.)

65.     This research was born out by FN's own SCAR Buyer Study (Ex. 146; Ex. 147) and an industry study which FN has relied upon, conducted by the well-respected National Shooting Sports Foundation. Portions of the study appear below (Exs. 148-150; Ex. 1 at 11-14.)





66. Barriers to entry make purchasing a firearm more difficult, including purchaser-age and background-check requirements. (Ex. 151.) Oftentimes, particularly for rifles like the FN SCAR and Ruger SFAR, purchasers cannot hold—let alone purchase—the firearm without first speaking with a store representative since the firearms are kept out-of-reach. (Ex. 152.)

## I.    Similar Third-Party Uses

67. At least the following companies use a name comprising the letters "S"+letter+"AR," like Ruger's SFAR (*see* Ex. 1 at 64-65):

- McMillan Firearms' STAR rifle (Ex. 153);

- Ferfrans' SOAR rifle (Exs. 154-156);

- Strike Industries' SIAR rifle (Exs. 157-158);

- Slide Fire's SSAR-15 rifle stock (Ex. 159);

- SAAR Corporation, a federally licensed contract manufacturer of precision firearms (Ex. 160);

- Stratus Armament's SQAR rifle sliding sleeve (Ex. 161); and

- SAR Firearms, who offers several SAR-branded firearms (Ex. 1 at 65).

## J.    FN's Delay

68. On October 6, 2022, FN sent Ruger a demand letter. (Ex. 162.) Ruger responded on October 21, denying liability. (Ex. 163.) FN responded on November 8. (Ex. 164.)

69. Counsel then exchanged emails and had multiple calls, last speaking on March 16, 2023, regarding FN's objection. (Rodgers, ¶ 166.)

70. Thereafter, FN sat silent until filing its complaint on March 12, 2024. (*Id.*) During that *entire year*, Ruger believed FN had dropped its objection.

### K. Consumer Survey Showing No Confusion

71. Ruger retained well-respected expert Hal Poret (who has implemented over 1,000 surveys and whose opinions have been admitted in courts nationwide) to conduct a consumer survey testing whether Ruger's use of SFAR creates a likelihood of confusion with FN and/or its SCAR. (Ex. 165 at 3.)

72. The survey utilized the well-established *Eveready* methodology—considered the "gold" standard for likelihood-of-confusion surveys—and questioned purchasers and prospective purchasers of semi-automatic rifles in the price range of Ruger's SFAR. (*Id.* at 6, 22-26.) The *Eveready* format is ideal for assessing confusion because "it involves exposing respondents to Ruger's use of SFAR as it is used in the actual marketplace … and determining whether respondents make a mistaken connection to FN or its SCAR mark/products." (*Id.* at 7.)

73. To simulate realistic consumer exposure to Ruger's use of SFAR, the survey used three different groups, testing the different ways consumers might encounter Ruger's rifle. (*Id.* at 7.) The first presented Ruger's rifle as it appears in third-party-retailer online ads and shopping pages—particularly those with a headline and image without a detailed description, or where someone does not scroll down to review the description. (*Id.* at 8.) The second presented Ruger's rifle as it appears in webpages containing SFAR in the headline and product description. (*Id.* at 10-11.)[7] The third presented an image of the actual rifle and one of its tags.[8] (*Id.* at 11.) Respondents were shown a close-up image of the rifle where SFAR appears—simulating encounters in retail environments, which typically involve seeing the rifle up-close and with a tag. (*Id.* at 12.)

---

[7] Using presentations from third-party retailers, rather than Ruger's website favored FN because the website has the most prominent emphasis on RUGER. (Ex. 165 at 11.)

[8] The tag presentation also favored FN because it showed the side with SFAR in large letters and Ruger in much smaller letters (the other side just shows RUGER). (Ex. 165 at 12, n 8.)

74.     The survey included three control groups, which replaced SFAR with the non-infringing SFSR. (*Id*. at 16.)

75.     When presented with SFAR and asked a series of accepted questions to assess confusion, 0% of respondents mentioned FN or its SCAR mark/products. (*Id.* at 38-42.) Most correctly named Ruger as the rifle's maker, with a small number naming other gun companies—like Colt and Smith & Wesson—but not FN. (*Id*. at 38, 41.)

76.     Mr. Poret concluded "[t]he absence of any confusion across a robust sample size of 300 Test Group respondents across three different scenarios tested is very powerful proof that consumers are not confused by Ruger's use of SFAR. Based on the survey results, it is my opinion that Ruger's use of SFAR does not create a likelihood of confusion with FN or its SCAR mark." (*Id.* at 43.)

77.     FN did not present its own survey or an expert to critique Poret's survey.

78.     The survey's result is consistent with Ruger's experience. In the two-and-a-half years Ruger has sold its SFAR, it is not aware of any confusion.

## IV.     ARGUMENT

### A.     The Material Facts Are Undisputed and/or Indisputable

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is not a "disfavored procedural shortcut," but an integral part of the process, designed to secure a just, speedy, and inexpensive determination. *Id.* at 327.

Summary judgment is appropriate in trademark cases as in any other case. *See*, *e.g.*, *George & Co. v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009) (affirming grant of summary judgment for defendant); *CFA Inst. v. Am. Soc'y of Pension Pros. & Actuaries*, No. 3:19-CV-

24

00012, 2020 WL 6507391, at *5 (W.D. Va. Nov. 5, 2020) (granting summary judgment for defendant); *Customer Co. v. E-Commerce Today, Ltd.*, 106 F. Supp. 2d 869, 872 (W.D. Va. 2000) (same); *Valador, Inc. v. HTC Corp.*, 241 F. Supp. 3d 650, 670-71 (E.D. Va.) (same), *aff'd*, 707 F. App'x 138 (4th Cir. 2017).

### B.       Ruger Is Entitled to Summary Judgment

FN's claims all turn on whether "an appreciable number of ordinarily prudent purchasers will be misled" or confused. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 127 (4th Cir. 1990) (citation omitted); *see also U.S. Search, LLC v. U.S. Search.com, Inc.*, 300 F.3d 517, 523 n.5 (4th Cir. 2002) (stating tests for infringement under Sections 32(1) and 43(a) of Lanham Act are the same); *Georgia Pacific Consumer Products v. Von Drehle Corp.*, 618 F.3d 441, 449 (4th Cir. 2010) (stating tests for federal and North Carolian infringement are the same). A mere possibility of confusion is insufficient; there must be a *substantial likelihood* that the public will be confused as to the source of the goods. *AMP, Inc. v. Foy*, 540 F.2d 1181, 1186 (4th Cir. 1976). In assessing confusion, courts look to "how the two parties actually use their marks *in the marketplace*." *CareFirst of Maryland., Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006) (emphasis added). The Fourth Circuit considers the following factors:

1. strength or distinctiveness of plaintiff's mark;
2. similarity of the marks;
3. similarity of the goods;
4. similarity of the facilities;
5. similarity of the advertising;
6. defendant's intent;
7. actual confusion;
8. quality of the defendant's product; and
9. sophistication of the consuming public.

*George*, 575 F.3d at 393. "Not all of these factors are of equal importance, 'nor are they always relevant in any given case.'" *Id.* at 393 (citation omitted).

25

Here, significant differences in the marks' appearance, sound, and meaning (when viewed in the marketplace), including the prominent and conspicuous uses of their well-known housemarks; differences between the firearms; differences in how the marks are advertised; sophistication of the parties' consumers and the extensive research and care they employ when buying firearms; weakness of FN's asserted SCAR mark; and absence of any confusion despite many opportunities over years, combined with Ruger's survey, all compel a finding of no likelihood of confusion as a matter of law.

### 1. The Marks Are Dissimilar

Mere use of a mark that is similar or even identical to a registered trademark does not, alone, establish infringement. *What-a-Burger of Virginia. v. Whataburger, Inc.*, 357 F.3d 441, 450 (4th Cir. 2004). To determine whether marks are similar, the challenged use is examined "in the context in which it is seen by the ordinary consumer." *CareFirst*, 434 F.3d at 271. A "side-by-side comparison of the marks without regard to the marketplace in which they are used" is inappropriate. *What-a-Burger,* 357 F.3d at 450. If one mark is "commonly paired with other material, that pairing" will lessen confusion. *CareFirst*, 434 F.3d at 271.

Here, the parties' marks virtually always appear with their well-known housemarks—RUGER and FN—leaving no room for mistake about who makes either rifle. (Facts 30-35, 52-55.)

*Colt Defense LLC v. Bushmaster Firearms, Inc.* (*Colt Defense*) is instructive. No. 04-cv-240, 2005 WL 2293909 (D. Me. Sept. 20, 2005). Colt accused Bushmaster of infringing its COMMANDO and COLT AR-15 marks given Bushmaster's use of COMMANDO and AR-15 for firearms. *Id.* at *5, 26. On summary judgment, the court found no likelihood of confusion. *Id.* at *29. Discussing similarity, the court noted that although Bushmaster was using marks "identical" to Colt's, the similarity factor weighed *against* likely confusion largely because Bushmaster

26

always used its BUSHMASTER housemark with its accused names, including in advertising and when speaking to consumers. *Id.* at 26.

So too here. Ruger stamps each of its SFAR firearms with the well-known RUGER housemark three times (Fact 53); prominently displays RUGER in its advertising, including on its website, in its brochures, and at trade shows (Facts 52-55); and makes it clear to customers they are dealing with Ruger (Fact 54).

Like in *Colt Defense*, courts in this Circuit regularly hold that uses of housemarks can avoid likely confusion—even on the same or closely related products. *CareFirst*, 434 F.3d at 271 (holding that, although the marks CareFirst and First Care were "mirror images of one another; thus the bare text of the two [was] similar," the marks were different in the marketplace because CAREFIRST was almost always paired with "Blue Cross Blue Shield"); *Valador*, 241 F. Supp. 3d at 664 (finding two VIVE marks different even though they were "textually similar" because plaintiff's mark was used with its logo and defendant's mark "almost always appear[ed] next to defendants' stylized 'HTC' and 'SteamVR' trademarks and a neon blue triangle"); *Fuel Clothing Co. v. Nike, Inc.*, 7 F. Supp. 3d 594, 616 (D.S.C. 2014) (no likely confusion between NIKEFUEL and NIKE+FUELBAND and FUEL "because Nike's use of 'Fuel' is always paired with the 'NIKE' house mark, the 'swoosh' mark, or the 'NIKE+FUELBAND' mark," which "[s]ignificantly reduce[s] the likelihood of confusion, notwithstanding their textual similarity"). The result should be no different here.

Beyond the parties' housemarks, SFAR and SCAR differ visually, aurally, and in meaning. *See George*, 575 F.3d at 396 (the similarity factor "focus[es] on whether there exists a similarity in sight, sound, and meaning which would result in confusion").

First, Ruger's SFAR and FN's SCAR appear in meaningfully different fonts, colors,

layouts, and sizes, e.g.:








(Facts 32, 51-55.) *See George*, 575 F.3d at 396 (different packaging and branding on similar products held sufficient to distinguish marks). *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir. 1999) ("[t]he use of different colors and typefaces, as well as the prominent display of the house marks convey perceptible distinctions between the products.").

Second, the parties advertise their firearms differently. When comparing advertising, courts consider various factors, including their appearance and content. *CareFirst*, 434 F.3d at 273. Both are distinct here. FN has emphasized its military heritage, using imagery of soldiers and military-themed taglines to promote its FN SCAR (Facts 19-29), as shown in its most recent catalog:



In contrast, Ruger, has no such military heritage and does not promote (and has not promoted) its products as such. (Fact 3.) Far from it, Ruger focuses on product features and specifications (over sensationalized imagery) and often leans into a Western—not a battled-hardened—marketing theme:

29







(Facts 4-5, 51-52.) These differences in advertising further differentiate the parties' marks.

Third, Ruger's use of an "F" in SFAR (contrasted with FN's use of a "C" in SCAR) changes the visual appearance of the terms. As with the names MARY and MARK, one letter can make a

big difference. *See Florida Int'l Univ. Bd. of Trustees v. Florida Nat'l Univ., Inc.*, 830 F.3d 1242, 1258 (11th Cir. 2016) (affirming that FIU and FNU acronyms, while similar in sound and appearance, were not confusingly similar); *NEC Electronics v. New England Circuit Sales, Inc.*, 722 F. Supp. 861, 865-67 (D. Mass. 1989) (finding, on summary judgment, no likely confusion between NEC and NECS).

Fourth, Ruger's use of an "F" in SFAR also impacts how the mark is pronounced. FN's SCAR is pronounced as the word "scar." Ruger's SFAR, on the other hand, is not a word in the English language and is pronounced either as S-F-A-R (with each letter pronounced individually) (Fact 56-59), or, less commonly, S-FAR (Fact 61). *B.V.D. Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727, 728-29 (Fed. Cir. 1988) (finding no likely confusion between BVD and BAD "with or without" periods because consumers likely view the junior mark as the word "bad"—not a simulation or suggestion of the mark BVD); *Basic American Medical, Inc. v. American Medical Int'l, Inc.*, 649 F. Supp. 885, 891 (S.D. Ind. 1986) (finding no likely confusion between the acronyms AMI and BAMI because, when referring to AMI orally, it was spelled out, whereas the BAMI acronym was pronounced "Bammy").

Fifth, Ruger's SFAR and FN's SCAR have different meanings. SCAR is an acronym for "**S**pecial Operations Forces **C**ombat **A**ssault **R**ifle." (Facts 11-18.) SFAR, on the other hand, is an initialism for **S**mall-**F**rame **A**utoloading **R**ifle. (Facts 43-44.) *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 160 (4th Cir. 2014) ("It would be apparent to an average consumer that SWATCH and SWAP: 1) look different when written; 2) sound different when spoken; and 3) have completely different meanings in common usage.")

These multiple differences serve to avoid likely confusion.

31

## 2. SCAR Is Entitled to Limited Protection

A mark's strength is measured conceptually and commercially. *CareFirst*, 434 F.3d at 269 (citation omitted). In both respects, SCAR is weak.

Conceptually, descriptive acronyms are not strong. *CFA Inst.*, 2020 WL 6507391, at *5 (CFA acronym for "Chartered Financial Analyst" found "quite generic"); *Valador*, 241 F. Supp. 3d at 662 (VIVE, an acronym for "Valador Immersive Visualization Environment," found not particularly strong); *George*, 575 at 395 n.12 (doubting whether the abbreviation "LCR" for "Left Center Right" could be conceptually strong).

Commercially, courts ask if "a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." *CareFirst*, 434 F.3d at 269 (citation omitted). Evidence of third-party uses of similar marks for related products is relevant to show that a mark is commercially weak. *See, e.g.*, *Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 93 (4th Cir. 1997) ("The frequency with which a term is used in other trademark registrations is indeed relevant….").

SCAR is conceptually and commercially weak. Conceptually, SCAR is a descriptive acronym that is "not particularly strong." *Valador*, 241 F. Supp. 3d at 662. FN's SCAR mark was originated by USSOCOM as an abbreviation for "**S**pecial Operations Forces **C**ombat **A**ssault **R**ifle to describe the weapons it was soliciting. (Facts 11-13.) Many acknowledged this descriptive meaning (Fact 14), and FN promoted it. (Fact 15-17.) Consequently, the public has come to recognize SCAR is associated with the phrase "**S**pecial Operations Forces **C**ombat **A**ssault **R**ifle." (Fact 18.) Indeed, based on this same evidence, FN's SCAR was deemed descriptive. *FN Herstal v. Clyde Armory, Inc.*, 123 F. Supp. 3d 1356, 1372 (M.D. Ga. 2015), *aff'd* 838 F.3d 1071 (11th Cir. 2016) ("Because SCAR is used pervasively by the media and FN in connection with 'Special

32

Operations Forces Combat Assault Rifle,' or some close variant thereof, the Court finds that SCAR is merely descriptive of a type of firearm."). That result should follow here.

FN's SCAR is also commercially weak given its coexistence with multiple other firearm marks that are no less similar—and in many cases more similar—than Ruger's SFAR. (Fact 67.) Because FN SCAR is conceptually weak to start, these third-party uses further demonstrate that SCAR is entitled to a narrow scope of protection that does not extend to Ruger's SFAR initialism.

### 3. Firearm Buyers Are Sophisticated and Careful

"[T]he sophistication and expertise of the usual purchasers can preclude any likelihood of confusion among them stemming from the similarity of trade names." *Perini Corp.*, 915 F.2d at 127 ("Although no one factor is dispositive of the 'likelihood of confusion' inquiry, the sophistication and expertise of the usual purchasers can preclude any likelihood of confusion among them stemming from the similarity of trade names.") (collecting cases). That is so here, as the parties' consumers are knowledgeable, sophisticated, and exercise considerable research, care, and deliberation when buying firearms.

Not surprisingly, several courts have deemed firearm buyers highly sophisticated and careful. For example, in *Colt Defense*, the court found purchasers of commercial firearms "are generally sophisticated and knowledgeable about the products they buy" because "[t]hey often have an interest in firearms generally, [] they conduct research before purchasing a weapon[,]," and "[t]hey also are typically very familiar with the firearms they own and know the differences between the various manufacturers and their products." 2005 WL 2293909, at *9; *Hornady Manufacturing. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1006-07 (10th Cir. 2014) (finding court "correctly weighed" consumer care in defendant's favor on summary judgment because plaintiff "ha[d] not presented any evidence that consumers commonly succumb to impulses and purchase [firearm] ammunition carelessly" and defendant submitted evidence that "the purchase of

33

ammunition would constitute a high involvement purchase decision, that is, one in which the consumer gives careful consideration to both the products and brand names being offered"); *Hodgdon Powder Co. v. Alliant Techsystems, Inc.*, 497 F. Supp. 2d 1221, 1231 (D. Kan. 2007) (finding "[m]ost consumers are likely to take great care in making sure they have the proper gunpowder to make their ammunition" because "[b]y its vary nature, reloading ammunition can be dangerous").

So too here, the end consumers of the parties' rifles are knowledgeable about the firearms they are buying and engage in substantial pre-purchase research. (Facts 62-63.) They also consider various factors, including firearm caliber, type, function, quality, safety, price, brand, and more. (Facts 64-65.) Additionally, most often, consumers *cannot purchase* the parties' firearms without first speaking to a store clerk, as they cannot be handled without assistance. (Fact 66.)

This extensive research makes sense considering the high price of the parties' respective firearms, with an MSRP between $1,329-$1,399 for the Ruger SFAR and around $3,000-$5,000 for the FN SCAR. (Facts 36-39, 47.) *See New Colt Holding Corp*, 312 F. Supp. 2d at 225 (finding consumers sophisticated because the revolvers at issue were a "significant investment," ranging from "$375 to over $1,900"); *Pignons S. A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 489 (1st Cir. 1981) (finding no likely confusion between plaintiff's expensive ($550-$1,400) cameras and defendant's less expensive ($188-$233) cameras; "Sophisticated consumers may be expected to exercise greater care.").

Further, the parties' distributors and retailers are unquestionably sophisticated and highly knowledgeable. *See Colt Defense*, 2005 WL 2293909, at *9 (finding on summary judgment "[t]he licensed firearms dealers from whom commercial purchasers buy firearms are very knowledgeable

34

about the products they sell, and they sometimes guide customers toward products that best suit the purchaser's needs").

Given the highly sophisticated nature of the parties' customers and the extensive research and care that goes into purchasing their rifles, this factor favors no likelihood of confusion. *NEC Elecs.*, 722 F. Supp. at 865, 867 (no likely confusion between NEC and N because sophisticated purchasers "unlikely to confuse" the two).

### 4. Ruger's Survey Shows No Likely Confusion, and There Is None After Two-and-a-Half Years

Surveys are regularly used and accepted "to show the presence or absence of actual consumer confusion." *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 571 F. Supp. 3d 185, 207 (S.D.N.Y. 2021). Although likelihood of confusion is the key issue in FN's case, and even though it retained other experts (one who charged over $100,000), FN failed to submit a survey. This "severely hampers" FN's claims. *See George & Co., LLC v. Imagination Entertainment Ltd.*, No. 1:07-cv-0498, 2008 WL 2883771, at *3 (E.D. Va. July 25, 2008), *aff'd*, 575 F.3d 383 (4th Cir. 2009) (holding on summary judgment that, because "George bears the ultimate burden of proving a likelihood of confusion by a preponderance of the evidence, the lack of survey evidence, while not fatal, severely hampers George's ability to meet that burden"); *see also Wag'N Enters., LLC v. United Animal Nations*, No. 1:11-cv-955, 2012 WL 1633410, at *20-22 (E.D. Va. May 9, 2012) (plaintiff's failure to produce a survey or evidence of actual confusion weighed heavily against a finding of infringement; granting summary judgment for defendant); *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 441 F. Supp. 1220, 1231 (S.D.N.Y. 1977), *aff'd*, 580 F.2d 44 (2d Cir. 1978) (chiding party for failing to present survey because it was "a substantial corporation with the means to have undertaken either a survey or an investigation to establish instances of actual consumer confusion").

35

Ruger retained a leading expert to conduct a confusion survey,[9] which netted 0*%* confusion—confirming what Ruger expected from the start: confusion is unlikely. This unrebutted result is potent evidence that there is no likelihood of confusion. *See Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 n. 15 (4th Cir. 1996) ("survey evidence clearly favors the defendant when it demonstrates a level of confusion much below ten percent"); *Henri's Food Prods. Co. v. Kraft, Inc.*, 717 F.2d 352, 391 (7th Cir. 1983) ("7.6% confusion finding weighs against infringement"); *Visa International Service Ass'n v. Eastern Financial Credit Union*, 24 USPQ2d 1365, 1368 (9th Cir. 1992) (6.7% confusion insufficient to show confusion).

Consistent with Ruger's survey, despite two-and-a-half years of coexistence, FN has offered *no evidence* of a single concrete consumer or retailer who was confused. *See CareFirst*, 434 F.3d at 269 ("[T]he absence of any evidence of actual confusion over a substantial period of time … creates a strong inference" that confusion is unlikely.).

None of the "evidence" FN points to as "confusion" moves the needle because it is not confusion. Confusion evidence is entitled to weight only if properly proven, and "not all evidence proffered to show actual confusion will be deemed in fact to show such confusion." *Georgia-Pacific Corp. v. Great Plains Bag Co.*, 614 F.2d 757, 760-62 (C.C.P.A. 1980); *Sno-Wizard Manufacturing., Inc. v. Eisemann Products. Co.*, 791 F.2d 423, 429 (5th Cir. 1986). Often "there is less to it than meets the eye." *Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 616 F. Supp. 370, 389 (S.D.N.Y. 1985), *aff'd* 788 F.2d 3 (2d Cir. 1986).

After years, all FN could muster is a few website comments where a person mistyped

---

[9] The *Eveready* methodology used has been deemed the "gold standard." 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:137 (5th ed.).

"SFAR" as "SCAR;" a single instance (recounted by an FN employee)[10] where an individual purportedly said "Ruger SCAR" instead of "Ruger SFAR;" and an example of a gun in a video game named the SFAR, the appearance of which some have likened to an FN SCAR. Critically, FN admitted it did not know if anyone was confused and has no evidence that any of these instances show *confusion* between FN's SCAR and Ruger's SFAR marks (Exs. 167-169), making them irrelevant. *See Streamline Production Sys., Inc. v. Streamline Manufacturing., Inc.*, 851 F.3d 440, 457 (5th Cir. 2017) (finding "not all confusion counts" and stating that, to "count," the evidence "must show that the 'the confusion was caused by the trademarks employed and it swayed consumer purchases'"). Moreover, none of FN's supposed instances resulted in a mistaken purchase. *See Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991) ("[T]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally.").

Even taking FN's purported evidence in the light most favorable to FN, these instances show nothing more than carelessness, typos, or a fleeting mix-up of names—none of which avoid summary judgment. *See Worsham Sprinkler Co. v. Wes Worsham Fire Protection, LLC*, 419 F. Supp. 2d 861, 881 (E.D. Va. 2006) (granting summary judgment for defendant and rejecting evidence because "the few instances of confusion shown by this record could well be the result of carelessness or inattention"); *Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Foundation of America*, 307 F. Supp. 3d 260, 293 (S.D.N.Y. 2018) ("[N]ot all confusion counts: evidence of actual confusion must show more than a fleeting mix-up of names; rather it must show that the confusion was caused by the trademarks and it swayed consumer purchase"); *La Terra*

---

[10] *Primepoint, L.L.C. v. PrimePay, Inc.*, 545 F. Supp. 2d 426, 443-44 (D.N.J. 2008) ("[T]he only source of this evidence is the testimony of a former employee, which for the reasons discussed above is viewed with some skepticism.")

37

*Fina USA, LLC v. TerraFina, L.L.C.*, No. 17-cv-03613 NC, 2017 WL 4284167, at *4, *11 (N.D. Cal. Sept. 27, 2017) ("[S]uch instances do not demonstrate confusion, but merely the fact that the general public occasionally inserts typographic errors into writing, or skips articles.").

Moreover, FN's flimsy evidence is *de minimis* given the substantial opportunity for confusion to occur (*see* Fact 2) and does not create a genuine dispute of fact. *See George*, 575 F.3d at 398 (affirming summary judgment for defendant, noting "[e]vidence of only a small number of instances of actual confusion [i.e., 4] may be dismissed as *de minimis*"); *Petro Stopping*, 130 F.3d at 95 (same); *Fuel Clothing*, 7 F. Supp. 3d at 622 (finding confusion evidence *de minimis* and granting summary judgment for defendant).

### 5.    The Parties' Goods Differ

The Fourth Circuit "measure[s] the similarity of [goods] with respect to each party's actual performance in the marketplace." *Carefirst*, 434 F.3d at 272 (citation omitted). Consequently, an analysis of the parties' goods does not end after considering the category in which they fall—an analysis into the specifics of those goods is needed. *See Petro Stopping*, 130 F.3d at 94-95.

For example, in *Petro Stopping*, although the parties both offered fuel, the court looked beyond that similarity to *how* the parties offered their fuel. *Id.* at 95. Because their "services and facilities differ[ed] in virtually every respect," the Fourth Circuit affirmed the finding—on summary judgment—that the services were dissimilar. *Id.*; *see also Carefirst*, 434 F.3d at 272 (affirming finding of no likely confusion, including that the parties' medical services were not similar based on differences); *Fuel Clothing Co.*, 7 F. Supp. 3d at 617 (finding on summary judgment, no likely confusion, including that the parties' fitness wristbands were dissimilar given their different functions and appearances).

There are significant, material differences between the parties' rifles that sophisticated and careful purchasers will recognize. (Facts 48-50.) In addition to the many functional differences,

the parties' firearms also look different:



(Ex. 1 at 59.)

In reality, the rifles' "actual performance in the marketplace indicates that the goods at issue are dissimilar," and this factor thus "weighs against a finding of likelihood of confusion." *Fuel Clothing Co.*, 7 F. Supp. 3d at 615.

Even were one to weigh this factor for FN, that does not overcome the significant differences between the parties' marks and advertising, consumer sophistication, weakness of FN's SCAR, and lack of actual confusion. *See George*, 575 F.3d at (affirming summary judgment of no likelihood of confusion even where low-priced dice games were "identical"); *Passport Health, LLC v. Avance Health System, Inc.*, 823 F. App'x 141, 148 (4th Cir. 2020), as amended (Aug. 17, 2020) (affirming summary judgment of no likelihood of confusion even where similarity-of-services factor favored plaintiff); *Colt Defense*, 2005 WL 2293909 at *27 at (finding no likelihood of confusion on summary judgment even where firearms were "similar").

### 6. Ruger Acted in Good Faith

A junior user's intent is relevant only if it "intended to capitalize on the good will associated with the senior user's mark." *CareFirst*, 434 F.3d at 273. "[K]nowledge of another's goods is not the same as an intent 'to mislead and to cause consumer confusion.'" *George*, 575 F.3d at 398 (citation omitted).

There is no evidence of ill intent here. Ruger undertook an extensive name vetting process and, after significant discussions where the FN SCAR was never mentioned or considered, came up with a name that accurately describes Ruger's product—**S**mall-**F**rame **A**utoloading **R**ifle, or SFAR—consistent with Ruger's use of descriptive initialisms for other products. (Facts 41-43.) While Ruger knew about FN and its SCAR rifle, that does not show ill intent. *George*, 575 F.3d at 398. Moreover, Ruger assumed that FN withdrew its objection given FN's substantial delay in filing suit after its initial objection. (Facts 68-70.)

This factor is, at worst, neutral, and, at best, weighs against likely confusion.

### 7. The Good Quality of Ruger's SFAR Is Irrelevant

This factor is relevant only in "situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods." *George*, 575 F.3d at 399 (citation omitted). Since that is not the case here, this factor is irrelevant.[11]

## V. CONCLUSION

For the above reasons, there is no likelihood of confusion as a matter of law.

---

[11] Even if it were relevant, there is no evidence that Ruger's SFAR is of poor quality. Indeed, FN's witnesses testified that Ruger's firearms are high quality. (Fact 1.)

40

Dated: April 11, 2025

Respectfully submitted,

Nelson Mullins Riley & Scarborough LLP

By: /s/ Lorin J. Lapidus
Lorin J. Lapidus, NC State Bar No. 33458
380 Knollwood Street, Suite 530
Winston Salem, NC 27103
Telephone: (336) 774-3329
Facsimile: (336)774-3299
Email:  lorin.lapidus@nelsonmullins.com

FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
Douglas A. Rettew (*pro hac vice*)
Patrick J. Rodgers (*pro hac vice*)
901 New York Avenue, NW
Washington, DC 20001-4413
Telephone: (202) 408-4000
Facsimile: (202) 408-4400
Email: doug.rettew@finnegan.com
Email: patrick.rodgers@finnegan.com

FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
R. Gordon Wright (*pro hac vice*)
271 17th Street, NW
Suite 1400
Atlanta, GA 30363-6209
Telephone: (404) 653-6400
Facsimile: (404) 653-6444
Email: gordon.wright@finnegan.com

*Attorneys for Defendant*

41

## CERTIFICATE OF WORD COUNT

The undersigned hereby certifies that the foregoing brief does not exceed 8,000 words and therefore is designed to comply with Local Rules 7.3(d)(1) and 56.1(c), subject to the Parties Consent Motion to Exceed Page Limit for Summary Judgment Briefs to which has been submitted to the Court for consideration. (DE 37)

/s/ Lorin J. Lapidus
Lorin J. Lapidus, NC Bar No. 33458


## CERTIFICATE OF SERVICE

I certify that on this day, I electronically filed the foregoing Defendant's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

This the 11th day of April, 2025.

/s/Lorin J. Lapidus
Lorin J. Lapidus, NC 33458