# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| FN HERSTAL, S.A., and | ) | |
| FN AMERICA, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No.: 1:24-cv-218-LCB-JEP |
| | ) | |
| STURM, RUGER & CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and L.R. 56.1, Plaintiffs FN Herstal, S.A. and FN America, LLC (collectively "FN"), through counsel, respectfully submit this Opposition to Defendant Sturm, Ruger & Co., Inc.'s ("Ruger" or "Defendant") Motion for Summary Judgment.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

   I.  Summary judgment standard ................................................................... 2

   II.  There are genuine disputes of material fact as to each likelihood of
      confusion factor, precluding summary judgment for Ruger. ................... 3

      A.    Ruger's claim that the marks and advertising are "dissimilar" is
           belied by the record evidence. ....................................................... 4

      B.    The SCAR- and SFAR-branded products are identical. ............. 17

      C.    The Parties target identical consumers through the same facilities. ........... 20

      D.    The SCAR Mark is conceptually and commercially strong ....................... 20

      E.    FN's evidence of actual confusion, and the flaws in Ruger's survey,
           preclude summary judgment. ....................................................... 27

      F.    Not all firearms purchases are carefully made. ........................... 37

      G.    A reasonable jury could conclude Ruger acted in bad faith ........................ 38

      H.    There are quality issues with the SFAR rifles suggesting Ruger's
           disregard of FN's rights to create a cheaper Ruger knockoff of the
           SCAR. ......................................................................................... 39

CONCLUSION ................................................................................................... 40

CERTIFICATE OF COMPLIANCE ................................................................... 41

CERTIFICATE OF SERVICE ............................................................................ 42

i

# TABLE OF AUTHORITIES

**Cases**

*Adventis, Inc. v. Consol. Prop. Holdings, Inc.*,
  124 F. App'x 169 (4th Cir. 2005) ............................................................... 3

*Anheuser-Busch, Inc. v. L. & L. Wings, Inc.*,
  962 F.2d 316 (4th Cir. 1992) .............................................................. 3, 4

*Bon Vivant Catering, Inc. v. Duke Univ.*,
  No. 1:13-cv-728, 2016 WL 3149725 (M.D.N.C. 2016) ................................ 3

*C.V. v. Casa Azul Spirits, LLC*,
  No. CV H-22-2972, 2023 WL 7284182 (S.D. Tex. Nov. 3, 2023) .............. 36

*CareFirst of Md., Inc. v. First Care, P.C.*,
  434 F.3d 263 (4th Cir. 2006) ............................................................. 8, 21

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .......................................................................... 2

*Colt Defense LLC v. Bushmaster Firearms, Inc.*,
  No. 04-cv-240, 2005 WL 2293909 (D. Me. Sept. 20, 2005) ............... 7, 8, 37

*Commc'ns Satellite Corp. v. Comcet, Inc.*,
  429 F.2d 1245 (4th Cir. 1970) ............................................................. 15

*FN Herstal, S.A. v. Clyde Armory, Inc.*,
  123 F. Supp. 3d 1356 (M.D. Ga. 2015) ............................................. 23, 26

*Fuel Clothing Co., Inc., v. Nike, Inc.*,
  7 F. Supp. 3d 594 (D.S.C. 2014) ....................................................... passim

*George & Co. LLC v. Imagination Ent.. Ltd.*,
  575 F.3d 383 (4th Cir. 2009) ............................................................. passim

*George & Co., LLC v. Imagination Ent. Ltd.*,
  No. 1:07-cv-498, 2008 WL 2883771(E.D. Va. July 25, 2008) ..................... 30

*Hammerhead Ent., LLC v. Ennis*,
  No. 4:11-cv-65, 2011 WL 2938488 (E.D. Va. July 19, 2011) ..................... 16

*Hornady Manufacturing Co. v. Doubletap, Inc.*,
  746 F.3d 995 (10th Cir. 2014) ........................................................... 37

Case 1:24-cv-00218-WO-JEP   Document 77   Filed 05/16/25   Page 3 of 48

*Inst. for Justice v. Media Grp. of Am., LLC*,
No. 1:15-cv-1410, 2015 WL 7758845 (E.D. Va. Nov. 30, 2015) ................................ 21

*IWLCA v. Corrigan Sports Enters., Inc.*,
694 F. Supp. 3d 625 (M.D.N.C. 2023) .................................................................... 2, 38

*JFJ Toys, Inc. v. Sears Holdings Corp.*,
237 F. Supp. 311 (D. Md. 2017) ..................................................................... passim

*Landstar Sys., Inc. v. Landstar Onway, Inc.*,
No. 1:22-cv-1417, 2023 WL 6453482 (E.D. Va. Aug. 15, 2023) ................................ 15

*Lone Star Steakhouse & Saloon, inc. v. Alpha of Va., Inc.*,
43 F.3d 922 (4th Cir. 1995) .............................................................. 17, 19, 27

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*,
243 F.3d 789 (4th Cir. 2001) ............................................................................... 28

*May Apparel Grp., Inc. v. Ava Import-Export, Inc.*,
902 F. Supp. 93 (M.D.N.C. 1995) ......................................................................... 4

*Mushroom Makers, Inc. v. R.G. Barry Corp.*,
441 F. Supp. 1220 (S.D.N.Y. 1977) ...................................................................... 31

*New Colt Holding Corp. v. RJG Holdings of Fl., Inc.*,
312 F. Supp. 2d 195 (D. Conn. 2004) .................................................................. 37

*Perini Corp. v. Perini Const., Inc.*,
915 F.2d 121 (4th Cir. 1990) ......................................................................... 21, 37

*Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*,
130 F.3d 88 (4th Cir. 1997) ........................................................................... 18, 29

*Pizzeria Uno Corp. v. Temple*,
747 F.2d 1522 (4th Cir. 1984) .............................................................................. 17

*Primepoint, LLC v. PrimePay, Inc.*,
545 F. Supp. 2d 426 (D.N.J. 2008) ...................................................................... 29

*QNX Software Sys. GmbH & Co. KG v. Netrino, LLC*,
No. CIV. RDB09-2206, 2010 WL 4941985 (D. Md. Nov. 30, 2010) ........................ 15

*Resorts of Pinehurst, Inc. v. Pinehurst Nat. Corp.*,
148 F.3d 417 (4th Cir. 1998) ............................................................................... 27

iii

*Reyazuddin v. Montgomery Cty., Md.*,
    789 F.3d 407 (4th Cir. 2015) ................................................................... 2

*Rosetta Stone Ltd. v. Google, Inc.*,
    676 F.3d 144 (4th Cir. 2012) ....................................................... 3, 30, 31, 38

*Sara Lee Corp. v. Kayser-Roth Corp.*,
    81 F.3d 455 (4th Cir. 1996) ............................................................. 22, 40

*Scotts Co. v. United Indus. Corp.*,
    315 F.3d 264 (4th Cir. 2002) .................................................................. 35

*Select Auto Imports Inc. v. Yates Select Auto Sales, LLC*,
    195 F. Supp. 3d 818 (E.D. Va. 2016) ................................................ passim

*Simon Prop. Grp. L.P. v. mySimon, Inc.*,
    104 F. Supp. 2d 1033 (S.D. Ind. 2000) ............................................... 32, 35

*Star Indus., Inc. v. Bacardi & Co. Ltd.*,
    412 F.3d 373 (2d Cir. 2005) .................................................................. 39

*Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc.*,
    87 F.3d 654 (4th Cir.1996) ................................................................... 30

*U.S. Search, LLC v. U.S. Search.com Inc.*,
    300 F.3d 517 (4th Cir. 2002) ................................................................. 22

*Valador, Inc. v. HTC Corp.*,
    242 F. Supp. 3d 448 (E.D. Va. 2017) ...................................................... 32

*Valador, Inc. v. HTC Corp.*,
    241 F. Supp. 3d 650 (E.D. Va. 2017) ....................................................... 8

*Variety Stores, Inc. v. Wal-Mart Stores, Inc.*,
    888 F.3d 651 (4th Cir. 2018) ............................................................ passim

*Wag'N Enterprises, LLC v. United Animal Nations*,
    No. 1:11-cv-944, 2012 WL 1633410 (E.D. Va. May 9, 2012) ...................... 31

*What-A-Burger of Va., Inc. v. Whataburger, Inc. of Corpus Christi, Tex.*,
    357 F.3d 441 (4th Cir. 2001) ............................................................... 4, 5

*WIZKIDS/NECA, LLC v. TIII Ventures, LLC*,
    No. 17-CV-2400, 2019 WL 1454666 (S.D.N.Y. Mar. 31, 2019) ................... 36

iv

*Worsham Sprinkler Co. v. Wes Worsham Fire Protection, LLC*,
    419 F. Supp. 2d 861 (E.D. Va. 2006) ............................................................ 29

**Other Authorities**

Hal Poret, <u>An Empirical Assessment of the Eveready Survey's Ability to Detect
    Significant Confusion in Cases of Senior Marks That Are Not Top-of-Mind,</u>
    109 Trademark Rep. 935 (2019) ................................................................... 35

Isaacson & Botner, <u>When to Conduct an Eveready Survey: The Importance of Aided
    Awareness,</u>
    111 Trademark Rep. 693 (2021) ................................................................... 36

J.B Swann, <u>Eveready and Squirt – Cognitively Updated,</u>
    106 Trademark Rep. 727 (2016) ................................................................... 35

<u>McCarthy on Trademarks & Unfair Competition</u> § 23:13 (5th ed.) ................................ 27

<u>McCarthy on Trademarks & Unfair Competition</u> § 32:163 (5th ed.) .............................. 32

<u>McCarthy on Trademarks & Unfair Competition</u> § 32:174 (5th ed.) .............................. 36

## INTRODUCTION

Ruger files a 40-page Brief with 24 pages of facts and 170 exhibits and then remarkably suggests that there are no disputed facts for a jury. Despite its breadth, Ruger's Brief tells only half the story, omitting key facts, ignoring evidence, and selectively using images and testimony to present purported facts as "undisputed." Examining the full record, particularly in the light most favorable to FN as is required, there are genuine factual issues as to every confusion factor under the Lanham Act.

The marks themselves are **highly similar**, they are not "pronounced differently ("scar" vs. S-F-A-R)," nor are they consistently "displayed with the parties' well-known housemarks." They are presented in standalone fashion, often in similar coloring or font, and pronounced (at least by many) as a word ("SFAR") rather than spelling out letters (S-F-A-R). The goods **are identical** modern sporting rifles sold to the same consumers, though the same stores and websites, and marketed through the same channels.

FN's SCAR mark is both **conceptually and commercially strong**, evidenced by incontestable registrations from the Trademark Office and two decades of advertising and exclusive use. FN proffered **actual confusion**, and Ruger's survey suffers from numerous flaws that require it to be discounted for purposes of summary judgment. There is also evidence that purchasers are not sophisticated but instead make impulse purchases, and Ruger's knowledge and disregard of FN's SCAR Mark when adopting SFAR evidences an intent to tread on FN's goodwill.

1

When the full record is examined and weighed in the light most favorable to FN, there are sufficient factual disputes on every factor that must be presented to a jury for consideration. Ruger's Motion should therefore be denied.[1]

## ARGUMENT

### I.  Summary judgment standard

Summary judgment is only proper if the full evidentiary record shows "that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might affect the outcome of the suit. *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). Thus, the "pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Id.* (*citing Reyazuddin v. Montgomery Cty., Md.*, 789 F.3d 407, 413 (4th Cir. 2015)). In making this determination, "the court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences." *IWLCA v. Corrigan Sports Enters., Inc.*, 694 F. Supp. 3d 625, 656 (M.D.N.C. 2023).

---

[1] FN has previously provided a factual background, *see* Doc. 44 at 2-5, and instead focuses here on the multitude of facts creating genuine disputes on each confusion factor.

## II. There are genuine disputes of material fact as to each likelihood of confusion factor, precluding summary judgment for Ruger.

Whether there is a likelihood of consumer confusion "is an 'inherently factual' issue that depends on the unique facts and circumstances of each case." *Variety Stores*, 888 F.3d at 666-67 (quoting *Anheuser-Busch, Inc. v. L. & L. Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992) ("Likelihood of confusion is 'frequently a fairly disputed issue of fact on which reasonable minds may differ'")). Courts consider the following nine factors when evaluating likelihood of confusion: (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services; (4) the similarity of the facilities; (5) the similarity of advertising; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public. *See Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 153 (4th Cir. 2012) (vacating summary judgment where there were questions of fact on disputed factors).

Likelihood of confusion is therefore "particularly amenable to resolution by a jury." *Bon Vivant Catering, Inc. v. Duke Univ.*, No. 1:13-cv-728, 2016 WL 3149725, at *16 (M.D.N.C. 2016) (denying summary where material factual disputes presented by non-moving party); *see also Adventis, Inc. v. Consol. Prop. Holdings, Inc.*, 124 F. App'x 169, 171 n.3 (4th Cir. 2005) ("This court has consistently held that the likelihood of confusion issue in an infringement claim is an inherently factual determination."). Accordingly, summary judgment "is the exception," and is "appropriate only in limited circumstances." *Id.* Those circumstances are absent here. *See May Apparel Grp., Inc. v.*

3

*Ava Import-Export, Inc.*, 902 F. Supp. 93, 98 (M.D.N.C. 1995) (weighing "likelihood of confusion is likely to be a difficult and fact intensive process.").

### A. Ruger's claim that the marks and advertising are "dissimilar" is belied by the record evidence.

Ruger stretches credulity, arguing that the marks—SCAR vs. SFAR—are so "dissimilar" as to warrant summary judgment. Brief at 26-31. But they are virtually identical, and the record shows both companies use and advertise their respective marks in a variety of ways—including not always with or in connection with a housemark. Viewed in full context and in FN's favor, as required, Ruger fails to sustain this argument. *See Variety Stores,*, 888 F.3d at 559 (courts must credit non-moving party and "refrain from weighing the evidence or making credibility determinations"); *What-A-Burger of Va., Inc. v. Whataburger, Inc. of Corpus Christi, Tex.*, 357 F.3d 441, 450 (4th Cir. 2001) (noting that an "informed analysis" of confusion factors requires analysis of the marks as they are used in the marketplace); *Anheuser-Busch, Inc.*, 962 F.2d at 319 ("we must examine the allegedly infringing use in the context…as a whole as sold in the marketplace.").

### 1. The Parties' marks are not "virtually always" paired with housemarks, and the presence of a housemark exacerbates rather than mitigates confusion.

Ruger erroneously claims that the SCAR mark is ***always*** "paired" with the FN housemark, and that the infringing SFAR mark is ***always*** "paired" with the Ruger housemark. Brief at 26-27 (citing facts 30-35 and 52-55, collecting cherry-picked examples of the Parties' advertising). Thus, according to Ruger, the proper comparison is

4

"FN SCAR" vs. "RUGER SFAR," rather than SCAR vs. SFAR. But this is **not** how consumers always encounter the marks in the marketplace. *What-A-Burger of Va., Inc.*, 357 F.3d at 450.

Both FN and Ruger advertise without pairing the marks with the respective housemarks. For example, FN has advertising campaigns featuring the taglines "EVERY **SCAR** TELLS A STORY" and "SMALL **SCAR** LONG LEGACY, that each include the stand-alone, stylized SCAR logo:

 

*See* Ex. A, Compilation of FN Advertisements.

Similarly, Ruger routinely presents its infringing SFAR mark without the housemark RUGER. *See* Ex. B (Compilation of Ruger Advertisements).







Chambered in 7.62 NATO / .308 Win , the SFAR™ combines
the ballistic advantages of .308 Winchester with the size
of a traditional MSR, while remaining smaller and lighter
than comparable .308-sized rifles.



6



The fact that a housemark may appear elsewhere on the page or website does not overcome this standalone use. *See, e.g.*, *JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 311, 336-37 (D. Md. 2017) (rejecting argument that marks were dissimilar because of presence of housemark elsewhere on packaging); *see also id.* ("permitting a junior user to appropriate a senior user's established mark merely by adding a housemark 'would make a mockery of trademark law'"). Indeed, rather than mitigating confusion, it actually exacerbates it. *Id.* at 337 ("appending a housemark to an infringing mark can "aggravate, rather than mitigate confusion.'"); *Select Auto Imports Inc. v. Yates Select Auto Sales, LLC*, 195 F. Supp. 3d 818, 835-36 (E.D. Va. 2016) (collecting cases and recognizing that the "addition of a housemark 'to one of two otherwise similar marks will not serve to avoid a likelihood of confusion.'").

Ruger's reliance on the out-of-circuit opinion in *Colt Defense LLC v. Bushmaster Firearms, Inc.* is misplaced. No. 04-cv-240, 2005 WL 2293909 (D. Me. Sept. 20, 2005). The parties in *Colt Defense* used their marks differently, with Bushmaster primarily using its housemark and not using the allegedly infringing marks as similarly, frequently or prominently as Colt. For example, the court noted that Bushmaster "never has marked

7

any of its products with any of the [infringing terms]," and "***precedes*** almost every model of firearms advertised in its brochures with the name 'Bushmaster.'" *Id.* at *26. That is not the case here (*supra*); Ruger uses the standalone SFAR mark on the firearms themselves and prominently in its marketing and advertising efforts—often separated from (*i.e.*, not "preceded" by) any housemark. *See JFJ Toys*, 237 F. Supp. at 336-37.

Ruger's other caselaw also falls short. Brief at 26-27. In *CareFirst of Md., Inc. v. First Care, P.C.*, the Court relied on the housemark only because the underlying mark "was not conceptually strong." 434 F.3d 263, 271-72 (4th Cir. 2006). Here, the SCAR Mark is both conceptually and commercially strong. *See infra* at Section D. In *Valador, Inc. v. HTC Corp.*, the marks at issue "identif[ed] strikingly different goods or services in different markets" as plaintiff sold technology services via government contracts and Ruger sold headsets to consumers. 241 F. Supp. 3d 650, 670-71 (E.D. Va. 2017). Not so here, where the goods at issue ***are identical***. *See infra* at Section B. And as quoted by Ruger, *Fuel Clothing Co., Inc., v. Nike, Inc.* relies on the fact that "Nike's use of 'Fuel' ***is always paired*** with the 'NIKE' housemark, the 'swoosh' mark, or the 'NIKE+FUELBAND' mark." Brief at 27 (quoting 7 F. Supp. 3d 594, 616 (D.S.C. 2014)). Again, SCAR and SFAR are not "always paired" with any housemark. *See supra*.

And the notion that Ruger "always" appends the RUGER mark to use of SFAR is also inconsistent with Ruger's established branding strategies. Ruger has taken deliberate steps to ensure its infringing SFAR mark stands on its own. This is most apparent in its purposeful use of the "tm" symbol with SFAR in much of its advertising. *See, e.g.*, Ex. B

8

(examples included *supra*). Ruger uses the "tm" symbol with SFAR to show consumers it is an individual brand and not one that relies on the RUGER housemark.

Ruger's intent is manifest when comparing SFAR to other Ruger rifles that include "Ruger" in their name: **RUGER** AMERICAN RIFLE, **RUGER** AMERICAN RIMFIRE, **RUGER** PRECISION RIFLE, **RUGER** PRECISION RIMFIRE, and **RUGER** SCOUT, to name a few. *See* Ex. B, Gurney Ex. 19 (below):



Ruger even maintains a number of these rifle trademarks as registrations with the Trademark Office, including RUGER PRECISION® and RUGER AMERICAN®. *See* Ex. C (Compilation of Ruger Registrations). This is telling when contrasted with its other

9

registrations for non-RUGER inclusive product names, such as HAWKEYE®, 10/22®, and AR-556®. *Id.* Plainly, Ruger knows how to brand its product names with "RUGER" when it wants to. It decided not to for SFAR and instead used the tm symbol to give notice that SFAR is a separate brand.

###    2.   The SCAR and SFAR Marks are highly similar.

Ruger next attempts to distinguish SCAR and SFAR by cherry-picking certain advertisements and arguing that the two have "meaningfully different fonts, colors, layouts, and sizes" (collectively "formats"). Brief at 27-28. But Ruger again ignores the myriad instances where such formats are identical. *See, e.g.*, Ex. D, O'Kelly Report ¶87 (FN website "SCAR® FAMILY" in plain lettering); Ex. B (Gurney Ex. 19 – showing plain lettering of "SFAR"):





The same is true in most of the Parties' social media, where the marks are presented without any particularized format. *See, e.g.*, O'Kelly Report ¶92 (showing recent FN social media post with plain-lettered SCAR); Ex. B, FN_R001194 (Ruger social media post with plain-lettered "The SFAR™"). And Ruger's attempt to distinguish "military heritage" advertising from "a Western" theme ignores the record. First, FN extensively advertises without military heritage. *See, e.g.*, Ex. A, FN_R00000801 (SMALL SCAR LONG LEGACY); FN_R00000808; FN_R00000818 (EVERY SCAR® TELLS A STORY – START WRITING YOURS); FN_R00000853 (social media post

11

from recreational target range); FN_R00000855 (promoting SCAR as "the perfect choice for ***tactical training and personal defense***").

Further, FN phased out the tagline "World's Most Battle-Proven Firearms" years ago and well before the SFAR launch, and FN no longer utilizes such marketing. Ex. E, Hines Depo. 85:2-6 ("We do not actively promote that anymore"). And Ruger's emphasis on FN's "Military Collectors Series" is misplaced and of little relevance. The majority of SCAR models were never included in this collection, and the collection itself was highly limited, with the vast majority of the purchasing public having "no exposure to these items." O'Kelly Report ¶57.

More egregiously, Ruger forgets that it too markets to law enforcement and military, negating its claim otherwise.



O'Kelly Report ¶¶39-41 (Ruger's website its "long history of serving the Law Enforcement and Military communities"). And while Ruger may market some products under a "Western" theme, it does not do so with the SFAR rife (*see* Ex. B, RUG000238; FN_R0001194):





The presentation of SFAR and SCAR in stores also belies that they differ in formats, where all modern sporting rifles line the outer wall together with no distinguishing markings whatsoever beyond a generic tag (Ex. F):



Often, the tag is no more than a handwritten or generated tag created by the store. These tags may include the manufacturer name, but only in a plain letter manner rather than any stylized color of font:



Ex. F – Poret Exhibit 12.

The visual differences between the two marks is not significant as Ruger contends. Brief at 30-31. In some cases, one letter may indeed make a difference, Brief at 30-31, but often, as here, it does not. *See, e.g.*, *QNX Software Sys. GmbH & Co. KG v. Netrino, LLC,* No. CIV. RDB09-2206, 2010 WL 4941985, at *10–11 (D. Md. Nov. 30, 2010) (finding "NETRINO" and "NEUTRINO" similar "as they have almost identical pronunciations and differ in spelling by just one letter"); *Commc'ns Satellite Corp. v. Comcet, Inc.,* 429 F.2d 1245 (4th Cir. 1970) (finding "COMSAT" and "COMCET" confusingly similar because the pronunciations of the marks were "almost identical" and the differences in spelling caused only a "slight" visual difference."); *Landstar Sys., Inc. v. Landstar Onway, Inc.*, No. 1:22-cv-1417, 2023 WL 6453482, at *10 (E.D. Va. Aug. 15, 2023), *report and recommendation adopted*, 2023 WL 6396068 (Oct. 2, 2023) (finding the marks confusingly similar where only one letter differed from registered marks); *Hammerhead Ent., LLC v. Ennis*, No. 4:11-cv-65, 2011 WL 2938488, at *4 (E.D.

15

Va. July 19, 2011) (spelling difference by one letter did not "readily differentiate the two marks.").

The marks are also pronounced similarly, as consumers pronounce the word "SFAR," or "S-FAR," rather than spelling out the letters (S-F-A-R) as Ruger claims. *See, e.g.*, Ex. G, Cole Depo. 243:8-11 ("I go to distributors who buy and sell Rugers. And they refer to the rifle as SFAR. I've never heard once anybody say S-F-A-R."); 243:13-17 ("I've never heard anybody call it an S-F-A-R, other than maybe a couple of websites. But I deal in the industry, and everybody just refers to it as SFAR."); Ex. H, Voss Depo. 305:13-21 ("Q. Have you ever heard anyone refer to the Ruger gun as a "SFAR"? A. I have."); Ex. I, Lydic Depo. 58:2-12 ("And did Eddie refer to the Ruger rifle as a SFAR, S-F-A-R, or S-FAR? A. SFAR."); Ex. J, Halstead Depo. 153:1-10 ("if anybody's real familiar with the S-FAR, SFAR, S-F-A-R, [] you're going to call it a SFAR, just as you did a minute ago, sir, on accident."). Indeed, it is common to pronounce acronyms as whole words, even those that are not English words—*e.g.*, ASAP as A-SAP, SCUBA, or ASCII.

Lastly, Ruger fails to show the marks have different meanings. First, FN long-ago abandoned promoting the SCAR mark as an acronym for Special Operations Forces Combat Assault Rifle, beyond explaining the history. Indeed, Ruger points to nothing in the last ten years to support this proposition. *See* Ruger's Fact 17 (citing Def. Ex. 27 (collecting only a series of articles from mid-2000s)). And on the commercial side, it's always "just been 'SCAR.'" *See, e.g.*, Ex. E, Hines Depo. 357:18-358:3; *id.* at 356:21-

16

357:5 ("I've never seen it in our trademark or branding as an acronym, no."); *id.* ("in the advertising we've done, it's usually just "SCAR").

Second, there is at worse a dispute about the meaning of SFAR. The record reveals that Ruger intends for consumers to understand SFAR has meanings other than "Small Frame Autoloading Rifle." Most significantly, those meanings include ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

 The similarity of the marks and of the advertising factors defeats Ruger's claim for summary judgment. *Variety Stores*, 888 F.3d at 659.

### B.     The SCAR- and SFAR-branded products are identical.

Where the goods at issue are identical, as here, the similarity of the goods factor weighs in favor of confusion. *See, e.g.*, *Lone Star Steakhouse & Saloon, inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 936-37 (4th Cir. 1995) (citing *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th Cir. 1984)). Ruger points to minor differences in the parties' same rifles to argue the goods are not similar. *See Fuel Clothing*, 7 F. Supp. 3d at 617 ("the goods in question need not be identical or in direct competition with each other"). This argument ignores basic, undisputed facts.

Ruger posits the rifles' "actual performance in the marketplace indicates that the goods at issue are dissimilar." *Lone Star*, 43 F.3d at 39 (quoting *Fuel Clothing*, 7 F. Supp.

17

3d at 617). But this is not an instance, like: *Fuel Clothing*, where the goods at issue were **actually** dissimilar (electronic wristbands vs. apparel), 7 F. Supp. 3d at 618; where the goods were arguably distinguishable, *Carefirst*, 434 F.3d at 272 (health plans vs. direct medical care); or the differing means of providing fuel services in *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 94-95 (4th Cir. 1997) (noting trademark owner's many additional services beyond just offering fuel relative to the accused infringer's mere provision of fuel). Here, both parties **offer identical goods**: modern sporting rifles that directly compete for the same consumers.[2]

First, it is undisputed both rifles are in the "modern sporting rifle" ("MSR") product category. Ex. L, Werkmeister Depo. 104:2-14 ("It's a line extension for our modern sporting rifle."); Ex. M, Hlebinsky Depo. 174:3-7 ("they both fall under the modern sporting rifle category."). Second, as MSRs, both rifles are routinely sold in the same sections of gun stores, *see* Ex. D, O'Kelly Report ¶50 ("one can expect to see a variety of MSRs, including the SCAR and SFAR directly adjacent to one another on display at a big box store"), and can be found under the same MSR sections of online retail websites. *Id.* ¶¶51-52; Ex. M at Hlebinsky Ex. 14 (Sportsman's Warehouse website listing with both SFAR and SCAR branded rifles). In both, they are literally found side-by-side. *Id.*

---

[2] And even if there were differences (the record demonstrates otherwise), it would not matter. *See JFJ Toys, Inc*., 237 F. Supp. 3d at 338 ("the similarity of the goods [] requires 'some degree of overlap' but need not be identical").

And third, the rifles are virtually identical in appearance and are both offered in black:



O'Kelly Report ¶111.



A simple comparison illustrates the vast similarities in appearance and operation. *See* O'Kelly Report at ¶¶108-23 (outlining the many similarities).

Accordingly, the similarity of these products weighs in favor of confusion, *JFJ Toys, Inc.*, 237 F. Supp. 3d at 338, and Ruger's argument otherwise is counter to law. *See, e.g.*, *Lone Star*, 43 F.3d at 936-37 (affirming lower court's rejection of infringer's argument that restaurants were dissimilar because one offered Tex-Mex while the other offered "more traditional American fare"); *Pizzeria Uno*, 747 F.2d at 1535 (finding restaurant services similar despite one providing "Italian cuisine and a full bar in a sit-

down restaurant" compared to "drive-through and counter service for Mexican fast food").

### C. The Parties target identical consumers through the same facilities.

Courts recognize that confusion is "increased if both goods are sold in the same channels of trade." *JFJ Toys, Inc.*, 237 F. Supp. 3d at 338. Ruger ignores and thus concedes this point that favors confusion. *See id.*; *Variety Stores*, 888 F.3d at 666 (argument waived).

Both products are sold in the same big box stores and via the same online retailers. *See* Ex. D, O'Kelly Report ¶50 ("SCAR and SFAR directly adjacent to one another on display at a big box store"); *id.* ¶¶51-52. Witness testimony further confirms this fact. *See, e.g.*, Ex. H, Voss Depo. 236:19-237:2 (SFAR and SCAR are "a similar product that appears very similar, fills the same role in the same product category marketed to the same consumer through the same distribution channel and retail outlets with a very similar trademark will inevitability…create confusion among consumers."); Ex. G, Cole Depo. 16:17-19 ("we are selling two modern sporting rifles to the same marketing channels to the same consumers with the same name…"); Ex. N, Trexler Report ¶¶147-48 (███████████████████████████████████████). This factor weighs further in favor of a likelihood of confusion.

### D. The SCAR Mark is conceptually and commercially strong.

Generally, "the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark." *JFJ Toys, Inc.*, 237 F. Supp. 3d at 334. The

analysis considers both conceptual and commercial strength. *See id.*; *Select Auto*, 195 F. Supp. 3d at 831 (citing *George & Co. LLC v. Imagination Ent.. Ltd.*, 575 F.3d 383, 393-36 (4th Cir. 2009)). The evidence, weighed in a light most favorable to FN, demonstrates that SCAR is both conceptually and commercially strong and thus summary judgment must be denied. *See Variety Stores*, 888 F.3d at 659; *see JFJ Toys*, 237 F. Supp. 3d at 334; *Select Auto*, 195 F. Supp. 3d at 831-34.

### 1. SCAR is conceptually strong.

Conceptual strength is a measure of the mark's distinctiveness and "the linguistic or graphical peculiarity of the mark." *CareFirst*, 434 F.3d at 269 (citing *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990)). Ruger's argument that SCAR was once an acronym does not render it conceptionally weak as a matter of law. *See, e.g.*, *Inst. for Justice v. Media Grp. of Am., LLC*, No. 1:15-cv-1410, 2015 WL 7758845, at *4 (E.D. Va. Nov. 30, 2015) ("acronyms are sometimes considered inherently distinctive despite the descriptive status of their underlying mark, for example 'IBM' and 'UPS'").

On the contrary, while the SCAR mark was associated with the acronym in the mid-2000s, it has long since branded SCAR as a stand-alone mark. Ex. A (FN advertisements, including "SMALL SCAR, LONG LEGACY," "EVERY SCAR HAS A STORY, START WRITING YOURS"); Ex. E, Hines Depo. at 356:21-22 ("I've never seen it in our trademark or branding as an acronym, no."); 357:18-358:3 ("But the commercial side has just been 'SCAR.'".); Doc. 41-14, Ruger Ex. 14, Voss Depo. at

21

167:20-168:2 ("We utilized the SCAR name, but that's not – each one of those letters doesn't stand for an assault rifle. It's not an assault rifle. *We just call it SCAR*.").

Ruger argues SCAR is an acronym, Brief at 5 (Facts 11-28), with articles and advertisements from mid-2000's related to the initial work FN did with the military to develop the initial military version of the SCAR. *Id.* Today, and for at least the last decade, the SCAR mark stands alone—not as an acronym. *See supra* ("We just call it SCAR").

Significantly, in 2017 when the Trademark Office registered the SCAR Mark, it did not require any evidence of secondary meaning, Doc. 1-3, establishing that the SCAR mark is distinctive and conceptually strong. *See Select Auto*, 195 F. Supp. 3d at 832 ("USPTO's registration of the SELECT AUTO IMPORTS mark without requiring proof of secondary meaning reflects a determination that the mark is inherently distinctive"); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 465 (4th Cir. 1996) (same); *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 524 (4th Cir. 2002) ("The *prima facie* evidence provided by the certificate of registration is generally sufficient to establish a question of material fact that cannot be resolved on summary judgment."); *see also George & Co.*, 575 F.3d at 395 (deferring to Trademark Office's determination of conceptual strength where LCR acronym was registerable without evidence of secondary meaning).

Even without the Trademark Office's blessing, the record supports a reasonable finding that SCAR is conceptually strong. Long ago the Eleventh Circuit affirmed that

22

SCAR acquired secondary meaning at least as early as the mid-2000s. *See FN Herstal,*

*S.A. v. Clyde Armory, Inc.*, 123 F. Supp. 3d 1356, 1372-75 (M.D. Ga. 2015) ("FN's

SCAR Acquired Distinctiveness prior to September 2006"), *aff'd* 838 F.3d 1071 (11th

Cir. 2016). Thus, even if originally categorized as merely descriptive, the Trademark

Office's registration, along with two decades of secondary meaning, supports a finding of

conceptual strength today. *Select Auto*, 818 F. Supp. 3d at 833; *Variety Stores*, 888 F.3d

at 663 ("in certain circumstances, the commercial strength of a mark can be more

important than the conceptual strength").

### 2. Two decades of exclusive use and sales, along with substantial advertising, media coverage, and unwanted plagiarizing demonstrate the SCAR Mark is also commercially strong.

Courts consider the following factors when determining whether a mark is

commercially strong: (1) advertising expenditures; (2) consumer studies; (3) sales

success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the

length and exclusivity of the mark's use. *Variety Stores*, 888 F.3d at 663. A proper

analysis demonstrates conclusively that SCAR Mark is commercially strong.

Ruger effectively concedes commercial strength by failing to analyze the relevant

factors. Brief at 33 (arguing only that there are other "similar" marks that coexist with

SCAR, citing Fact 67). This is overstated. None of these marks are "similar" or relevant:

SOAR is by a Philippines-based company that does not market or sell in the U.S. *See* Ex.

O (Ruger's Facebook posts from 2014 do not refute that); (Doc. 45-76); the Strike

Industries SIAR rifle has not been released and may never be for sale; Ex. O ("still

working on the SIAR" nearly 10 years after the Facebook post shown at Doc. 45-74); STAR is not a modern sporting rifle and is known as the "McMillan ALIAS STAR" (Doc. 45-73); the SSAR-15 is a stock and not even a rifle (Doc. 45-79); the Stratus SQAR is a rifle *sling*, not an actual firearm (Doc. 45-81); the SAAR Corporation sells no firearms under the SAAR mark (*see* Doc. 45-80). And, FN sued and resolved its case against the "SAR Firearms" that will no longer be sold under that name. *FN Herstal, S.A. v. SAR USA Corp.*, Case No. 1:23-CV-1380 (E.D. Va. 2023).

This omission is significant, as evidence of commercial strength can substantially outweigh any alleged conceptual weaknesses. *See Variety Stores*, 888 F.3d at 664 (unpresented arguments waived).

**Advertising Expenditures**: FN has expended ███ over the past two decades to advertise its SCAR Mark, Ex. P (Interrogatories 3, 18), initially devoting nearly ███ of its advertising budget to promote the SCAR Rifle in the mid-2000's, and spending approximately ███ since on various advertising, and more than ███ with social media influencers. *Id.* Such expenditures result in "millions of impressions" on consumers. Ex. E, Hines Depo. at 424:6-18.

**Consumer Studies**: FN's consumer studies further demonstrate the SCAR Mark's commercial strength. The "SCAR Buyer Study" shows that ███ ███ Doc. 58-3 at 7. SCAR is actually ███ ███, and the ███ ███ *Id.*



**Sales Success**: Consistent with its decades of advertising and brand recognition, FN's SCAR sales further establish the mark's strength. From 2010-2018, FN had sales revenues ████████████████████████████ for SCAR rifles. Ex. P, Supp. Response to Interrogatory 19. More recently, from 2019 through 2024, those revenues range from ████████████████████████. Ex. N, Trexler Report Ex. 5.0. Such revenues, over these many years, further evidence the strength of the SCAR Mark. *JFJ Toys*, 237 F. Supp. 3d 335.

**Unsolicited Media Coverage**: Articles and stories about the SCAR rifle are legion. Ruger cites many. Brief at 5. Other examples include, more recently, the NRA's recognition of the SCAR 16s as the "2022 NRA Gun of the Week." Ex. Q (collecting examples).

**Attempts to Plagiarize**: Like Ruger's willful infringement here, FN has been required to enforce its rights against other parties that tried to trade on the goodwill of the SCAR Mark. *Clyde Armory*, 838 F.3d 1071; Ex. R (collecting examples); *SAR USA Corp.*, Case No. 1:23-CV-1380 (E.D. Va. 2023); *FN Herstal, S.A. v. P.W. Arms, Inc.*, Case No. 3:24-7589 (D.S.C. 2024). Such copying further supports commercial strength. *See, e.g.*, *Fuel Clothing*, 7 F. Supp. 3d at 614 (finding commercial strength where there was "evidence of litigation proceedings against five separate companies and consent agreements with numerous other companies regarding allegedly infringing use of the "Fuel" mark.").

**Length and Exclusivity of Use**: FN has exclusively used its SCAR mark since at least the mid-2000's. *See Clyde Armory*, 123 F. Supp. 3d at 1373. This is further established through the consistent advertising and sales outlined above, and FN's consistent policing of the mark, *see supra*, further evidencing strength. *JFJ Toys*, 237 F. Supp. 3d at 335.

The commercial strength of the SCAR Mark thus prevents summary judgment for Ruger. *See, e.g.*, *Variety Stores*, 888 F.3d at 666 ("because Factors 1, 2, 6, and 7 are genuinely disputed, we find that the ultimate question of likelihood of confusion is also genuinely disputed."); *id.* at 666-67 ("Whether Walmart's mark created a likelihood of confusion is indeed a question that the jury, consisting of ordinary consumers and using the nine factors as a guide, is well-suited to evaluate").

26

### E. FN's evidence of actual confusion, and the flaws in Ruger's survey, preclude summary judgment.

Actual confusion evidence may be demonstrated by both anecdotal and survey evidence. *George & Co.*, 575 F.3d at 398. Trademark law does not require a plaintiff to present an affirmative confusion survey, and Ruger's survey is flawed and thus entitled to no weight at summary judgment. Instead, FN's actual confusion evidence tilts this factor in favor of denying summary judgment.

#### 1. FN's actual confusion evidence must be credited at summary judgment.

Actual confusion evidence is often considered "the best evidence of likely confusion," *Resorts of Pinehurst, Inc. v. Pinehurst Nat. Corp.*, 148 F.3d 417, 423 (4th Cir. 1998), and is entitled to "substantial weight." *Lone Star*, 43 F.3d at 937. Given the difficulty of obtaining evidence of actual confusion, "even a minimal demonstration of actual confusion may be significant." *Select Auto*, 195 F. Supp. 3d at 838 (noting also "the difficulty of obtaining" such evidence); McCarthy on Trademarks & Unfair Competition ("McCarthy") § 23:13 (5th ed.) ("Any evidence of actual confusion is strong proof of the fact of a likelihood of confusion.").

Despite the difficulty in uncovering actual confusion evidence, FN managed to do so here. First, there is testimony from witnesses regarding actual confusion. Ex. G, Cole Depo. 43:7 (FN's Sales and Marketing VP: "People get confused between a SFAR and SCAR"); Ex. E, Hines Depo. 296:8-16 (FN's Marketing Director: "consumers who are looking for an AR name…have been confused between the look of the [SFAR] and the SCAR.").

27

More specifically, other witnesses testified to an incident at a gun store in Ohio where a consumer stated, "I also wanted to see *the Ruger SCAR*." Ex. I, Lydic Depo. 57:3-14 ("Q. Okay. And what were the exact words that the person said? A. Is that the new Ruger pistol, and *I also wanted to see the Ruger SCAR*"). This incident, reported under oath by the person who directly heard the statement, is not hearsay—the customer's statement constitutes a verbal act. *See, e.g.*, *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001) (finding district court's dismissal of actual confusion evidence as "unreliable hearsay" erroneous, instead finding the statements "direct evidence of the children's and reporters [confused] reactions and not hearsay.")

Other examples appear online. In one, a consumer seeks assistance regarding whether a "buffer and spring kit [will] work on my ruger scar 308?," demonstrating confusion between the two marks. Ex. S, FN_R001331. In another, players of the video game Battlefield 2042 express confusion over the game's use of SFAR rather than calling the rifle a "SCAR." *Id.* (FN_R001337; FN_R001351 ("Two versions of the SCAR-H appear in Battlefield 2042, the futuristic SFAR-M GL (Special Forces Assault Rifle…) and the Battlefield 3 version of the SCAR-H in Battlefield Portal")).

Ruger's attempt to dismiss this confusion evidence mistakes the law and relies generally on non-binding, out-of-circuit cases. Most improperly, Ruger asks the court to weigh credibility, Brief at 37 n.10, which is improper at summary judgment. *See, e.g.*, *Variety Stores*, 888 F.3d at 659 ("courts must … refrain from weighing the evidence or

28

making credibility determinations." (cleaned up)). Indeed, the cited *Primepoint, LLC v. PrimePay, Inc.* case appears legally flawed as well, given its reliance on cases weighing actual confusion evidence in contexts ***other than*** summary judgment. 545 F. Supp. 2d 426, 444 (D.N.J. 2008).

Even more telling, Ruger overstates the only cited authority (albeit non-binding) from within the Fourth Circuit. Brief at 37 (citing *Worsham Sprinkler Co. v. Wes Worsham Fire Protection, LLC*, 419 F. Supp. 2d 861, 881 (E.D. Va. 2006)). *Worsham* was ***not*** a summary judgment case, as Ruger represents, but the result of a bench trial where the Court, appropriately, "weighed, as a whole," all the evidence presented. *Id.* at 884. The Court there was not obligated, as it is here, to weigh the actual confusion evidence presented ***in a light most favorable to FN***. *Variety Stores*, 888 F.3d at 659. Regardless, Ruger has no support for its allegation that the confusion evidence presented is merely "carelessness or inattention." Brief at 37. A reasonable fact finder could conclude that the confusion resulted from the infringing SFAR mark. *Variety Stores*, 888 F.3d at 659.

Lastly, the actual confusion evidence presented is not *de minimis*. *See* Brief at 38 (citing *George & Co.*, *Petro Stopping*, and *Fuel Clothing*). In *George & Co.*, the Court balanced the few instances of actual confusion against the "500,000" unit sales each year (575 F.3d at 399)—a far cry from Ruger's ██████████████ over 2.5 years here. Ex. N, Trexler ¶118. The same is true in *Petro Stopping*, where the Court noted a "huge volume of commerce." 130 F.3d at 95; *see also Fuel Clothing*, 7 F. Supp. 3d at 622

29

(same). The sales volumes here, while not insignificant, are distinguishable from those cases with "hundreds of thousands" of transactions finding actual confusion evidence *de minimis*.

Viewed in a light most favorable to FN, this evidence further weighs against finding summary judgment for Ruger.

### 2. FN was not obligated to conduct an affirmative confusion survey.

Ruger suggests that FN's "failure" to submit an actual confusion survey demands summary judgment it its favor. Brief at 35. That is not the law. *See, e.g.*, *Rosetta Stone*, 676 F.3d at 156 (vacating summary judgment award to infringer and recognizing that survey evidence is not required to prove likelihood of confusion); *Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654, 660–61 (4th Cir.1996) ("Actual confusion can be demonstrated by survey evidence, but contrary to [Ruger's] suggestion, survey evidence is not necessarily the best evidence of actual confusion and '*surveys are not required to prove likelihood of confusion*.'"); *Select Auto*, 195 F. Supp. 3d at 838-39 n.4 (same).

Ruger's authority does not suggest otherwise. Brief at 35. Indeed, the lower court *George & Co.* decision makes this point explicitly. No. 1:07-cv-498, 2008 WL 2883771, at *3 (E.D. Va. July 25, 2008) ("surveys are not required to prove likelihood of confusion"). *George & Co.* simply recognized noted that the absence of any survey, and more importantly, any other significant actual confusion evidence, would "hamper"

30

trademark owner's ability to meet its burden of proof when ***affirmatively*** moving for summary judgment. *Id.*

The same is true of *Wag'N Enterprises, LLC v. United Animal Nations*, dismissing infringement claims because the trademark owner presented no actual confusion evidence whatsoever, in addition to a number of other factors weighing against confusion. No. 1:11-cv-944, 2012 WL 1633410, at *8 (E.D. Va. May 9, 2012).

*Mushroom Makers, Inc. v. R.G. Barry Corp.*, is likewise misplaced. 441 F. Supp. 1220, 1231 (S.D.N.Y. 1977). The absence of any actual consumer confusion "is by no means determinative," but because it was not summary judgment, the court there weighed all the evidence (which the Court cannot do here) and found no likelihood of confusion. *Id.*

Accordingly, FN's decision not to rely on an actual confusion survey, relying instead on its other actual confusion evidence, does not require this factor be construed against FN. *Rosetta Stone*, 676 F.3d at 156.

### 3. Ruger's "no confusion" survey is flawed and entitled to no weight at the summary judgment stage.

Ruger's proffered survey, which it contends demonstrates no likelihood of confusion, suffers from several flaws and is therefore entitled to no evidentiary weight at summary judgment.

First, and most egregiously, the survey used the image below rather than what actually appears in stores to represent how consumers encounter the infringing mark in person:

31



Doc. 46-1, Poret Report at 11.

This does not "replicate market conditions" and must be rejected. *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 461-62 (E.D. Va. 2017) (rejecting survey where specimen did not accurately show the marks as they appear in commerce); *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1038–39 (S.D. Ind. 2000) (same); McCarthy § 32:163 ("The closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results.").

According to Mr. Poret, the red Ruger® tag is intended to mimic what he contends is the typical hang tag encountered by consumers in the brick-and-mortar gun store environment. Poret Report at 11-12. The "tag" used in the survey is red (Ruger's primary color), includes the registered RUGER® name, and includes the registered Ruger bird logo. *Id.*; Ex. T, Ruger Brand Style and Usage Guide at 2 (specifying Ruger's red color), *id.* at 6 (illustrating Ruger's red primary bird logo); Ex. C, Ruger bird logo Registration). The survey expert used this tag because counsel for Ruger provided a single example of such a tag being used at an unknown gun store. Ex. F, Poret Depo. 56:11-18 ("these are

32

not photographs that you took, correct? A: Correct."); 56:19-57:2 ("I didn't visit a store physically myself"); 57:5-14; 57:9-14.

But this prominent, red-branded Ruger tag is ***not*** typical of how consumers encounter the mark. Typically, MSRs are together along a wall behind a counter with store generated tags—not tags provided by the various manufacturers:



Poret Ex. 10.

*See also* Ex. D, O'Kelly Report ¶50 ("one can expect to see a variety of MSRs, including the SCAR and SFAR directly adjacent to one another on display at a big box store").

If there is a tag at all, it is more often generic to the store and includes only the manufacture name without other associated branding and logs, as shown for example below (Poret 11):

33



An enlarged view of the SFAR price chart above is presented below, as well as another

example of a more typical, non-branded hang tag:





Poret Exs. 11-12.

Accordingly, Mr. Poret's presentation of the infringing mark, in conjunction with Ruger's distinctive red coloring, and registered bird logo, misrepresents the marketplace conditions and calls the survey's conclusions into question. *See, e.g.*, *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280 (4th Cir. 2002) (finding lower court abused its discretion in relying on a flawed survey that did not properly test "the consumer's reaction to the advertisement as a whole and in context."); *Simon Prop. Grp.*, 104 F. Supp. 2d at 1038-39 (collecting cases and rejecting survey where specimens "depart from and distort" the marketplace experience).

Second, Ruger oversells the appropriateness of the *Eveready* survey format used. Brief at 36 n.9 (characterizing *Eveready* as the "gold standard"). Indeed, some commentators have qualified the "gold standard" nature of *Eveready*, limiting that moniker to cases "assessing confusion as to (readily recalled) top-of-mind marks." J.B Swann, Eveready and Squirt – Cognitively Updated, 106 Trademark Rep. 727, 733-34 (2016). This is significant, because the *Eveready* format requires the respondent to recall the senior mark (here, SCAR) ***unaided*** from memory. *Id.* Accordingly, "not all commercially strong marks [as SCAR is here] are cognitively stored top-of-mind; and the *Eveready* format is thus not appropriate for all strong marks." *Id.* at 734.

Mr. Poret has argued against this critique. *See* Hal Poret, An Empirical Assessment of the Eveready Survey's Ability to Detect Significant Confusion in Cases of Senior Marks That Are Not Top-of-Mind, 109 Trademark Rep. 935 (2019). According to Mr. Poret, the Eveready survey "is quite *aided*, in the sense that it cues respondents with

35

a specific mark allegedly *similar to the senior mark*." *Id.* (citing PHEELA as an example of an infringing mark that would sufficiently cue respondents to the senior mark FILA).

But that logic fails here. Respondents were not asked to identify the rifle name (SCAR), but the "company" that "makes or puts out the rifle you were just shown." Doc. 46-1, Poret Report at 14. Unlike PHEELA for FILA, SFAR does not aid a respondent's memory to trigger the company name sought—FN.

Even brands associated with expensive goods, like the rifles at issue here, and even commercially strong marks like SCAR, are not necessarily top-of-mind such that they can be sufficiently recalled unaided. *See* Cognitively Updated, 106 Trademark Rep. at 733; *see also* Isaacson & Botner, <u>When to Conduct an Eveready Survey: The Importance of Aided Awareness</u>, 111 Trademark Rep. 693, 709 (2021) ("If an *Eveready* survey is used to measure confusion relative to a mark that does not have appreciable levels of aided awareness, the survey will not show substantial levels of confusion.").

While full exclusion may not be appropriate, <u>McCarthy</u> § 32:174 at n.7, cases recognize that this critique reduces the evidentiary weight afforded the survey. *See, e.g.*, *id.* (citing *WIZKIDS/NECA, LLC v. TIII Ventures, LLC*, No. 17-CV-2400, 2019 WL 1454666, at *12 (S.D.N.Y. Mar. 31, 2019) ("The Court thus places limited weight on the survey in light of the flaws in its methodology"); *C.V. v. Casa Azul Spirits, LLC*, No. CV H-22-2972, 2023 WL 7284182, at *5 (S.D. Tex. Nov. 3, 2023) (recognizing that fact finder may reduce evidentiary weight of the survey)). Accordingly, the survey should be disregarded for summary judgment purposes here because a reasonable fact-finder,

considering this critique, could dismiss the survey's evidentiary weight. *See Variety Stores*, 888 F.3d at 666 ("if Walmart's surveys carry any flaws identified by Variety, the jury—not the judge—must decide how much weight to place on them.").

### F.    Not all firearms purchases are carefully made.

In the Fourth Circuit, the "sophistication of the consuming public" factor is only relevant "when the relevant market is not the public at-large." *George & Co.*, 575 F.3d at 400. Ruger's lone controlling authority is *Perini Corp. v. Perini Const., Inc.*, where sophistication was only relevant because the consumers at issue were "highly trained procurement professional whose sensitivity is heightened by the responsibility of sensibly spending millions of dollars." 915 F.2d 121, 127 (4th Cir. 1990). Such is certainly not the case here, where the relevant consumer base is the entire firearm purchasing public at-large.

Some consumers may do their research, as Ruger suggests. *See* Brief at 33 (citing *Colt Defense*, 2005 WL 2293909, at *27 (crediting ***uncontested*** evidence of sophistication), and *Hornady Manufacturing Co. v. Doubletap, Inc.*, 746 F.3d 995, 1006-07 (10th Cir. 2014) (noting failure by plaintiff to present evidence that consumers "succumb to impulses")); *id.* at 34 (citing *New Colt Holding Corp. v. RJG Holdings of Fl., Inc.*, 312 F. Supp. 2d 195, 225 (D. Conn. 2004) (same)). In these cases, the record on sophistication and care was undisputed.

But the record is disputed here. FN's expert testified that many consumer purchases "are a lot of times just impulse buys." Ex. U, O'Kelly Depo. 124:17-125:3;

126:13-127:8; *id.* 125:17-126:5 ("When you're buying a gun just to use a range toy, you don't do research generally"). Ruger's expert likewise acknowledged that some purchases are "impulse buys." Ex. M, Hlebinski Depo. 104:4-12. Other witnesses agree. Ex. H, Voss Depo. 221:12-20 ("it's not to say all customers do research"). And any research that may be performed is not necessarily reliable. O'Kelly Depo. 110:3-16 ("the problem is a good amount of the information they get is not correct"); 110:17-111:2; 137:16-138:2; 169:15-22 (discussing potential "research" sources and recognizing instances where "what they're telling the public is false").

Accordingly, this factor cannot be said to favor Ruger. *See IWLCA*, 694 F. Supp. 3d at 677-78 (finding conflicting sophistication evidence and denying summary judgment); *Rosetta Stone*, 676 F.3d at 160 (rejecting conclusion, at summary judgment, that "substantial cost" of products negates confusion).

### G.     A reasonable jury could conclude Ruger acted in bad faith.

Ruger admits it knew about FN and its SCAR rifle when it adopted the infringing SFAR Mark. Brief at 40. In fact, this is not the first time FN has been forced to take Ruger to court over its infringing use of FN's trademarks. *See FN Herstal, S.A. v. Sturm, Ruger & Co., Inc.*, Case No. 1:20-cv-249 (E.D. Va. 2020) (asserting Lanham Act claims for infringement of FN's "5.7" trademark).

Not only that, but when it conducted its trademark clearance search, the FN's SCAR Mark was disregarded in the report, ***despite the fact that the searches conducted would have revealed FN's SCAR Registration***. Ex. V, Betts Report ¶44-47. This

38

knowledge of, yet purposeful disregard of, FN's SCAR Registration is sufficient to create a genuine dispute and "support an intent to infringe." *See Variety Stores*, 888 F.3d at 665 (citing *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 389 (2d Cir. 2005) ("Bad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark.")). Weighing this evidence in FN's favor, as required here, supports a likelihood of confusion. *Id.*

### H. There are quality issues with the SFAR rifles suggesting Ruger's disregard of FN's rights to create a cheaper Ruger knockoff of the SCAR.

Ruger contends that the quality factor is irrelevant, and that "there is no evidence that Ruger's SFAR is of poor quality." Brief at 40. This is legally and factually inaccurate.

Ruger highlights that the SFAR rifle is substantially cheaper than the SCAR. Brief at 11-13 (Facts 36-39; 47). But Ruger's effort to develop a cheaper rifle has resulted in substantial quality issues. Ex. W (compilation of SFAR complaints, including "cycling issues," issues with the gas block being out of alignment, "failure to function," "jamming," "failing to feed," and "fired rounds failing to eject," and article regarding "5 Common Ruger SFAR Problems."). One exacerbated customer complained on a forum that he had "bout had it with my new Ruger SFAR!!!" *Id.* "If a defendant markets a product under a mark similar to that affixed by a competitor to a commodity of like nature but superior manufacture, that the defendant's product is markedly inferior is

***likely to be highly probative of its reliance on the similarity of the two marks to***

***generate undeserved sales***." *Sara Lee*, 81 F.3d at 467. Such inference is appropriate here.

## <u>CONCLUSION</u>

The genuine disputes of material fact on each of the likelihood of confusion factors precludes an award of summary judgment to Ruger. Plaintiff FN respectfully requests Ruger's Motion be denied.

Dated: May 16, 2025    Respectfully Submitted,

         **WILLIAMS MULLEN**

         By: <u>*/s/ Robert C. Van Arnam*</u>
         Robert C. Van Arnam NC 28838
         Andrew R. Shores NC 46600)
         Carmelle F. Alipio, NC 54738
         Aaron T. Fadden, NC 59495
         301 Fayetteville Street, Suite 1700
         Raleigh, NC  27601
         Telephone: (919) 981-4000
         Facsimile: (919) 981-4300
         rvanarnam@williamsmullen.com
         ashores@williamsmullen.com
         calipio@williamsmullen.com
         afadden@williamsmullen.com

         *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that this brief contains fewer than 8,000 words, as

calculated use the word count feature in Microsoft Word, and therefore complies with the

Court's extension of word limits under Local Rule 7.3(d)(1). *See* Doc. 62.

By: <u>*/s/ Robert C. Van Arnam*</u>
Robert C. Van Arnam, NC 28838
Andrew R. Shores, NC 46600
Carmelle F. Alipio, NC 54738
Aaron T. Fadden, NC 59495
**WILLIAMS MULLEN**
301 Fayetteville Street, Suite 1700
Raleigh, NC  27601
Telephone: (919) 981-4000
Facsimile: (919) 981-4300
rvanarnam@williamsmullen.com
ashores@williamsmullen.com
calipio@williamsmullen.com
afadden@williamsmullen.com

Attorneys for Plaintiffs

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 16, 2025 I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which will send notification of electronic filing

to all counsel of record for Plaintiff.

*/s/ Andrew R. Shores*
Andrew R. Shores, NC 46600
**WILLIAMS MULLEN**
301 Fayetteville Street, Suite 1700
Raleigh, NC  27601
Telephone: (919) 981-4000
Facsimile: (919) 981-4300
ashores@williamsmullen.com

*Counsel for Plaintiffs*