UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

FN HERSTAL, S.A., and )
FN AMERICA, LLC, )
Plaintiffs, )1:24CV218
v. )
STURM, RUGER & CO., INC., )
Defendant. )MAY 28, 2026

TRANSCRIPT OF THE MOTIONS HEARING
BEFORE THE HONORABLE DAVID A. BRAGDON
UNITED STATES DISTRICT JUDGE

COURT REPORTER:

STACY HARLOW, RVR-M, CVR-M, CM, RBC, RCP
Post Office Box 21471
Winston-Salem, North Carolina 27120

Proceedings recorded by voice stenography realtime translation.
Transcript produced by computer-aided transcription.

APPEARANCES:

FOR THE PLAINTIFFS:

ROBERT VAN ARNAM
CARMELLE F. ALIPIO
AARON THOMAS FADDEN
Williams Mullen
301 Fayetteville Street - Suite 1700
Raleigh, North Carolina 27601

FOR THE DEFENDANT:

LORIN J. LAPIDUS
Nelson Mullins Riley & Scarborough
380 Knollwood Street - Suite 530
Winston-Salem, North Carolina 27103

DOUGLAS ANTHONY RETTEW
PATRICK J. RODGERS
Finnegan, Henderson, Farabow, Garrett & Dunner LLP
901 New York Avenue, NW
Washington, DC 20001

ALSO PRESENT:

PATRICIA SHEPARD, Ruger Associate General Counsel

CONNOR GRANT, Summer Intern at Williams Mullen

P R O C E E D I N G S

(May 28, 2026, at 1:31 P.M.)

THE COURT: Good afternoon.

So if -- if it's okay with the parties, I thought we would proceed to Defendant's summary judgment motion first. And I appreciate you all bringing guns. What I thought -- what I thought we'd do is give -- give you an opportunity to make your arguments, show me anything about the guns that you think is relevant to your argument.

At that point, the Court will take a recess and I'll -- I'll have a chance to review the guns in chambers to take a closer look at them. That will give me a chance to ask any additional questions, if I have any, about that afterwards.

And then we'll hear the remaining motions, including the plaintiff's motion for partial summary judgment as -- as well as the expert motions.

Does anybody have any objection to that way of proceeding?

MR. RETTEW: No, Your Honor.

MR. VAN ARNAM: No, Your Honor.

THE COURT: Okay.

MR. VAN ARNAM: May I ask for clarification, though? About how long do -- would you like us to argue our sides for summary judgment on the defendant's motion?

THE COURT: Yeah. Let's start with -- if it's -- if

it works for the parties, I'd like to start with 30 minutes a side, and I may have -- I may have questions. If it runs a little over, that's not the end of the world and we may -- you know, if we need more time, we can adjust at that point.

MR. VAN ARNAM: Thank you, Your Honor.

THE COURT: So the -- the Court will hear from Defendant first on the motion.

MR. RETTEW: Thank you, Your Honor. Doug Rettew from the Finnegan law firm here on behalf of Ruger.

And, Your Honor, what -- what we've done is, I know Your Honor asked for some binders with exhibits, which we have. They're -- they're exhibits from the summary judgment record. And then we prepared some slides, which are basically these documents, so I can move through them and -- and -- and kind of explain them, but I'll -- I'll -- as we walk through it, I'll tell you what tabs correspond, if that's okay.

THE COURT: Absolutely.

MR. RETTEW: Great. Thank you, Your Honor.

So this is a trademark case, a Lanham Act case, involving two large firearms manufacturers.

Sorry, Your Honor. I've got my makeshift podium.

THE COURT: Fair enough.

MR. RETTEW: Two large manufacturers of -- of -- of firearms, and Ruger, in 2017, decided it was going to make a new type of gun, and it was going to be a rifle, and it is a

rifle that was the -- that is chambered for calibers that are typically larger, more powerful, like an AR-10 style rifle.

But they packaged it in the body of a smaller, modern sporting rifle, like an AR-15. So after going through and -- and -- and debating, they -- they finally landed on a descriptive initialism that would tell people what this new rifle was, tell -- what -- what the features are and what the characteristics are, so they landed on Small Frame Autoloading Rifle, and they use the initialism S-F-A-R.

A year and a half after the rifle came out, FN Herstal sued, and they claim that this infringes their moniker that they use for their gun, which is SCAR, which is a descriptive acronym that stands for Special Operations Forces Combat Assault Rifle, not something that FN coined. That was coined by the U.S. military when they put out the bids for different companies to make the gun. FN won the bid and then took the name and used it for its gun.

After full discovery in this case, we believe that FN cannot meet its burden of proving the likelihood of confusion, which is required for trademark infringement. Therefore, Ruger filed this motion for summary judgment.

THE COURT: And I -- I have a preliminary question about summary judgment and -- and the standard of review that applies here.

So when -- when the Court is -- obviously there's

this multifactor test that the Court considers in likelihood of confusion, but then you combine that with -- with the summary judgment standard where you're -- you're essentially looking for whether or not there is a factual dispute. And I am curious about how those two things work together.

So let's say hypothetically the Court finds that factors -- you know, several factors lean a particular way and there's no factual -- there's no material factual dispute as to those factors, but it finds that other factors either lean the other way or there is a factual dispute on those.

In that case, can the Court still issue summary judgment? Does -- does the Court still balance the factors? And tell me how that -- that works in this context.

MR. RETTEW: Ab- -- absolutely, Your Honor. So the answer is yes. The Court can issue summary judgment even if it finds certain factors favor the plaintiff. How do we know this?

Well, we know this because in the Fourth Circuit there have been a number of cases -- we've cited them in our brief on pages 24 to 25 of our main brief. There's a number of cases where the defendant prevailed on summary judgment in trademark infringement cases.

For example, there's the *George & Co.* case, the *CFA Institute* case, the *Customer Co.* case, the *Valador* case. These were either in the Fourth Circuit or affirmed by the Fourth

Circuit. All found for the defendant on summary judgment. There's others we've cited in our reply brief. There's the *Grayson* case and B and J -- *B and J Enterprises*.

Now, your question is a good one, Your Honor. What happens when certain factors favor the plaintiff? And so -- and I have a copy for Your Honor, if you'd like, or another version. This is a game that was in the *George & Company* case. So this is the case we cite a lot. It's -- it's articulated for the Fourth Circuit standards and likelihood of confusion.

And, in this case, the defendant won on summary judgment. And they won on summary judgment even though these little dice games -- and this, by the way, was the deluxe version of the game. There was even, like, a -- a -- a less expensive, less fancy version of the game. But this little dice game, the -- the Court found no likelihood of confusion with a competing dice game, even though the products were identical, the trade channels were identical, the customers were identical. There was actually more confusion in that case than is even alleged in this case that the Court discounted.

But the Fourth Circuit affirmed the Eastern District of Virginia's finding of no likelihood of confusion on summary judgment. And the other cases we've cited, *Grayson*, identical products. All of these had -- in all of these cases, there were factors that the Court weighed for the plaintiff but still decided summary judgment was appropriate for the defendant.

So --

THE COURT: And that was -- that was my impression, but it doesn't quite answer the question of -- of what the standard is. And so you could imagine it a couple ways. One possibility is the Court considers, okay, what factors are there no factual dispute on, and it determines those factors. And let's say it thinks those factors favor the defendant. Then maybe the Court just balances all of the factors on its own. That's one possibility.

A second possibility would just -- would -- would be to say, oh, well, this is summary judgment. We're taking this balancing away from the jury. The balancing itself is a sort of factual determination. And so we have to have a higher standard. And -- and maybe the standard is something like, well, no -- no reasonable juror -- jury would have balanced it a different way. Do you understand that distinction?

And so I -- I haven't seen -- and maybe there is a case that discusses how that's done at summary judgment, but I'm curious your opinion on it.

MR. RETTEW: Well, it -- it -- it's a very good question, Your Honor. And the answer is, you have a lot of discretion. The Court has a lot of discretion. We know in the -- the *George & Company* case, again, this dice case from the Fourth Circuit. In that case, the Court -- and it was a summary judgment case -- noted that when you look at all the

likelihood of confusion factors, not every one should be given equal weight and not every one is always relevant. So that is the Court -- the Court has the discretion to determine what's relevant, what's not relevant.

And we believe this is a good, appropriate case for summary judgment because when you look at all the likelihood of confusion factors, there's no reasonable dispute, there's no evidence that the plaintiffs have come forward with to tip these factors in their favor, and -- with the exception of the fact these guns are sold in the same stores. That's it. And that's not enough.

But FN bears the burden of proving likelihood of confusion, and they have to prove that an appreciable number of ordinary, prudent purchasers will be misled or confused. And that's the Fourth Circuit's *Perini* case.

And also another kind of tenet of -- of -- of trademark law when we're looking at these cases, including at summary judgment, is that the mere possibility of confusion is insufficient. It has to be a substantial likelihood of confusion.

So -- and -- and as you're -- to kind of sum up the question, Your Honor, the Court has wide discretion to weigh the factors and to balance them and to determine whether a reasonable jury could find ultimately that there's a likelihood of confusion or not.

THE COURT: And -- and I -- and I hate to short circuit your argument, but I -- I will a little bit. Are -- are there any factors that Ruger is willing to admit either that there's a factual dispute on or that -- that favor the plaintiff here?

MR. RETTEW: I would say the only thing that the plaintiffs have proven weighs in their favor is the similarity of the stores where these -- that these are sold in the same stores, that they can be sold in the same retail channels.

The strength of the mark favors Ruger. The similarity of the marks favors Ruger. Similarity of the goods favors Ruger. And even if you decided, Your Honor, that the similarity of the goods would favor FN, which we don't agree with, that still doesn't change things because of cases like the dice game, the -- the -- the *George* case.

The defendant's intent, there's no issue that Ruger did not act in bad faith.

THE COURT: Why isn't the strength of the mark a factual dispute? And -- and I -- you know, I -- I read your brief. I -- I -- I heard, you know, your argument, well, this is -- this -- it's -- it's an acronym. I -- I'm not sure that every acronym necessarily means it's not strong, you know. And you could imagine it being developed over time. You know, examples were given like IBM and -- and so on.

And it -- it seems like that question in particular

would go to, you know, how the public views this and -- and -- and how it's considered. Why -- why isn't that a -- why isn't there a factual dispute as to that -- as to that one?

MR. RETTEW: Two reasons. Well, there's -- there's two ways to look at strength. There's conceptual strength, which is kind of the inherent nature of the mark. And then commercial strength. Right? Has it been used so much that people readily associate it with one source?

Conceptually -- and -- and we noted on -- I can pop up a slide, Your Honor. There is -- this has already been litigated. It's already been adjudicated. It's a case that FN relies upon, and this is the -- the *Clyde Armory* case. And, in that case, the Court said that, inherently, SCAR is merely descriptive of a type of firearm.

Now, we concede even a descriptive mark or a weak mark can build strength over time. Right? So you can advertise it and promote it in a way that will eventually build strength. But the -- in this --

THE COURT: This is a -- this is a -- this is a case that's 10 years old, 10 or 11 years old. Right? So -- so that could have happened in that intervening time. Right?

MR. RETTEW: Correct.

But the inherent nature of the mark is always the nature of the mark; right? Because then we -- the -- the inherent conceptual strength or weakness is always the same.

Then we go to commercial strength. And yes, that could increase over time through sales and advertising.

But the Fourth Circuit has held or has explained that when you are trying to prove strength and secondary meaning, it is a rigorous standard and -- and the Court -- and I quote, "The Court is entitled to conclude on summary judgment that a mark lacks commercial strength where the evidence is sufficiently lacking." And that is the *B and J Enterprise* cases -- and Enterprise case out of the Fourth Circuit.

Now, what has FN come forward with? Have they -- have they shown that they have commercial strength? We don't believe they have. And I'm -- I'm going to be sensitive to confidential information of FN, so I'll -- I'll paint generalities, and I'll refer Your Honor to the part of the record where the specific numbers are.

But FN has claimed without details that they've spent millions over the past two decades advertising the SCAR mark. That's not enough to just say how much you've advertised. You must show -- or one must show -- and this, again, is also the *B and J Enterprise* case, which said,

(Reading): Large advertising and promotional expenditures are not dispositive. Advertising proofs without evidence of the time and place and publication are of little, if any, evidentiary value.

FN has not come forward with that. They failed to

identify the times or places where they've advertised, and that's Docket 88-2, which -- which is the details of that.

They couldn't -- they couldn't tell how many people viewed their website and their web pages. That's Docket 88-3.

They couldn't tell how many promotional videos were even made for the SCAR. That's 88-3.

They couldn't tell how many people posted about the SCAR or how many sponsored events were used where the SCAR was promoted, and that is 88-3 again.

And they guessed that the advertising has generated millions of impressions, but they had no idea how many people have seen it. And that's 88-4, Docket 88-4.

They also over- -- overstate the expenditures that they've spent on advertising, and they give numbers that are for all products. But the actual expenditures that are allocated to the SCAR -- and, again, that's a confidential number, but it can be found at Docket 80-16.

Those numbers are less than what the Fourth Circuit has found is needed for there to be commercial strength. And I refer to the *Renaissance* case, which found that ad spends averaging less than $360,000 per year weighed against commercial strength. And that was back in 2007. So the number necessarily must be higher today.

So --

THE COURT: Well, wouldn't -- wouldn't it depend on

the product, though? I mean, wouldn't the amount of money vary based on what you're talking about?

So imagine, for instance -- and I'm not saying this is that case -- but imagine you were in a -- a very specialized market, let's say law school textbooks. Right? That -- that amount of money might be an awful lot in that market. Right? The -- in a way that it wouldn't be.

So I'm not sure -- like, I'm not sure you can make an -- unless you -- unless you've -- unless you've got a case that says, hey, this is how much it takes in this kind of firearms case, I'm not sure you can just compare a raw number from a Fourth Circuit case and say that same raw number would apply here. Can you?

MR. RETTEW: I don't think you can, Your Honor. I would agree with that. But this is FN's burden. They have the burden of proving -- they have the burden of proving this -- right? -- that this was significant.

THE COURT: What -- what about the -- what about their argument about recognition of SCAR? You know, and so they cite a study. And I -- I get that -- that you dispute, you know, the -- the way in which that's done. But doesn't that at least create a factual question?

MR. RETTEW: Not at all. That survey, Your Honor, was -- was woefully leading. It asked people, do you know this? And case after case after case, when you're talking

about secondary meaning surveys, that is absolutely a -- methodologically and statistically from a survey perspective is not reliable at all. That -- that study, the way it was -- and I know we briefed this -- the way the wording was, the way the questions were, it -- it -- it begs an answer yes because -- and there's two problems with that study.

One, the reason questions like that in surveys are not appropriate is because there's a demand effect; right? Everybody taking a survey from social psychology, the assumption is, okay, they're going to want to give you a yes answer. So you have to have a non-leading question and you need a control group. There was no control group in that study. So that study absolutely does not meet their burden of proving recognition.

We -- and we don't -- we don't know much about the universe and how it was done. It doesn't re- -- re- -- it doesn't meet the rigors of reliability.

THE COURT: Well, there -- there's a difference, though. I mean, I get -- I guess the question on something like that would be who decides that. Right? Like, is it enough, you know, that -- that -- that that's a factual question that a jury -- I mean, obviously those -- those would be great points for cross-examination -- right? -- to -- to critique the study. Are you saying that there's case law that's like -- that says that wouldn't be admissible or

relevant at all?

MR. RETTEW: I believe that would be struck on a limine motion. They didn't use an expert to proffer it.

THE COURT: And what's your best case for that?

MR. RETTEW: Best case for that is -- sorry, Your Honor, I'm just going to look. I've got -- okay. The *CareFirst Maryland v. First Health of Carolinas*. That was a trademark trial and appeal board case that was affirmed by the Federal Circuit.

And there --

THE COURT: And what's the citation on that one?

MR. RETTEW: Sure. It's 77 USPQ2D 1492, with a pinsite of 1507. And it was affirmed by the Federal Circuit at 479 F.3d 825. And this is cited in our brief, Your Honor.

But there, the Court -- the Trademark Trial and Appeal Board, who focuses on these trademark disputes, found that aided awareness questions -- and the questionnaire was: Have you ever heard of blank -- did not support a claim that a mark was well known because of the improper question.

Also Professor McCarthy, which is the tome for trademark law. It is -- he is the commentator that everybody cites. He also notes that -- on the issue of a control,

(Reading): That courts often recognized the absence -- absence of a control as a fatal weakness.

And there are -- and I -- I can provide this for Your

Honor. I mean, there is case after case after case that says without a control, a study is not reliable.

So those are the two -- two sup- -- two supporting -- two supporting materials I have for that proposition. If Your Honor would like, the Court would like, I can get more. I mean, because this is a -- it is -- it is a noncontroversial point in the area of trademark law.

Also on this -- this -- this -- Your Honor, a -- a good question about how do we -- how do we measure sales and advertising versus the whole marketplace? Right? And courts commonly say, when you're looking at strength, you have to look at the whole marketplace for these particular products.

The *Grayson* case, another Fourth Circuit case, and the *Renaissance* case, both looked at the whole industry. Now here, we believe it is FN's burden to come forward to show what percentage of the marketplace they have. But they didn't, and we did.

So we have evidence, and I -- again, I want to be very sensitive to confidential information, but the sales of the SCARs are infinitesimal, infinitesimal, when we look at the whole market, which, for firearms -- which saw 97 million firearms sold during the same period. That's Docket 88-7.

So their sales are a very small sliver of the overall market. And that's the -- the type of analysis and comparison.

THE COURT: Well, wouldn't be -- wouldn't the -- the

relevant comparison be modern sporting rifles and not all firearms? I mean, it seems like that -- for purposes -- that's what I would think would be -- would be a more -- more relevant because that -- that's focused on the kind of -- at least the kind of gun we're talking about.

And -- and, you know, most -- I would imagine that most people walking into a gun store at least have an idea of the kind of firearm that they want and they're not comparing -- they're not going in -- you know, the -- setting beginners aside, they're probably not coming in saying, hey, tell me what kind of gun. I -- I'm deciding between a handgun, a shotgun -- you know, like, I mean, to -- to some degree a lot of at least firearms enthusiasts are going to be going in looking for a particular kind even if they don't know the brand.

So why -- why isn't -- like, do you have a statistic or something in terms of where they would fit within that more narrow sphere?

MR. RETTEW: I -- I don't, Your Honor, but that -- that's FN's burden. Right? That's the problem here is that is -- that is their burden.

And -- and -- and, unfortunately, I've learned from experience. Many years ago I was in a case where we had great numbers and we said to the Court, look at what we've done. We've done this; we've done that. And the Court said, where's your comparison? Where's the market? It's your burden to show

that this is significant, that it is material, and that is -- that is a failure on their part.

One -- one thing, though, Your Honor noted is, if we look at MSR, they're also -- modern sporting rifles -- FN has -- also does have some pistols. So I'm not sure if the right analysis would be -- I mean, they're -- they're semi-automatic pistols. It's the FN SCAR 15P, and that's in the binder if Your Honor wants to look. It's on Tab 7.

But it's not clear what is -- what is the proper market. It is their burden to come forward with that number. And I would suspect their numbers are going to still be quite low compared to MSRs or the overall marketplace.

THE COURT: Well, I -- I've been asking you a lot of questions. I do want to make sure you have time to get to your other points. You probably have about another ten minutes or so before we switch to the other side.

MR. RETTEW: Oh boy. I'm going to talk fast, Your Honor, if that's okay.

THE COURT: Okay.

MR. RETTEW: All right.

So one important thing is -- I think a -- a couple very important points are the dissimilarity of these marks. When examining marks it is critical that you look at the context in which it's seen by the ordinary consumer. That's the *CareFirst* case, which found for summary judgment for the

defendant in the Fourth Circuit.

And so what does this mean? We have to look at the whole context of the rifles. And may I -- may I approach the --

THE COURT: Yeah.

MR. RETTEW: And one of the things that's important here, Your Honor, is the house marks that -- and -- and courts have held, and we've cited a number of briefs -- a number of cases in our briefs that say you have a house mark. And, on this box, FN, you've got the logo. FN. This couldn't be any more clear who makes this. It's Ruger. Nobody cannot know that these guns are made by Ruger and FN.

And -- and on the guns themselves, you see the Ruger mark on the guns. Here you see the FN mark and the logo on their guns. So they always have the house marks. Construction manual. Even the lock has their logo. It is laden with the FN mark.

And may I --

THE COURT: Yeah.

MR. RETTEW: Right there. FN, their logo. And you will see it on the -- on the -- on the gun. There is a requirement that these be marked with brand names with the -- with the manufacturer, but you've got their logo on this.

Ruger appears several times on the gun. When -- when you examine it, you'll see, Your Honor, like right there.

That's a big one right there. Ruger. Got the Ruger logo.

So these products have their house marks. That, the case law has said, does distinguishing marks because common sense -- and trademark is rooted in common sense -- how is anyone to be confused if they know who makes a product?

THE COURT: But if a customer purchases one of those guns, does it always come in the box?

MR. RETTEW: If it's a new gun, it -- sometimes it's displayed without it. But if it's a new gun, it does come in the box. That's my understanding.

THE COURT: Okay.

MR. RETTEW: Now, FN -- well, the -- let's go fly through.

When we look at the marks, not only does -- does -- do the parties' house marks appear, but they're just fundamentally different looking. There's different fonts, there's different logos, different type styles, different ad messages. And you could see that -- this is the Ruger. There's the FN.

And the *George & Company* case, back -- back to the dice game case, *George & Company* said, you can -- the Court can, on summary judgment, decide that marks are dissimilar based upon the way they appear.

And, in that case, both parties -- one party was using LCR, the other was using left center right. They were

similar marks. There's a number of cases where courts have said that marks that are even mirror images of each other -- that's the *CareFirst* case -- even if they're mirror images of each other, then if they look different, that could be enough to avoid a likelihood of confusion.

Now here, beyond the house marks, beyond the way they look, beyond the advertising looking different --

THE COURT: Well -- well, help me out for a minute. What -- what do you think are the ways in which the -- the guns themselves look different?

You know, I -- I saw -- when I was reading the -- one of the expert reports, it talked, among other -- it talked about a lot of things, but one of the things it talked about was the distinctive boot shape, I guess, of the stock. And --

MR. RETTEW: The Ugg boot.

THE COURT: And -- and, you know, I looked at -- at the -- at the -- at -- at Ruger's gun, and it appears to also have a little bit of a boot shape as well, at least compared to some of the other -- some of the other models shown. So, you know, you can see the shape at the end. I mean, it's -- it's not brown, obviously, but it's -- it's got -- yeah, you could -- you could stand it up. It looks a little bit like a boot.

So -- so tell me what you think are -- are the differences in the way that these guns look or appear.

MR. RETTEW: The first thing, Your Honor, is this doesn't -- I mean, the Ugg boot shape is -- is pretty well known in the industry. And we have evidence showing people -- people recognize the Ugg boot. This is just the standard stock. This is not remarkable or does not look like an Ugg boot. I mean, it's -- looks like any other stock you can get on an AR-15.

We've got -- I mean, this is a -- this is a AR-15-style gun. So, you know, they -- they -- some people refer to them as Lego guns. You can accessorize them. You can -- you can kind of model it the way you want. Think of it like a Jeep; right? See Jeeps, people customize them.

Not with -- not with the SCAR. The SCAR is only -- they have only FN aftermarket parts.

But there's a number of fundamental differences between these.

Patrick, can we pull -- pull up that slide?

And we've chronicled them in the -- chronicled them in our briefs. But the -- the impingement system is completely different. This is a gas system. This uses a rod. Fundamentally the -- the guns are serialized different. One is up --

THE COURT: And is the gas or rod system, is that something that would be significant to a -- to a consumer?

MR. RETTEW: Yes. This is a military-style gun.

Like, this was -- you know, this is a commercial version of a military gun.

And the reason they use the rod system is because it keeps it clean. So if you're in the sand, you're in the dirt, it's better for combat. So it's a fundamentally different system.

Now, a gas system does operate differently. It's more accurate, but sometimes it can build up dirt. So these different systems are built for what you like. You know, what -- what are you going to use the gun for?

And that goes to this fundamental point that these are expensive, serious, highly regulated products. Nobody is going to use these and nobody, the evidence shows, is going to buy these without a lot of care, a lot of deliberation. We have testimony, and I have in the slides, which I'll gladly submit to the Court, you know, FN's own witnesses saying that this is a luxury purchase.

There's a study that FN did where -- I'm sorry, a study done by an industry association that talks about the different things that people consider when they buy these -- the MSRs. And we look right here. Online reviews. Spoke with friends. This is a study that -- that FN has relied upon. Again, it's -- it's an industry study from the National Shooting Sports Foundation.

But, unremarkably, it shows that people consider a

lot of things. This is such a high care purchase that when you look at the differences between these marks, which are pronounced differently, which look different, nobody's going to be confused.

And this slide shows that the we -- have testimony from FN -- and that's why -- that's why this is a good case for summary judgment, or a great case for summary judgment, because our evidence is really FN's evidence. It's the things that FN has admitted. These are the things people consider when they buy these -- these products.

And what's critical, Your Honor, is there has been no confusion. There has been no confusion in this case. And it's a little weird, this case, a little unusual because it's FN's burden to prove the likelihood of confusion. And in trademark cases, typically the plaintiff will do a survey. I mean, surveys are kind of the norm in trademark litigation. You always do a survey to prove that there's a likelihood of confusion.

Here, they did not do a survey, even though that's their burden of proof. We, however, did a survey, even though it's not our burden of proof. And the *George* case made it very clear, even though it's not -- I don't want to suggest that it is fatal to their claim, but the *George* case did explain you -- that if you do not do a survey -- here -- here's what they -- here's what the -- the Court said,

(Reading): George bears the ultimate burden of proving likelihood of confusion by a preponderance of the evidence. The lack of survey evidence, while not fatal, severely hampers George's ability to meet that burden.

And that was on summary judgment. Kind of going back to Your Honor's first question about what's the burden of proof here?

There's other cases. Another case out of Eastern District of Virginia, which similarly said, a failure to produce a survey for a plaintiff weighed heavily against the finding of infringement.

So not only does FN not have a survey, we do have a survey. It showed zero percent confusion. It used what's called the Eveready standard, which is like the classic design for surveys.

Now, one thing that goes back to the commercial strength, which I think is very interesting, is, in our survey, what we did in the Eveready survey, the design is, you show the alleged infringing product and then you ask people a series of accepted questions to see if they're confused. And, of course, you have to have a control cell.

So our expert, Hal Poret, who is a very well-known expert and has been accepted numerous times, he's one of the top -- the top experts in surveys. He did this survey, and one of the criticisms that FN has with the survey, they didn't --

now, they didn't do their own survey. They didn't hire an expert to critique it. But they argued that this is not the right design because when you use the Eveready survey format, the assumption is that the plaintiff's mark is top of mind. Right? Because if you're showing the defendant's mark, they're only going to confuse it with the plaintiff's if they already have the plaintiff's mark in their mind.

They criticized the survey on that basis, which undercuts the notion that this is a strong mark. If this is a strong mark, why would it not be on the top of people's minds?

THE COURT: The -- the other criticisms they made was that -- that it included the -- the Ruger logo or label. And I think my understanding of their argument was that many gun stores don't necess- -- that the tag that lists the manufacturer, it may be handwritten; it may not have the -- the logo on it.

And so I -- I guess maybe the -- the first factual question is: Do you -- do you disagree that -- that gun -- some gun shops don't actually have the logo with the firearm?

MR. RETTEW: Well, they al- -- they have tags. We've not seen anything that doesn't have a tag that says what the -- who's the manufacturer.

THE COURT: Sure. Sure.

MR. RETTEW: But I --

THE COURT: But the tag could be handwritten or -- or

not have the actual, like, colored logo.

MR. RETTEW: Correct. The evi- -- there is not a lot of evidence that this is the norm, but, yes, we would concede that does happen.

However, if -- if Your Honor looks at Tab 34 of the binder, in Tab 34, if you go to page 7.

THE COURT: Okay.

MR. RETTEW: So if we go on -- this is the actual questionnaire, the screenshots of the -- of the questions that were asked in the survey.

And what Mr. Poret did was, he showed a number of stimuli. It wasn't just with the Ruger tag. So you look at -- we have one right here on the left. And he explains in his report that he picked a cross-section of uses that would -- that would exemplify a gun store purchase with a tag, a gun store purchase without the tag.

The -- what you'd see when you see the gun online with the Ruger logo and what -- you'd see the gun online without the Ruger logo. So if you look at pages 7, 8, 9, and 10, and then even 11 and 12, you'll see -- there's even one that was shown where it was just the gun with nothing other than a close up, but -- or that was actually sequential. But he went through different variation permutations.

And on page 9, you see there's no Ruger logo; it's just plain text. And page 7. So he covered that base because

I wanted to make sure I was --

THE COURT: Well, your -- the argument would be pages 7 and 9 would be equivalent to seeing it with just a handwritten tag because there's nothing special about -- it's -- it's just written in plain text here.

MR. RETTEW: Correct.

And -- and, in fact, I say a tag is more powerful than what we see here; right? Because the tag's on the gun. It says who makes it. This is just plain text on a website not as impactful, I think. So I think he was conservative in that respect.

But what I think's very important, too, is on the -- on the issue of confusion, Your Honor, they came forward with -- well, on this sophistication point, I -- I'd be remiss not to point out that their guns are $3 to $5,000. This is an expensive item and -- and -- and one that they admit is a luxury purchase. Ruger's not as expensive but still pricey, $1300 to $1400. These are not cheap.

And, again, what's the point of that? People are going to be careful. They're going to know what they're looking for. They've done their research. They're not going to be confused.

THE COURT: Tell me this: What's the average price of a modern sporting rifle? And I won't hold you to it. But, like, are -- are these -- are the -- the Ruger, is it, like a

little cheaper than average? Is it about average? I mean, it sounds like you're saying that the SCAR would be above average, is -- is my impression.

MR. RETTEW: Oh, yeah.

THE COURT: But, like, where -- where are -- where is -- is your gun on the range?

MR. RETTEW: I don't know, Your Honor. If I can consult with in-house counsel, Patricia Shepard. She's here. She would know.

MS. SHEPHARD: Yeah, we're on mid- -- mid-range.

MR. RETTEW: So mid-range for the MSRs.

THE COURT: Okay.

So -- so something in the, like, thousand to $1500 range would be normal-ish.

MS. SHEPHARD: Yeah.

MR. RETTEW: Some less than that --

MS. SHEPHARD: I've seen some hundreds, and expensive in the multi-thousands.

THE COURT: Okay.

MR. RETTEW: But our point is enough that not something people are going to just buy on a whim; right? This is -- this is -- this is a -- as -- as FN said, any -- they said any firearm is a luxury purchase.

And I know I'm short on time, but there's a -- if it's okay, Your Honor, can I just hit a couple points on the

actual confusion?

THE COURT: Yes.

MR. RETTEW: Okay.

So what's very critical here too is that there's been a lot of time that these have been on the market. And one would think that FN would come forward with confusion. And that's what courts require; right? If you -- if -- if they've been out for a while, then there should be some evidence of confusion. If this was a problem, we'd know about it.

They did come up with a couple instances of a website where somebody typed S-F-A-R, mistyped the name on a website. And then there was one person, a FN employee who was in a store and he said he overheard someone say, I want a Ruger SCAR. It's hearsay. We don't know -- we don't know who that person is. We don't know anything about them. He just -- that's his -- his kind of uncorroborated hearsay evidence.

THE COURT: The -- the plaintiff says that's not hearsay. That's a -- that's a verbal act. That sounds -- that sounds right to me. Right? Like, because it's not -- did not go into the truth of the matter asserted, is it?

MR. RETTEW: The prob- -- I -- it's -- we've been debating. You know, I've been pondering this, Your Honor, and --

THE COURT: Well, what -- what matters is that they said it. Right? If they said it, it suggests they get it

wrong. You know, it doesn't matter how truthful they are; right? I mean...

MR. RETTEW: The problem is his statement, though. The truth of the matter is he's saying that they said this, and that's kind of the big issue at hand. So I think this is -- to me this is kind of in a -- a gray zone and --

THE COURT: I'm not saying that -- that it's enough necessarily. But -- but it strikes me that it would be admissible evidence. Do you disagree with that?

MR. RETTEW: I -- I think it's a close -- honestly, I think it's a close call, Your Honor. The problem is, we don't have the right to cross-examine this person to find out, did you really say that and what were they thinking? That's -- that's the issue.

THE COURT: Well, that -- that's a normal summary judgment thing; right? Like, at this -- at the -- well -- well, the question when you have -- I mean, the whole purpose of having these -- when you think of nonhearsay, the classic reason why something is not hearsay is you don't have to question the person who said it because what matters is not whether or not it's true. It's whether or not it's said. Right? And you would have the right to cross-examine the people who overheard it. Right? And -- and you can then challenge whether it was said or not.

If it was said, it's relevant. It doesn't mean

necessarily that they -- that they win on that basis. But it strikes me that that's at least evidence that the Court could consider.

MR. RETTEW: I would say, Your Honor -- like I say, I do -- I do think it is a close call. But I -- let's -- let's -- let's assume, totally comes in. It's not hearsay.

If we look on the screen, this is the person that overheard it. And so this is what's critical. Even if we take as true everything that was said.

(Reading): Question: Do you know if that customer actually thought Ruger made the FN SCAR?

Answer: No.

Do you know if that person thought that FN makes Ruger?

No.

Do you know if that person actually thought there may be some connection between the Ruger SFAR and the FN SCAR?

No.

Do you know if that person thought there was any connection between Ruger or FN in any way, shape, or form?

Answer: No.

Do you know if that person actually thought that the Ruger SFAR and the FN SCAR products are affiliated or connected in any way?

No.

So whatever was said, their own witness, a person who is advancing this testimony, could not admit that this person was confused because they don't know. And we've cited cases saying mere mixup -- mere mixups are not enough, that that is not enough for confusion. It must be confusion of the brands that somebody thinks one product's made by another, and a purchasing decision has to be made from it.

Their other testimony suffers the same -- same flaw. These are the 30(b)(6) witnesses. When I questioned Mr. Hines, I said,

(Reading): Can you name one consumer that has confused the look of the SFAR and the SCAR?

Answer: I don't have a person standing here. No.

Mr. Cole, he had referred to several online posts, and these are the three series of questions, and each one I asked,

(Reading): You don't know if this person ever confused a Ruger SFAR gun with FN.

Answer: I do not.

And you don't know if this person ever confused an FN SCAR with a Ruger?

Answer: I do not.

Nobody -- their -- the people proffering this could not say that anyone was confused. There's no confusion evidence here. And when we have no confusion plus a survey

showing no confusion, with this being FN's burden of proof, this is classic for summary judgment.

In the *George* case, neither side did a survey; right? And the plaintiff was chided for not doing a survey. Neither side did a survey, and they had more evidence than the evidence here, which is not confusion evidence.

But, in this case, there was good evidence. It was four instances where it was a retailer and consumers who called up and said, I saw your product in this store and it was the defendant's. So it was legitimate, viable, good confusion, and the Court said on summary judgment, that's not enough because it's only four instances.

Now, FN has said, well, we have to look -- and they're correct -- that we have to look at the number of opportunities for confusion to arise. And we have evidence showing that there have been a lot of opportunities for confusion to arise and -- sorry, Your Honor. Bear with me.

We have evidence in the record that Ruger had received -- Ruger, during the course of the -- the -- the litigation, when the Ruger SFAR was out in the market, they received 719,000 -- 719,016 calls, 182,731 e-mails, and they sold over [redacted] Ruger SFARs since the launch at that time. No confusion.

So there -- I mean, if we add this up, it's around a million opportunities for confusion to arise. None.

And that's not a surprise when we look at these products, when we look at the -- the house marks, when we look at everything. Even if some models may resemble the Ruger SFAR.

THE COURT: I -- I am -- I just want to make sure I -- I'm clear on what you mean. Are you -- are you saying that Ruger has records of what all those calls were about and that none of them were actually -- none of them said -- refer- -- referred to anything that would be a SCAR?

MR. RETTEW: Oh, yeah. No, we -- FN, unsurprisingly, asked in discovery that we produce all documents and -- and -- and instances of confusion.

So Ruger, as it's required to do, went to its call center, went to the people, talked to the people who would have all this information to see, has anyone been confused? None.

THE COURT: And their -- and -- and Ruger -- you -- you could imagine, you know, a company might delete its record -- might not want to save every record of every call. Ruger saves records of all of its calls?

MR. RETTEW: I don't know --

THE COURT: Because it's a separate question to say, you know, we've had this many calls and we don't remember anything; right? Than to say we have this many calls. We have all the records from all calls and there's no evidence of confusion. Like, those are two separate things. And I'm

trying to make sure what category we're in.

MR. RETTEW: Yes. So not every call is recorded, but notes are made of calls of any substance, so they reviewed all their records -- and they keep those -- they reviewed all their records of any complaints. Anything that would be confusion would be recorded and written down.

THE COURT: Okay.

MR. RETTEW: And so -- and -- and -- and Ruger, once this case came out, they monitored this very early. They were monitoring this to see how this rifle was going to do in the marketplace. Right?

So they -- they actually were very interested to see what people said about it. So they took -- I mean, they did -- took very seriously their duty to take down notes and -- and -- and they took records. There's no confusion.

THE COURT: One -- one final question and then I'm going to give FN an opportunity. So my understanding is that -- that Ruger is also moving for summary judgment on the UDTPA claim. We did not see any specific briefing on that issue, and -- and I -- and I'll ask the plaintiff the same question -- but is it your understanding that that stands or falls based on -- on whether or not the -- the trademark claim is successful?

MR. RETTEW: Yes, Your Honor.

THE COURT: Okay.

And if the -- if the plaintiff disagrees with that, I'll -- I'll give you another chance to -- to talk about it. But I -- I -- in all likelihood, I'm going to give you another chance to talk, but -- but I appreciate you -- you trying to keep your remarks brief and -- and to answer all my questions. So thank you for that.

MR. RETTEW: Thank you. Thank you, Your Honor.

THE COURT: And I'm sure I'll have ask -- questions for you, but I probably won't hold you to a literal half an hour, just -- just like I didn't hold Defendant to a literal half an hour. So go -- go ahead.

And -- and well, could -- if you don't mind, just so I don't forget, could you answer that last question first?

With respect to the UDTPA claim, hypothetically, if summary judgment were granted on the trademark, do you agree that that would cover this too? Or is there -- if not, like, what would you point to that's different about that claim that would --

MR. VAN ARNAM: Right.

THE COURT: -- save it from summary judgment?

MR. VAN ARNAM: Yeah. Thank you for your question, Your Honor.

So that wasn't briefed and that wasn't -- it wasn't part of the motion, so would we have denied that? The same underlying facts give rise to both claims. So, arguably,

and -- and -- and probably the answer to that is -- is yes, that they rise and fall together.

There have been cases of other instances where a 7511 claim, unfair and deceptive, would survive despite the IP claim, but, I think, in this instance, they -- the facts give rise to both and they rise and fall together.

THE COURT: And -- and I don't want to put you on the spot too much. If you go back and decide that -- that you think that there's some difference or some reason why it would survive, even if the other does not, could you just file something to the Court that would flag that?

MR. VAN ARNAM: I appreciate the opportunity, Your Honor. Frankly, we didn't spend much time on that because that was not part of their motion whatsoever.

THE COURT: Okay. Thank you.

MR. VAN ARNAM: Thank you.

THE COURT: And I'll just -- just so we're clear, if you would file something like that within ten days, or ask for additional time if you need it. If -- if -- if you don't -- if you don't think it matters, if you don't think there's a difference, no need to file something. But if you do think that that stands, even if the other claim were to fall, I think I'd like to -- to see something on that. And it doesn't --

MR. VAN ARNAM: Thank you, Your Honor. Be happy to do that.

THE COURT: -- doesn't have to be super long, but just something that would flag that for the Court. And if you do file something, I'll probably give the defendant a -- a -- a chance to address it as well.

MR. VAN ARNAM: Right. We'd be happy to do that.

Rob Van Arnam from Williams Mullen on behalf of FN. Over two decades ago, Plaintiff, FN, and its U.S. affiliate, FN America, established a strong, highly recognized valuable brand, SCAR.

And attempting to trade off that goodwill, it's our allegation, and facts support, that Ruger, a direct competitor in the industry, introduced an inferior modern sporting rifle, this one branded under virtually the same mark, SFAR.

There are two essential elements of an FN -- of a trademark claim. The first has been established, validity. There's -- there's been a concession on the part of Ruger -- and we can talk about that later -- on FN's motion. The second is confusion, and that's the disputed element here.

On likelihood of confusion -- and you asked the question -- what is the standard and who bears that burden? Certainly as a plaintiff in a trademark case, at trial, FN would have to establish under a preponderance standard that it had sufficient evidence. And we fully expect that if we showed that to a jury, they'd give us a fair shake, and we think we could do that.

On the summary judgment motion and standard, it is defendant's or non-movant's burden to show there are no genuine issues of material fact on the elements of confusion. And there are cases where a court has found summary judgment while crediting a plaintiff with maybe an element, but it is taken as a whole.

And it's important if we go to the first slide. As you look at the elements, we believe they are all in FN's favor --

THE COURT: Well -- well, I -- I'm going to stop you and just hone in on the same question I asked to defense counsel, which is, so -- so I understand -- you know, I understand these -- these elements or these factors. And I also understand the general summary judgment of -- of no dispute of material fact.

And so you could imagine looking at that with respect to these factors and saying, is there a dispute of material fact as to factor one? Factor two? Factor three?

Let's suppose I do that analysis and I find that some factors have no dispute of material fact and other factors do. Am I then allowed to balance those factors or is there something else that comes into play at that point?

MR. VAN ARNAM: You certainly have the discretion to balance those factors.

THE COURT: Okay.

MR. VAN ARNAM: But typically -- and -- and we could show you a law -- it's at the bottom of this slide -- summary judgment on likelihood of confusion is an exception. And it is because it's an inherently factual question. All of these elements and all the things that counsel talked to you about are questions of fact that need to be resolved.

We concede that they have counter evidence and arguments as to why they should win at trial, but they are not enough to establish we cannot prove or that there's no genuine issue on any of them.

And, frankly, if several of the elements are in FN's favor or there's at least a genuine issue, that balance tilts in favor of allowing a plaintiff to go to trial. Again, there's no decision on the merits, but it's allowing the case to be brought and for those facts to be heard. That's why the Fourth Circuit has -- has said this is an inherently factual question that needs to --

THE COURT: But it -- but it's not -- it's not exactly just a numbers game; right? Like it's not strictly speaking the number of factors. Some can be more important than others or some can be stronger than others. Would you agree with that?

MR. VAN ARNAM: Correct. Correct.

THE COURT: Okay.

MR. VAN ARNAM: It's -- it's not, well, you get five

and they get two or something, but --

THE COURT: Right.

MR. VAN ARNAM: -- you know, a plaintiff also doesn't need to win or show all elements even, frankly, to win at trial, but particularly on summary judgment.

The question is, are there genuine issues on balance with these factors in whole? And we would argue, if they're not in FN's favor -- which we believe most of them, if not all of them are -- there's at least genuine issues of fact on them.

Go to the next slide.

We talked about commercial strength and the strength of the mark, which is an important factor. What mark are we looking at comparing? And SCAR is and has been found to be a strong mark. Frankly, it wasn't a big part of Ruger's brief, so we're surprised they spent that much time of it today in oral argument.

THE COURT: Well, that may be my fault. I think I asked questions.

MR. VAN ARNAM: They did have to respond to questions, so I don't fault them with that.

But if you look at our brief, if you want to follow up on that, in terms of all of the evidence we put out about advertising expenditures --

THE COURT: Well, I -- I think one thing -- and I -- I'm not sure I -- I quite made a good note of this, but they --

when I asked Ruger questions about that, they did point to -- I think it was a -- a district court case that had been affirmed by the 11th Circuit. They had some language in there indicating that.

MR. VAN ARNAM: Can we go next slide?

THE COURT: The -- the Court -- yeah.

MR. VAN ARNAM: Yes, Your Honor.

They -- they did talk about that district court case --

THE COURT: Right.

MR. VAN ARNAM: -- that found secondary meaning. And this is the 11th Circuit affirming that district court case. And we believe this shows, essentially as a matter of law, the strength of the SCAR mark because secondary meaning is the equivalent of strength of -- commercial strength of the mark.

And the -- in the *Clyde Armory* case that FN brought, trademark infringement case, you know, these issues were considered, and the district court found in favor of FN on its mark and commercial strength, and the 11th Circuit -- and this quote here on the slide, again looking de novo, affirmed that decision.

So not only does it have commercial strength, but it established that in 2006 and the advertising, the unsolicited media, everything has continued and strengthened that mark since that time. So this is, you know, over 20 years of strong

use of a mark.

Again, I -- we think your question was appropriate. Why is that not in FN's favor, that -- that element of confusion? At least there's a genuine issue. The 11th Circuit, we believe in that case -- they cited the district court case -- has established it.

If that's insufficient, certainly the evidence in this case of advertising expenditures, of sales success, of unsolicited media coverage, this is all in our briefing at page 23 through 26, including a study that they seem to critique now, but was the same study that their expert -- damages expert used -- you'll hear about him later -- for part of his damages analysis. Again, we think that this -- this confusion factor is in our favor.

Go next slide.

This is the study at issue where SCAR was one of the best known brands in this -- this category.

THE COURT: And what is your response to Ruger's argument on that? You know, so I -- I asked about this study, and -- and I did see this in Ruger's brief. But Ruger's response is, well, you know, the way the question was asked was suggestive, and -- and so it doesn't -- it doesn't mean as much for that reason.

MR. VAN ARNAM: That's a weight question. That's a question of fact. They can examine our witnesses, which they

did in depositions and at trial, to suggest this doesn't have as much weight.

THE COURT: So you disagree with the idea, and I think Ruger said that there was considerable case law suggesting that, well, this wouldn't even be admissible because there wasn't a control and...

MR. VAN ARNAM: It -- it's admissible because it was a study that was done. It's not -- we didn't offer it as an expert where they could seek to exclude it. It's a piece of evidence that FN has. Again --

THE COURT: Well, not -- not every study would be admissible. Right? I mean, there's got to be -- just because something is called a study or even if it's published somewhere, that doesn't mean necessarily that a court would admit it. Right?

MR. VAN ARNAM: That's true. Certainly studies or evidence generally could be found to be inadmissible.

But, again, attacking what the study was about or how it could have been done better is -- is issues and arguments that they can make to a jury. It is not sufficient to exclude it at -- at this stage. It's only one small piece of the mountain of evidence that we have as to the commercial strength, and the 11th Circuit found already.

If you could go to the next slide.

I want to talk about the next category and the

similarity of the marks. You heard argument about Ruger's depiction of its mark in -- in different colors or in different ways. But, at the heart of the case, we're talking about SCAR and SFAR, two very similar names and marks used for almost identical products.

And when you look at the similarity of the marks, again, a confusion factor. They're highly similar. Do they contend, particularly now, that the correct pronunciation is S-F-A-R? Sure. But we have other evidence to suggest that is not how the market understands or says their mark, which is SFAR (pronouncing) or S-FAR (pronouncing). Those two are together.

Counsel talked about the *George* case, a case he -- he knows well. That was LCR and left center right. Their -- the other cases that -- on summary judgment that they cited, much dissimilar marks than what we're talking about here. Here they appear, often as they do here, in black lettering with one letter difference. And we think, again, that was intentional to trade off the goodwill of FN.

Go to the next slide.

So this is some of the evidence that we submitted, at least presents genuine issues on this, from various witnesses. And this is in the copy of the slide deck that I believe you have, so I -- I won't belabor it. Again, people pronounce it S-FAR (pronouncing) or SFAR (pronouncing).

You can go to the next one.

Additional testimony and evidence suggesting that it is SFAR or S-FAR.

Okay. Go to the next one.

In fact, FN did an investigation of this and had an investigator poll a small number of -- of gun shops and almost half of them, the response was S-FAR, not S-F-A-R, as Ruger contends now that the mark should be heard or understood.

THE COURT: What did the other half find?

MR. VAN ARNAM: S-F-A-R.

THE COURT: So --

MR. VAN ARNAM: There were six --

THE COURT: So FN did an investigation and half of them found it SFAR and the other half found S-F-A-R?

MR. VAN ARNAM: Correct.

THE COURT: And none of them did SFAR (pronouncing)?

MR. VAN ARNAM: Well, there were only 11 people polled. We suggest and there's -- there's additional supplemental --

THE COURT: I mean, that's not great for you -- right? -- if -- if you're trying to make a point about the pronunciation and -- and your own --

MR. VAN ARNAM: Actually -- sorry.

THE COURT: Go ahead.

MR. VAN ARNAM: Actually we think it's great for us

because if half the people asked don't pronounce it the way they need to have it pronounced to differentiate it from our mark, that is significant evidence and it leaves genuine issues of fact about how that mark is heard and pronounced in the market.

Again, it's -- it -- it was a small survey by an investigator that called gun shops where most of guns are sold in the country.

THE COURT: Where is -- where is that survey in the record?

MR. VAN ARNAM: I'm sorry, where is?

THE COURT: Where -- that survey, where is it in the record?

MR. VAN ARNAM: The investigator --

THE COURT: Or it's --

MR. VAN ARNAM: It's the Halstead deposition. And hopefully my colleagues will help me find the Docket Entry. It's the Halstead dep transcript 148,13 through 149,2.

If we could find the exhibit number, I'd appreciate that. I'll follow up with you on that, Your Honor.

THE COURT: Okay. Thank you.

MR. VAN ARNAM: All right. Next slide.

Again, the understanding, or Ruger's argument now, about what S-F-A-R stands for, at least there's counter evidence from their own CEO about what he understood they were

marketing and selling when it was conceived and sold, special forces AR.

THE COURT: And -- and I don't want to cut you short too much, but I -- I have read your brief on this. I -- I -- I would like to see a little more some of your arguments on the other factors.

MR. VAN ARNAM: Sure.

THE COURT: Particularly, I'm -- I'm very interested in the next one as to the similarity of the goods or services.

MR. VAN ARNAM: Okay. Let -- let -- let's move to that.

Your Honor, what's important when looking at the similarity of the products as a confusion factor is not at the minute level of are there any differences between these? This is not a counterfeiting case, and a -- a trademark infringement case doesn't require the two products to be identical, which is -- seems to be Ruger's argument.

It's analogous to biology, kingdom, phylum, class, order, family, genus, species. They hope to show you there's some species difference, some DNA differences between the gun. Frankly, gas powered and other things aren't visible and not necessarily a reason someone would buy it.

Trademark is at the class level. That's how you get a trademark. They're both in class 13. What is class 13? Not only are they both firearms but they are both rifles. And not

only that -- and it's been admitted by Ruger witnesses -- they're both modern sporting rifles.

THE COURT: And I -- you know, I -- I know that you've cited some case law on it, and -- and I'll -- I'll look at that more closely than I've had a chance to yet.

But why -- why is it -- why is it at that high of a level of generality? And I'm sure Ruger will -- will tell me it's -- it's different if -- if I ask them or they -- they seem to think it's different.

But if the focus is on whether or not it's confusion -- right? -- and you have someone going into a -- a gun shop, presumably, who knows something about guns, why -- why do we have to ask, well, is it a gun or a watermelon? Why isn't it enough to say, well, these two guns are -- are different in important ways that the average gun purchaser would recognize? Why is that not enough for this factor?

MR. VAN ARNAM: Because the element for what has to be proven is a likelihood of confusion. And when two products are in the same class of goods and seen in the same stores, they are more likely to be confused. So some of those purchasers might be looking for a specific feature and understand it, but many of them are not.

This is why, you know, Dove soap can't prove infringement or stop Dove ice cream from selling with using the same mark. But when the goods are in the same class, it -- it

-- it impedes a registration and it also shows a likelihood. That's why it's -- it's examined at that level, and they're also the same consumers and similar advertising.

THE COURT: So -- so that -- so if you're -- if -- if you're right about that -- and again, I'll -- I'll have more of a chance to kind of dig into the case law later, but if you're right about that, then that would suggest that this -- that this factor would unambiguously go your way.

But in -- in that case, it would -- it would only take you so far because, you know, just -- just because a -- you know, two things happen to be guns doesn't mean it's that likely that -- that an average gun consumer is going to confuse them. Right?

MR. VAN ARNAM: Yes, Your Honor. Again, if the marks were different, dissimilar like they are in -- in many of the cases that Ruger cited. Or, for instance, it was a pistol or a completely different type of rifle, we might --

THE COURT: Well --

MR. VAN ARNAM: -- have a harder --

THE COURT: -- hang on. Isn't that just different from what you told me a second ago? I mean, when you started this part of the argument, didn't you say guns were the class?

MR. VAN ARNAM: Yes.

THE COURT: I mean, would your argument be different if it was a handgun as to this ar- --

MR. VAN ARNAM: What I --

THE COURT: -- as to this point?

MR. VAN ARNAM: What I'm -- sorry. What I'm saying, Your Honor, let me explain. The inquiry doesn't end just because they're both guns. We understand that. That's not what I'm arguing.

But when they are both guns, both rifles, both modern sporting rifles, you have kingdom, phylum, class. You have an overlap of product. And that's all that's required, an overlap of what the product is, not identity.

THE COURT: Let me ask you this. And this is more of a factual question than kind of the broader legal argument you're making here.

Ruger says that -- that -- that theirs is modeled after an AR -- an AR-style and that the SCAR is not. Do you agree with that fact? Even -- I -- I understand completely that you disagree with the significance because you think the fact that they're modern sporting rifles is enough. But do you disagree -- do you think the SCAR is modeled after an AR? Let's start with that.

MR. VAN ARNAM: I -- well, I do -- I don't -- I -- I think their argument is theirs is modeled after the A-10, but -- they -- they --

THE COURT: Well -- well, just -- just answer my question for now. Is the SCAR modeled after or meant to be

sold to the consumers as a type of AR? You know, AR-15, AR-10, you know, something like that? Is -- is --

MR. VAN ARNAM: I'd say generally yes, Your Honor. Again it's -- it is...

THE COURT: And what would you point to in the record for that point? Like, maybe advertising or, you know, any -- what would you point into the record that -- that the SCAR is meant to be seen as a type of AR?

MR. VAN ARNAM: Well, there's testimony from FN's witnesses that I can identify specifically. And also its expert, Dan O'Kelly, that Ruger hasn't challenged for that notion.

Now, a- -- a- -- again, the functional equivalent of them, same caliber. I think there was an argument that FN's can't be configured or -- or altered, and -- and that's not the case. And they're used for the same purpose.

So a- -- again, if you -- even if it's a question of A- -- you know, A-10, A- -- AR or something like that, that's not the analysis that one needs to determine whether they are similar in terms of products.

THE COURT: I understand that. I just -- I just was curious about the fact.

MR. VAN ARNAM: We can go to the next slide.

So we won't belabor this because you're going to have them in front of you. We've set them forth here on -- on the

table, and I can certainly --

THE COURT: Yeah, you can approach.

MR. VAN ARNAM: Okay. Lift them up.

Again, are there some small differences? Yes. This is the SCAR, the original version.

And the SFAR.

And this is the second version of the SCAR.

And, again, whether it's the Ugg boot stock, whether it is -- again, they're both sold in black. The rail. We -- we think there are more -- way more similarities than differences.

And, again, that's looking at a very precise analysis that is beyond what we would have to show, particularly on summary judgment, to establish this element of likelihood of confusion that we think, again, goes in FN's favor.

THE COURT: There -- there's a couple of factual questions I wanted to just understand.

One of the arguments that -- that Ruger makes is that while the -- while the SCAR guns are all available in black, that the way they're marketing on- -- online is and I -- I'm -- I apologize, I'm going to use the wrong color, but I'm just going to say the brown color because that's -- that's the way it looks to me. I know it's -- it's got a specific name to the color. But that when you're looking at them online, the -- what shows up initially is the brown. Is that true?

MR. VAN ARNAM: In -- in some instances.

If we could go to the -- right here.

Here's an example of a -- a -- of online where the --

THE COURT: Well, this -- this is social media.

MR. VAN ARNAM: This is social media.

THE COURT: Right? Sorry, I was --

MR. VAN ARNAM: On top --

THE COURT: -- talking about a --

MR. VAN ARNAM: Yeah, and I'm --

THE COURT: -- website.

MR. VAN ARNAM: -- not sure if we have that. So on the website -- and I don't know if it's always the case, but, yes, it will show up in an FDE, or the brown, but it will also show up underneath with sort of select your color as if you're buying apparel.

THE COURT: Sure.

MR. VAN ARNAM: You know, do you want a blue shirt, a red shirt, et cetera. And frankly, that's a --

Stay -- yeah. No, stay where we are.

The -- a surprising argument because it can't be a defense to say, well, we sell, you know, Kaka Cola in a black label. It's not a red label. So how could we be infringing Coke? Yes, sometimes ours are brown and sometimes theirs are black, but we're also selling it in the exact same color.

THE COURT: Well, I -- I was wondering this with

respect to, you know, one of -- one of the factors that is considered is -- is the intent; right? And if -- if Ruger were intending to infringe, wouldn't it use the same color that FN most commonly uses?

MR. VAN ARNAM: Well, not necessarily. And it's -- again, it's not a -- a trade dress case. So we're not -- we haven't claimed that it's exactly in shape or color.

THE COURT: And I don't want to get you out of order too much. But what is your evidence of intent?

MR. VAN ARNAM: So --

THE COURT: I know that's just one factor --

MR. VAN ARNAM: Sure.

THE COURT: -- but -- but -- but I did understand your argument to be that you -- you thought you had met that factor.

MR. VAN ARNAM: Right.

The element of intent or bad faith going to confusion, it doesn't require, obviously, a smoking gun. You know, we intended to do it. We meant to rip them off. You'd never be able to prove that element.

What you can show is the inference, and here that is, Ruger was well aware of FN, was well aware of the SCAR and its trademark, and that it knew it when it adopted the SFAR mark.

And more than that, it did a trademark search that we have an expert that said, under those search criteria, there's

no way that SCAR wouldn't have come up and they wouldn't have known about it.

THE COURT: Well, let -- let's assume -- let -- let's assume for a second that I -- that -- that Ruger knew that SCAR existed and that that gun existed. Right?

That doesn't mean that it knows that there will be confusion or that it -- its gun infringes. Right? Like, those are two separate questions. And so the fact that they know there is a SCAR doesn't necessarily mean that they know that, you know, SFAR or S-FAR or, you know, that -- that their -- that their gun is going to be confused.

And so I think -- I would think -- and maybe I'm wrong -- but I would think for that factor you would have to show either circumstantially or in some other way that they were intending to infringe to create confusion.

And I -- I just -- I'm struggling to see what's in the record that supports that for that factor.

MR. VAN ARNAM: So -- so, again, we have the -- the -- the -- the admitted knowledge of FN and its trademark. Not just that there was a SCAR, but that it was a trademark.

And also the search report that they did that there was privilege objections that we -- we couldn't get to communications between counsel and Ruger. But the inference is that when they did that search, they came up with our trademark. And -- and why -- why they did that search was to

determine what would be confusing.

That's why you do -- that's why you have your lawyer do a search to determine what's out there in the field and would this be confusing with the -- with the brand that we want to introduce.

And, Your Honor, we think that we would be able to admit at -- at not going to liability or anything else, but that this is the second trademark case between these two parties. And that goes to the knowledge of the defendant and the infringer as to the plaintiff and its marks and that it enforces its rights.

So, again, do we have conclusive evidence? If we had an -- an e-mail or an admission, we probably wouldn't be here. But we believe, again, there's genuine issue of fact on that element as well.

THE COURT: If you could -- if you could jump -- I -- I don't think I need to hear argument on the similarity of facilities or channels of advertising, but I would like to hear argument related to actual confusion.

MR. VAN ARNAM: Okay. Yes.

And if you could scroll ahead to get to that.

Your Honor, again, we think this is a genuine issue of fact. And -- and you identified at -- at least -- or had a discussion about at least one piece of evidence that we have, and we agreed with Your Honor's understanding that it's not

hearsay, it's a verbal act. Otherwise, you'd never be able to introduce or have that in a trademark case.

It's not for the truth of the matter of -- and, of course, when counsel put up FN's witness, he's not in that person's head. Of course he's not going to know. It's that it was said.

And the same is with our online evidence. Counsel argued that it was, I think, a mistyping or misspelling. There's no evidence of that. They can argue that at -- at trial or that that happens. But that's a jury question, a fact question.

THE COURT: Tell -- tell me about this video game. And I -- I don't think -- and maybe it was in the record. I didn't see a -- I -- I could have missed it. I didn't see a picture of the video game. Is that in the record somewhere?

MR. VAN ARNAM: It should be here, I believe, in this slide. And that's at Docket Entry 80-19, I think is where we had some discussion of it. The video game itself, Your Honor, or -- or -- this is the evidence, I think, a screenshot of it.

THE COURT: Well --

MR. VAN ARNAM: So the --

THE COURT: I -- I guess -- so I -- I don't -- I would say I -- I don't understand that part of the argument very well right now. So is -- is the argument that the video game is using a SCAR gun and then that -- that someone confused

it as being a -- a -- an S-FAR?

MR. VAN ARNAM: Yes, Your Honor. And -- and the way that links -- well, I'm sorry.

THE COURT: And how do we know that the video game is using a SCAR gun? Let's start there.

MR. VAN ARNAM: That should be in the record and -- and that is --

THE COURT: Well -- well, just explain it to me.

MR. VAN ARNAM: Sure.

THE COURT: I'm not asking where it is in the record right now. Like, did -- you know, did the maker of the video game specifically use a SCAR gun as its model?

MR. VAN ARNAM: Yes, it -- it -- it's been --

THE COURT: Like the military version of it or the -- or the commercial version of it?

MR. VAN ARNAM: They're sort of part and parcel. I -- I think it was the commercial model of it.

THE COURT: Well, you would know I guess because if it were in the video game you would know whether it automatically fired or it was semi-automatic --

MR. VAN ARNAM: That --

THE COURT: -- right?

MR. VAN ARNAM: -- that's correct, Your Honor. And I -- I -- now that I'm thinking of it, I think it may be both, but often in those games they're going to want the highest

power and the most automated they can make. So I believe there's probably a military. But, again, it's the same name and it's the same version.

And how that connects is -- and -- and maybe this is unfortunate -- but for younger folks who play more video games and who believe and understand -- it's another element to our strength -- of the popularity of the SCAR, that's why it got used by the video game manufacturers, makers in those games.

So people, young people, and as they get to the age to be able to be interested in purchasing guns, know that. So that's another element of confusion.

Again, it -- it's not the only one. But that's -- that's another online reference where someone mistook the SFAR and the SCAR.

So, again, yes, they have a survey. I think you identified our arguments about why we think it's flawed and, in some parts, unreliable. Again --

THE COURT: What -- what is your -- you know, their -- their response to that -- and -- and they pointed me to -- you know, I think to the relevant -- to the relevant page, and I may not be able to find it this second.

But their response is, well, one of -- one part of the survey did show a picture of this gun with the manufacturer in plain text. What -- why isn't that equivalent to, you know, seeing a handwritten tag? You know, it doesn't have the

special logo on it.

MR. VAN ARNAM: Well, first of all, all of those images that he used are from Ruger's website, so it's not what you identified as the --

THE COURT: Well, the -- the one, sure. But the one that they show- -- one of the images they showed, even if it's not from the website, it did seem like it didn't show anything but the gun and the label of it.

MR. VAN ARNAM: I -- I believe at the top of that image, the -- the -- the one image there is the -- the use of the -- the -- the Ruger name. The rest of it was -- was cut out.

THE COURT: Could -- could I ask -- and I -- could -- could I ask Ruger to just remind me. What -- what -- do you know the page you referred me to earlier?

MR. RETTEW: Yes, Your Honor. It's Tab 34.

THE COURT: Okay.

MR. RETTEW: And it's pages 7 --

THE COURT: And nine.

MR. RETTEW: -- through 12.

THE COURT: Okay.

So -- so I do -- I do see what you're saying. It looks here -- it's got -- it does show something about the website. So it says, home, shooting, guns, Ruger, SFAR semi-auto rifle, and then it's got the name Ruger SFAR,

semi-auto rifle, and it's got a -- the gun displayed there and then it's got the -- the question --

MR. VAN ARNAM: Yeah.

(Indiscernible cross-talk.)

THE COURT: -- the ad clearly. But -- but it looks like at least from that particular picture, most of what you're -- like, the most prominent thing there is the picture of the gun itself and then the name in plain text.

MR. VAN ARNAM: That's -- that's true, Your Honor. But, again, we believe three images from Ruger's website is not necessarily market conditions. We have a -- a -- a slide of photos from a gun shop, which is how most people encounter them.

THE COURT: Why didn't you do a survey in this case?

MR. VAN ARNAM: It --

THE COURT: I mean, and Ruger tells me -- and -- and this is -- this is my -- my first trademark case -- but Ruger tells me it's common for the plaintiffs to do surveys. Is -- do you agree with that? And -- and, if so, or -- or even if not, why -- why did Ruger -- why did FN not do one here?

MR. VAN ARNAM: Yeah, there's a couple points to that. There is black letter Fourth Circuit law that we can find and cite to you -- it's in our briefing -- that it's not required.

THE COURT: I saw that.

MR. VAN ARNAM: And, frankly, Ruger's argument that we didn't do one is not admissible. But what we didn't do cannot be evidence about what we should have done in the case. The -- the short answer --

THE COURT: I -- I understand --

MR. VAN ARNAM: Yeah.

THE COURT: -- all that.

MR. VAN ARNAM: And the short answer is, it's expensive, and often you have competing experts that -- again, we think their expert did the same thing -- that -- I don't want to say manufacture -- that take advantage of an image to get a result from a survey. And, frankly, we didn't think it was necessary in this case, given the mountain of evidence that we have.

Yes, we -- we understand that they will, at trial, talk about their survey and say from that there is no actual confusion. We have other evidence on actual confusion, which is just one element. It's not -- missing just that element does not diminish a likelihood of confusion analysis.

And, again, with the strength of the mark, the similarity of the products, the advertising, frankly all the elements we've talked about, we think that is a -- a minor point.

Now --

THE COURT: I thought from some of the case law I

looked at that -- that the similarity of the marks and actual confusion, while they're each one element, that those were -- or not element, factor -- that those were important factors in this analysis.

MR. VAN ARNAM: Yeah, the strength of the mark is -- is -- is one of the most important as well, and the similarity of the marks.

Actual confusion is important because -- but -- but people misunderstand or equate it to what the standard you need to show, which is a likelihood of confusion, looking at all the factors together.

And here the short -- the -- the short answer is, we sent them a demand letter about a month, five weeks after they launched their gun. So did they try to be more careful on -- on the recordings? And I -- it's a little unclear to me that the number of recordings they have is for everybody calling Ruger about everything as opposed to just for the -- the SFAR product.

It's very difficult to get actual confusion evidence because you have to sort of catch somebody in the act in the scenario. And people buying guns are -- are not happy and the gun shops are not happy with someone standing around looking to record or interview somebody as they're making that purchasing decision.

Your Honor, again, on balance, there are at least

genuine issues of material fact on all of these elements. But if we go back to them, we think FN wins on the -- the bulk of them. Is there competing and genuine issues as to, you know, actual confusion? Will they contest that with a survey?

THE COURT: Well --

MR. VAN ARNAM: Yes.

THE COURT: -- there's at least one more of these elements that I do want to talk about. And I know, you know, I've taken up some of your time with my questions. But I do want to hear your arguments relating to the sophistication of the consuming public.

I -- you know, it -- it sounds like it's undisputed that -- that FN's rifle -- rifle here, the SCAR, is a high-end rifle in the -- in the modern sporting rifle.

And -- and -- and obviously this is a little bit of a specialized area just within firearms. Why -- what's your argument -- are -- are you arguing that -- that purchasers of -- of SCARs are not sophisticated or what -- what's the argument there?

MR. VAN ARNAM: That's correct, Your Honor. Some are, some aren't. This is, in large part, the consuming public or those particularly interested in a gun purchase, a rifle purchase, or an M- -- MS -- modern sporting rifle purchase.

THE COURT: And remind me what's your -- what is -- what is the -- what is your evidence that the consuming public

in this area is unsophisticated?

MR. VAN ARNAM: So our expert, Mr. Dan O'Kelly, who is long experienced in this field, testified that a lot of these times rifles such as this are impulse buys. That's Exhibit U, and his deposition testimony is 124 to 125 on that point.

THE COURT: And --

MR. VAN ARNAM: And he talked about people who buy them as a range toy or whether they see it on a video game or someone says, hey, this is really cool. They will make that purchase. Yes, they have to be licensed --

THE COURT: And was he speaking to modern sporting rifles in general or was he speaking to SCAR rifles in particular?

What -- what's the -- tell me the context, number one, and tell me, two, like, a lot of times is the -- a lot of times is not that -- that helpful. Like, what -- what percentage of these purchases -- if he's an expert on this, I'm hoping that he said something a little more specific than that.

MR. VAN ARNAM: Right. Well, Your Honor, he -- he testified about this -- and we can i- -- i- -- identify it. I -- I think the counter evidence is -- is from the two experts and also from FN's witnesses who talked about who buys these and why.

There are certainly people well versed in this field

who are looking for a specific thing who have done a lot of research. They pulled up the study on their slide about what people do. But just because they do some research doesn't mean that's informed or that they are knowledgeable or sophisticated.

One of the top things was friends and family. Well, that information's only good as to what they're saying and what they know. Similarly to online, particularly there's YouTube videos.

So sophistication, this is not marketing to, like, doctors or folks in a specialized field that are paying attention even more. This is to a class of generally gun buyers and rifle buyers.

And, again, people may come to that decision through informed research or because they're interested in moving up or that's -- they're going to buy their first rifle. So, again, we think that element is at least disputed.

And -- sorry.

THE COURT: What -- what percentage of FN SCAR's purchases would be first-time rifle buyers or first-time gun buyers?

MR. VAN ARNAM: I don't know if we have that in the -- let -- let me see if we can pull that up. I think there are -- the -- the SCAR buying study came up with that. There's some of this that is confidential, so I'm going to maybe try to

talk at a high level.

THE COURT: And if it's important, you know, we could always have you --

MR. VAN ARNAM: Yeah, it's --

THE COURT: -- approach the bench.

MR. VAN ARNAM: -- it -- it's something I can follow up with, and it may be that we might have to excuse counsel if that part is -- I think we designated some of that material as -- as attorney's eyes only. But I can follow up with you after the break --

THE COURT: Okay.

MR. VAN ARNAM: -- on that.

Okay. So, again, certainly they can make an argument and they have evidence that there's some sophistication. People are paying attention, but there's --

THE COURT: Well, let me ask this legal question. For this element to cut one way or the other, what -- what percentage of -- of the -- of the -- of consumers needs to be sophisticated?

So let's -- let's suppose not firearms because that's what we're fighting about, but let's -- let's suppose in some other area. You know -- you know, Pokemon purchases. Right? Seventy percent of buyers are sophisticated and 30 percent are not. Right? Is -- is that enough? Like --

MR. VAN ARNAM: It just has to be appreciable numbers

so that you're looking at the audience and potential consumers for it. There's no magic number that it has to be, you know, 50 percent or higher or 80 percent or something.

If it's de minimis -- if it's, you know, a very small percentage, then your consumer base at large is sophisticated. But if you're marketing to a consumer base that includes half or some percentage sophistication, some aren't, that cuts in favor of -- of both parties because those people who are less sophisticated are more likely to be confused.

So there's no set number that you have to meet. It is what is the consumer base that you're marketing to?

THE COURT: Okay.

Well, I'll -- I'll give you just another minute or so to wrap up and make any other points you want to make.

MR. VAN ARNAM: Thank you, Your Honor.

Again, this is a case distinct from many of those cited by counsel where summary judgment was granted, which is a very -- again, limited circumstances.

The cases that he cited, *CareFirst*, there was substantial third-party use. The mark was weak and not commercially strong. Not the case here.

In the *George* case that he talked a lot about, again, a very weak mark with no commercial strength and dissimilar. The -- the comparison was LCR versus left center right. And the game at issue had dissimilarities too.

At the summary judgment stage, their burden was to show there is no genuine issue of material fact. Again, I believe that we've established that FN, on the bulk, if not all of these factors, or most of these factors, has established its case. But at least there are genuine issues. There's a dispute; there's counter evidence; there's testimony; there's record evidence as to all of this. And, in such cases, those cases go for a jury to weigh the evidence and the credibility.

Thank you, Your Honor.

THE COURT: Thank you.

At -- at this time, I think I -- I will -- we will take a break. We'll take a look at the -- at the guns back in -- back in chambers that the parties have brought.

And -- and then I'll -- when we -- when we reconvene, I may have a couple of additional questions, and I'll give both sides a chance to make, you know, three-to-five-minute kind of final arguments on the summary judgment motion before we move into the other motions.

Does that make sense to both sides?

MR. VAN ARNAM: Yes. Thank you, Your Honor.

MR. RETTEW: Thank you, Your Honor.

THE COURT: Okay. Thank you. The Court will be in -- we'll -- we'll be -- we'll be in for recess at least 15 minutes. But we may -- it may be a little longer than that.

(Off the record at 3:08 P.M.)

(On the record at 3:37 P.M. )

THE COURT: All right. Thank you.

And I -- I will -- as I said, I'll give both parties a -- a chance to -- to make final comments. I do want -- I do have a couple things I'd like both of you to address.

One -- one is, when -- when we reviewed -- when I took -- took a close look -- and I think this is true in your -- in your briefs as well -- the -- the -- the -- the guns have the manufacturer and SFAR or -- or SCAR next to one another. And so one question is, is that true on -- on all the -- the gun -- the SCAR and the SFAR guns?

So the second question I have is, the style that SFAR is written in is almost like an outline style, so it's -- it's not just kind of a one font. It has sort of that outline look to it. Is that true on all of the SFAR guns?

I think -- and then -- and then I -- I think, you know, for -- you know, for FN in particular, related to that, how does it respond to the argument that -- on the guns and -- and, you know, maybe -- and -- and in other places if -- if Ruger is next to SFAR, why does that not eliminate confusion?

So I think those are -- those are -- you can address anything else you want to. I would ask to limit your remarks to five minutes apiece. But -- but -- but if you would hit those comments at some point.

And we'll hear from defendant first.

MR. RETTEW: Thank you, Your Honor. So yes, the markings are the same on all the Ruger SFARs. There's two different barrel lengths, but they all have those same markings in the same outline stylization.

THE COURT: Okay.

MR. RETTEW: So I'd -- I'd like to address some of the points that counsel made on the key factors. Pronunciation is number one.

And could we show the screen real quick?

THE COURT: Yes.

MR. RETTEW: Oh, thank -- thank you very much.

Your Honor, this is the testimony from their investigator. He's a licensed investigator. He went out to trade shows and he called retailers. And, as Your Honor noted, he had 11 conversations with retailers, and then he went to trade shows. He could not find one instance where somebody said SFAR (pronouncing). The only time we've heard it is counsel and the 30(b) witnesses from FN. All he got was half S-F-A-R and half S-FAR, and even if it's S-FAR, that is different enough.

This is significant, Your Honor. This is their evidence. They paid for this. They paid somebody to go out and get good evidence for them, and it's good for us. The pronunciation, nobody -- not one instance -- from this investigator who was retained by them who's licensed and was an

impressive guy, no SFARs, just S-F-A-R, S-FAR.

Ruger does its own videos. This is in the -- in the record, Docket 40, Exhibits H through L, there's videos where Ruger, when they announced their gun, educates people on how to pronounce the -- how to pronounce the rifle name, and that it's the Ruger S-F-A-R.

On the similarity of the marks, counsel noted that the LCR dice game -- different marks, LCR versus left center right, which is actually the full meaning of LCR.

But, irrespective, there are a number of other summary judgment cases in the Fourth Circuit where the defendant prevailed where the marks were, in fact, very close. And they are *CareFirst* where the marks were -- *CareFirst* and *FirstCare*. There's *Valador* where they were both V-I-V-E, but HTC -- defendant added their house mark, which, again to your point -- or to your question, Your Honor, that's why we believe, under at least that case, adding a house mark is absolutely sufficient to avoid confusion.

*Fuel Clothing Co. versus Nike*, summary judgment to the defendant. And that one, both parties use the same mark, fuel. Had Nike put "Nike" next to that it's -- and the house mark eliminated confusion. It is precisely what we have here.

There was some issue or questions on the goods, and counsel said that you have to look at goods as far as the general class of goods, but that's not the Fourth Circuit law.

The Fourth Circuit law says when you're looking at goods -- and this is in the *CareFirst* case --

THE COURT: Tell me, just so I have it convenient, give me the -- the case citation for *CareFirst.*

MR. RETTEW: Sure. It's 434 F.3d at 272, for the point we're making here, but I can give you the full cite.

THE COURT: No, that's fine.

MR. RETTEW: But there, the -- the Court said when you look at the similarity of goods, you look at -- you look at it with respect to each party's actual performance in the marketplace.

And the -- and the Court -- and -- I'm sorry, in *Petro Stopping*, another Fourth Circuit, where the defendant wanted summary judgment, the Court said, the analysis of the parties' goods does not end after considering the category in which they fall. And analysis into the specifics of those goods is needed, and that's *Petro Stopping* at 130 F.3d at 94 to 95.

And here -- Your -- Your Honor had a question about -- well, actually, before I get there, when we talk about class. We think of United Van Lines and United Airlines, both transportation. They can coexist. We think of Domino Sugar, Domino's Pizza. Both food products. They can coexist. Marks can coexist if there's no likelihood of confusion.

Now, Your Honor asked the question is the --

May I approach?

THE COURT: Yes.

MR. RETTEW: Is the FN -- is the FN SCAR, was it intended to a AR-15 or AR-10 style?

Not at all. This is meant to be the commercial version of the military rifle that FN won the contract for with the U.S. government to make this -- what was initially a battle rifle. And this is a commercial version of it. And how do we know this, Your Honor? The box says it. The world's most battle-proven firearms.

This is a commercial version of a combat rifle. This is an AR-10 style rifle and an AR-15 body through different products. And they -- and the people that buy them are different, and they use them for different things. And we have evidence in the record of all the differences.

Irrespective, even if they are considered identical, as I mentioned for the -- earlier, the cases, summary judgment can still be granted and should still be granted for Ruger. That doesn't change things.

But, again, this is their evidence. This is why we're here on summary judgment. The investigator, their evidence. The box, their evidence. The advertising, their evidence. We're relying, and we were very careful in our motion, to rely upon FN's testimony, FN's documents. That's why there's no issues of fact here because it's their stuff

that supports our case.

On intent, the law is clear. Attorney speculation is not sufficient for intent. And the record shows that when Ruger chose its S-F-A-R, it was to communicate the virtues of the rifle. But they listed competitors. Our documents show this; we -- Ruger listed competitors of this rifle.

THE COURT: And I am -- you're about at your five minutes, so I'll give you -- if that's the last point you want to make, that's -- that's fine. But if there's anything else, I'll -- I'll let you wrap up.

MR. RETTEW: Can I just --

THE COURT: In a minute.

MR. RETTEW: -- wrap up one other thing --

THE COURT: Yeah.

MR. RETTEW: -- Your Honor?

The survey. Mr. Poret, he -- the stimuli he used were from third -- from third-party websites. It wasn't the Ruger website. So it was to replicate what's seen on third-party websites. And that is in his expert report.

Intent. FN was never mentioned in any documents when Ruger was selecting this mark. And FN mentioned that they sent a demand letter. They sent a demand letter in November, I believe around November. Counsel had discussions till March. Ruger responded and said, we don't think there's confusion. They waited a whole year to file suit.

If that doesn't go to good faith. Ruger thought this was done. They had no idea because FN waited a whole year. There was no bad intent here.

Finally, the confusion, the video game that we saw, if Your Honor reads that closely, there's no mention of Ruger. It's very confusing what that is, and that's why their witnesses couldn't even say what it was. But there's nothing in there -- and I looked at it closely; we've examined it -- that any reasonable person could say, this person was thinking Ruger or confused it with Ruger's rifle.

And finally, sophistication. Your Honor asked some questions about FN SCAR buyers and what other rifle -- what -- what other firearms they own. The answer to that question is in Tab 35 on page 15-16 and 15-23. And there's data on their buying habits and how many other guns they own.

And I'll -- I'll -- I'll sum up, and I thank you for your indulgence, Your Honor. If these products that are sitting here on this table are not ones that people purchase with care and deliberation, then that factor is completely superfluous. It has no meaning at all.

This is -- these are very serious products. People have to be -- you have to go through background checks to get them. They're expensive. You have to do research. This --

THE COURT: I do want to take a minute to just give you a chance to respond to the question that I asked to -- to

FN's counsel, which is, you know, if you have -- and this, you know, may kind of go to whether this is a -- a -- question of fact or factual dispute.

If you have -- you know, I -- I accept that probably some percentage of gun purchasers and -- and modern sporting rifle purchasers may make impulse purchases. What do you think the standard is in -- in terms of this particular factor? How -- does it mean -- I mean, he -- FN's counsel gave the example of a doctor's office. Obviously that's going to be more sophisticated.

How -- how many people -- what percentage of the group, has to be sophisticated? Like, if you have a -- if you have a group where some of them are -- let's say 5 percent of modern sporting rifle purchasers are unsophisticated, which way does that factor cut? And is that enough to, like, not -- not resolve that factor on a summary judgment standard?

MR. RETTEW: No, that -- that -- that's enough to resolve it on summary judgment. And -- and we cited several cases involving firearms.

One of them is the -- and it's an Eleven -- I think a Tenth Circuit case. It's *Hornady v. Doubletap*. There it was just ammunition, and the Court said that is purchased with care and sophistication. That was summary judgment. And the plaintiff's mark was deemed strong in that case too. Still the defendant won on summary judgment, and it was just ammunition,

not -- not rifles.

But the answer to your question, Your Honor, is, there's no hard and fast rule, but cases have found that televisions, cars, expensive electronics are pur- -- are care and -- purchased with care and deliberation.

This is the classic gun. And if there are one off, if there's a couple percentage of people's out -- that -- that are outliers, that is not enough to create an issue of fact. I mean, these -- and -- and -- and when we look at the cases, when we look at the summary judgment cases, things that are not as -- and sophisticated and potentially dangerous as these are found to be high care items be- -- and it's not just are the people sophisticated. It's sophistication, care, and the time they spend in purchasing this.

And the record shows 98 percent of people do research beforehand. And we have hard, fast evidence that the impulse purchases are absolutely nothing but an outlier, if they even are. There's no evidence of -- of impulse purchases. There's not one person -- nothing in the record that points to that that -- that I'm aware of.

THE COURT: Okay. Thank you.

MR. RETTEW: Thank you, Your Honor.

MR. VAN ARNAM: Thank you, Your Honor. So briefly, let me try to address your questions first to make sure I get to them.

THE COURT: Thank you.

MR. VAN ARNAM: So I think you asked about any stylization of -- of SFAR.

And if we could pull up the slides.

THE COURT: Well, and specifically my question was -- was on the guns themselves.

MR. VAN ARNAM: They are on the guns themselves.

THE COURT: Okay.

MR. VAN ARNAM: I -- I don't believe they're stylized in any way. They are small, rarely hugely visible. And we -- we -- I think there's evidence that that's not part of the purchasing decision.

THE COURT: I -- I guess -- I guess my question -- my -- my literal question is, I -- I -- I carefully looked at the five guns that you all presented today and the way that -- that they're labeled by Ruger, FN and -- and -- and SFAR versus SCAR. Is -- is that the same on -- on all guns of that kind or are there different examples? That's my question.

MR. VAN ARNAM: Right.

On --

THE COURT: On the guns themselves.

MR. VAN ARNAM: Right.

And -- and they are labeled on the guns. You're absolutely right. We would agree with that.

THE COURT: But there's not -- there's not some

different way they're labeled on other guns that I haven't looked at today?

MR. VAN ARNAM: That's correct.

THE COURT: Okay. Thank you.

MR. VAN ARNAM: That's correct, Your Honor.

THE COURT: And then -- yeah, go ahead.

MR. VAN ARNAM: So one point about the SFAR, the argument that Ruger has tried to make is that the comparison or that when you see them, it is always with Ruger.

But that's not what it does, and that's not what it intended. And there's evidence in the record -- we see it on the slide -- of how they use their mark, with the TM symbol. That means that they are used unilaterally individually as a mark itself, intended not to be with Ruger.

And can you get the -- that slide up? Oh, it's up.

I think this is an important distinction because it's -- it's -- it's fine for them to argue now that this is how it should be considered, but that's not how they are using it, and that's not how they intended to use it. This is a slide that shows they're different rifles.

On the right-hand side is -- it includes SFAR -- is where they are used with marks without Ruger, and that's how they want to be able to sell and market their guns. Otherwise, if it was Ruger dash or something we may not be here.

I don't understand why the Halstead investigator

evidence supports them when half the people asked, or 5 out of 11, said S-FAR. The point is, it is not pronounced in the way that Ruger intends it to be.

And I believe you asked me for the record cite to that, and that is --

THE COURT: I did.

MR. VAN ARNAM: -- 80-10, and the transcript is 148, 13 to 149,2.

Your Honor, I -- particularly on sophistication of consumers, their witnesses testified that these are sold under MSRs, modern sporting rifles, in the same category for the same purpose. It doesn't matter how they were originated.

And they're showing you boxes that are all post-sale. This is not what you see pre-sale. And historic, not current, FN marketing about -- about military heritage.

Your Honor, we think this case, like the majority of cases that consider likelihood of confusion on summary judgment, is one that should go to a jury. There are genuine issues on all factors.

There's a couple cases that we would cite and -- and have you look at, one from this very court. IWLCA, the *Intercollegiate Women's Lacrosse Coaches Association versus Corrigan Sports Enterprises*, and that's 694 F.Supp. 3d 625, Judge Schroeder, as well as the Fourth Circuit's *Variety Stores versus Wal-Mart Stores*, 888 F.3d 651, and it's Fourth Circuit

2018. There are legions of other cases.

The point being, when there are genuine issues of fact, at least on the confusion factors, the balance tips in favor of the plaintiff. The defendant had the burden to show no genuine issues at this stage of the case. The burden flips when we get to trial, but we should have the opportunity to do that.

Again, we -- we believe the evidence on the majority of factors favors FN at this point, but there's at least a genuine issue on all of those factors entitling us to have their motion denied and for the facts to be examined, including the weight and credibility of the witnesses and the investigator and the evidence and argument heard by a jury.

Do you have other questions, Your Honor?

THE COURT: Not at --

MR. VAN ARNAM: I tried --

THE COURT: -- this time.

MR. VAN ARNAM: -- very hard to stay within your five minutes.

THE COURT: No, and I -- I appreciate that. I appreciate that.

Well, the -- you know, I -- I'm not -- obviously in a case of this magnitude, I'm not going to rule on -- on any -- on -- on that motion today. I'll take it under advisement and we will -- but I -- but I do appreciate the arguments and the

time taken by both parties and how well prepared you are.

I do also appreciate your accommodating my desire to -- to see the -- the physical guns. I think that was helpful. It's sometimes hard to get a good perspective from pictures, so I -- I appreciate both sides in that regard.

I think it probably makes sense next to -- to move to Plaintiff's partial summary judgment motion. My understanding is that this one is not fully disputed. Is -- is -- and maybe if -- if -- if the parties will accommodate me, maybe if I could just briefly hear maybe a minute or so from -- from Defendant as to what exactly you disagree with about that motion, and then I'll give Plaintiff a chance to address it just so we can -- if there's not that much disagreed to, I don't want to have a real extensive argument on it.

MR. RETTEW: I will keep this very brief, Your Honor. We do not dispute that the SCAR mark is protectable. We believe it's weak, inherently and commercially, but we do not dispute that it's protectable. So we do not dispute that motion. And, again, protectable? Yes. Weak? Yes. We -- protectable --

THE COURT: And the weak would just go to those factors we've been discussing --

MR. RETTEW: Exactly.

THE COURT: -- already?

MR. RETTEW: Exactly.

THE COURT: Okay.

MR. RETTEW: And -- and --

THE COURT: And that would just mean that you would get to argue that -- assuming the case went to trial, you'd get to argue that at trial. You -- your -- you don't want to give up your ability to argue that it's weak at trial?

MR. RETTEW: Precisely.

THE COURT: Okay.

Anything else that you disagree with with respect to --

MR. RETTEW: No, and --

THE COURT: -- the motion?

MR. RETTEW: -- on the affirmative defense, we'll -- we've -- we've withdrawn those. So that --

THE COURT: Okay.

MR. RETTEW: -- doesn't seem to be any dispute.

THE COURT: Is that --

MR. VAN ARNAM: Nothing much more to add.

We -- we think then, Your -- Your Honor can grant our motion and find as a matter of law on the question of validity and their affirmative defenses of laches, acquiescence, and unclean hands.

Correct me if I've misspoken.

But that was the nature of our motion. They didn't contest that, so we believe you can --

THE COURT: Is that correct?
MR. VAN ARNAM: -- rule on that.
MR. RETTEW: That's correct, Your Honor.
THE COURT: So -- so I will grant that motion, obviously, with the understanding that Defendant can make an argument at -- at trial regarding the weakness. If -- if -- if the case were to go to trial as to the -- the weakness of the mark, but -- but certainly grant -- grant the motion that -- that there is a mark and it is protected.
Anything else on that motion?
MR. VAN ARNAM: No, Your Honor.
THE COURT: Okay.
And then I will ask the parties' thoughts on -- on what we take up next. Do you have a preference for order?
MR. VAN ARNAM: Your Honor, I -- I think the docket entry and order was the *Daubert* motion to exclude Hlebinsky --
MR. RETTEW: Correct.
MR. VAN ARNAM: -- their expert, so --
THE COURT: Okay.
MR. VAN ARNAM: -- we would -- we would suggest we take that one up next.
And -- and maybe I could -- because we didn't have a chance to do it before -- quickly introduce my side. I've got Aaron Fadden, associate with me at Williams Mullen; he'll be arguing that motion. Carmelle Alipio, who will be arguing the

Schoettelkotte *Daubert* motion.

And also with us behind me is Connor Grant, who's a summer intern with us. I don't -- make sure he's included. He went to George Mason. He's at Campbell Law and clerked last summer for Justice Newby. Thank you for letting me introduce our side.

THE COURT: Okay.

And would you like to introduce your -- your side?

MR. RETTEW: I would. Thank you, Your Honor. We jumped right in. I apologize for that.

We've got my colleague, Patrick Rodgers, and our local counsel, Lorin Lapidus. And then we have Patricia Shepard, who is associate general counsel at Ruger with us. And Mr. Rodgers will be arguing both *Daubert* motions.

THE COURT: Okay.

So --

MR. RODGERS: And no objection from Ruger to take Ms. Hlebinsky first and Schoettelkotte.

THE COURT: Very good.

And I would just -- I -- I don't want to set a -- a specific time limit, but I -- I would ask the parties to be a little -- to be briefer on this or -- or maybe aim -- aim, if we could, for no more than 30 minutes a side counting both motions.

So you know, if -- if 15 minutes apiece, or if you

want to allot 20 for one and -- and 10 for the other, however, in that ballpark. But just -- just so we're not here too much -- ideally if we're getting out by around 5:00 or a little bit before, that would be great.

MR. VAN ARNAM: Thank you, Your Honor.

MR. FADDEN: Thank you, Your Honor.

As Rob introduced me, Aaron Fadden on behalf of Plaintiffs, FN America and FN Herstal. I'm here today to argue the merits of FN's motion to exclude the expert testimony of Ms. Ashley Hlebinsky.

The question before the Court is straightforward. May a firearms historian and museum curator, without any training in marketing, consumer psychology, or survey methodology, and without having interviewed even a single customer, presume to speak on behalf of an entire customer base of firearm purchasers?

More specifically, should she be permitted to tell the jury what those consumers perceive and whether they are confused without having consulted even a single one of them? Under Rule 702, the answer is no.

But that is exactly what Ruger is asking Ms. Hlebinsky to do. As you can see on my slide in front of you, Ms. Hlebinsky's report is filled with numerous sweeping assertions about what consumers think, how they perceive brands, and whether they are confused. But none of these

alleged assertions are grounded in any empirical evidence or tested by any methodology.

If admitted, Ms. Hlebinsky intends to speak for consumers she never consulted about perceptions she never measured based on methodologies she never employed.

THE COURT: Let me -- let me ask you one question before you get too far.

MR. FADDEN: Yeah.

THE COURT: You know, it's -- I -- I have read through her report; it's a -- it's a long report. Do you think there's any categories in there that would be appropriate?

MR. FADDEN: So, Your Honor, the -- the categories that -- that may be appropriate are the objective history of the firearm manufacturers and any testimony on the objective differences between the firearms. But anything that gets into the minds of consumers or consumer perception or generalizations about the consumers, we do not believe that's appropriate.

THE COURT: And do you think -- and -- and to split hairs a little bit, as to the minds of consumers and so on, do you think that that's just inappropriate for testimony generally or that she -- that it could be appropriate or would be appropriate but that she lacks the experience and expertise to speak to that?

MR. FADDEN: I think that --

THE COURT: Or both. You could be both.

MR. FADDEN: Yeah. Yeah. I -- I believe it's the former, Your Honor.

It's -- it's ipse dixit. She -- she's speaking as if she is the consumer, but she has 15-plus years of experience as a firearms person. She's speaking generally for an entire class of consumers. Every purchasing -- every purchasing firearm purchaser that there is, she's speaking on behalf of without having consulted with a single one of them. So I -- I think it's -- it's the former; it's ipse dixit.

And then -- and in addition to that, her qualifications --

THE COURT: So the --

MR. FADDEN: Go ahead.

THE COURT: So that no -- no one could speak to that? Is that what you're saying?

MR. FADDEN: Sorry. No one could speak to...

THE COURT: So -- so let's -- let's suppose that -- and I don't -- I don't know what this would look like, but let's suppose that -- that Ruger produced an expert that had extensive experience in consumer interests and -- and firearms, could that kind of expert -- and we can add credentials if we need to -- could that kind of expert give this kind of testimony?

MR. FADDEN: I think if there is a reliable

methodology that can be tested on cross-examination, potentially. But when -- when you just say it is because I say it is, that's where our issue is.

And, to be clear, Ruger did produce a witness that talks about consumer perception, and that's their survey expert, Hal Poret. So our position is that Ms. Hlebinsky is not qualified to be testifying about consumer perception and the like.

Let's see. So, like I said, if this Court does not act as a gatekeeper, the jury will have no way to know the difference between a conclusion that's reliably derived from sufficient facts and data and a reliable methodology and Ms. Hlebinsky's personal opinion. Like I said, her 15-plus years of firearm experience.

They will hear that consumers are not confused and they will credit it -- credit the opinion as reliable not because it came from reliable methodology but because the witness is presented as an expert.

Under the framework of *Daubert*, this Court has a gatekeeping role to ensure that only admissible testimony reaches the jury. The stakes of this gatekeeping decision are very significant. Not only would the failure to exclude her unreliable testimony constitute a reversible error, but it is also highly prejudicial to FN.

Once Ms. Hlebinsky tells the jury what consumers

think, carrying her authority as an expert, the prejudice to FN cannot be undone by cross-examination. The jury will have already heard an expert declare that there is no confusion, and that bell cannot be unrung.

That brings us to the core of FN's motion. As I stated earlier, what Ms. Hlebinsky's done is taken her opinions and repackaged it as the opinions of the general consuming public. That is the textbook definition of ipse dixit. Supreme Court held in *Joiner* that a court not need to admit opinion evidence connected to existing data only by the ipse dixit of the expert where there is simply too great an analytical gap between the data and the opinion proffered. That analytical gap is on full display here.

Ms. Hlebinsky reviewed advertisements and social media posts, and just from that review, she leapt to sweeping conclusions about what an entire consumer base thinks, how they perceive the brands, how they perceive the products, and their opinions of the like.

With that framework in mind, FN's motion targets three specific categories of Ms. Hlebinsky's testimony. Each of these categories go far behind -- far beyond her expertise as a firearm historian and a museum curator.

The first is the ultimate issue of confusion. She stated in her report directly that FN -- FN's customers have not confused FN's unique SCAR rifle with Ruger's new SFAR

rifle, or vice versa. And that consumers quote, "easily differentiate," end quote, the two rifles.

That is not a factual observation. It is a legal conclusion about the mental state of consumers she never consulted with. That goes to the very issue that the jury must decide, and she has no foundation for it beyond her personal opinion.

Ruger will tell the Court that Ms. Hlebinsky is not being offered to opine on confusion, but rather the foundational subfactors of confusion. Quite frankly, the record says otherwise. When asked under oath if she was asked to give an opinion in this case that there would not be confusion, her answer was, correct.

But even accepting Ruger's attempted recharacterization of her testimony as being towards the foundational subfactors and not confusion directly, it cannot save her testimony.

Whether she is opining on the ultimate issue of confusion or the foundational subfactors of confusion, Rule 702's requirement of qualification, reliable methodology, and sufficient factual basis must apply with equal force. An expert who lacks qualifications in methodology to testify about consumer perception cannot avoid those deficiencies with her testimony by simply relabeling it.

The second category of testimony we seek to exclude

are Ms. Hlebinsky's sweeping assertions about how consumers perceive the two rifles.

So you can see here I have a compilation of the statements drawn from her expert report that are directed towards her opinion on how consumers allegedly perceive the firearms. She claims, among other things, that the SCAR is, quote, "incredibly distinct and unmistakable." That its FDE coloring is, quote, "the most well-known coloration to consumers." And that specific technical features like gas systems drive consumer purchasing decisions.

The fact that Ms. Hlebinsky, a person with 15 years of firearms experience, may place weight on these or may believe that one is more unmistakable than the other does not mean that the average purchasing consumer does. She is simply projecting her own expert-level familiarity onto a consumer base that may have far less experience or knowledge.

The third category of testimony that we seek to exclude is Ms. Hlebinsky's testimony about how consumers perceive FN and Ruger as brands. She characterizes FN as having a quote, "almost cult-like following," end quote, with a, quote, "niche cult-like base."

She characterizes Ruger as being known as a quote, "good value commercial firearm," end quote. Producer. These characterizations are not drawn from any consumer data. She doesn't have any data to back up these statements. They are

drawn from advertisements that she viewed and her own impressions of those advertisements.

But how a company markets itself is not necessarily the same as how every single consumer perceives that company. Ms. Hlebinsky's testimony goes beyond the factual observations of the advertising and into the claims of what happens inside the mind of the consumer when they view these advertisements. That is improper.

Those are the three categories of testimony that we seek to exclude.

One of the bases also for exclusion of Ms. Hlebinsky's testimony is her qualifications. We do not dispute that Ms. Hlebinsky's credentials in firearm history and/or museum curation are satisfactory. But the relevant question under *Daubert* is not whether she is an expert in something, it is whether she's an expert in the subject that she is seeking to opine on.

Consumer perception is a marketing and psychological question. It's not a historical question. It is not a museum question. Ms. Hlebinsky holds degrees in American history with a focus on post-World War II material synthetics and museum studies. She has no education, training, or experience in marketing, consumer psychology, or survey methodology. She could not remember whether she had ever taken a marketing course. She had never conducted a consumer survey. She has

never worked in firearm sales or advertising.

She has never been accepted by any court as an expert on consumer perception or trademark confusion, and she admits that she is not a trademark expert and cannot identify the factors the courts use to assess the likelihood of confusion. The very analysis her testimony is designed to inform and those foundational subfactors for which Ruger says that she's being offered to testify to.

But even if the Court was to find that Ms. Hlebinsky was qualified -- and we submit that she is not -- for the testimony that she is being offered to give, her testimonies must still be excluded because it is not the product of any reliable methodology.

Rule 702 requires that when an expert relies on experience, experience specifically, they must first explain how the experience leads to the conclusion reached; second, explain why the experience is a sufficient basis for the opinion that is being offered; and, third, how the experience is reliably applied to the facts of the specific case. And that's *Noble Bottling, LLC v. Gora*. I can give you a cite for that if needed. It's in our briefing.

Ms. Hlebinsky cannot meet this experience-based methodology standard. The record shows that she did not interview a single customer. She did not conduct a survey or any sort of study, formal or informal. She did not visit any

gun stores to investigate the specific facts of this case for which she is testifying to.

She did not analyze any empirical data or -- on consumer perception. Her review of online comments and social media was limited to materials posted after the litigation was filed, and her independent research on confusion consisted of two Yahoo searches. The first typing SFAR rifle, and the second, SCAR rifle, into Yahoo searches and seeing what pops up.

Beyond the Yahoo searches, Ms. Hlebinsky relies on her general involvement in the gun community, attending gun shows, visiting gun stores, and reviewing online forums. But when pressed at her deposition to explain how these activities actually informed the specific consumer perception of the opinion she was offering, she could not articulate any connection whatsoever. She repeatedly cited her experience visiting gun stores, but could not elaborate or tie how those visits to the gun stores actually built the -- the consumer perception opinion that she is offering.

On top of that, she even acknowledged that she had not gone to any gun stores specifically for the purpose of this case, so -- and general immersion in the community is not the same as methodologically applying experience to a specific set of facts.

To be clear, FN is not arguing that a formal survey

is the only permissible methodology, but there has to be some sort of empirical formula or foundation for FN to cross-examine, and there just isn't any sort of basis for the testimony that she is offering.

The Rug- -- the cases that Ruger cites for the proposition that surveys are not required all involved experts who had paired their opinion and their experience to some sort of data-driven measure of consumer perception.

So, for example, in *Apple v. Cao*, the experts' opinions on consumer perception were corroborated by Google search trends data. And in *Mountain v. Century Arms*, the expert's internet research was supplemented by relevant expertise -- which we do not believe Ms. Hlebinsky has -- and other record evidence that was relevant to the case. Here there is nothing comparable. There is no data. There was no methodology. There is only Ms. Hlebinsky's personal impressions presented as the views of the consuming public.

Ruger points to the 81 footnotes in Ms. Hlebinsky's report as evidence of a reliable foundation for her opinion, but citations do not equal methodology. Those footnotes largely cite advertisements, social media posts -- many of the same examples that we viewed here today earlier -- and the parties' own marketing materials. Not one of those cites that she provides has any evidence of what consumers actually think or perceive of those advertisements.

*Daubert* requires more than a bibliography. It requires that an expert apply a discernible methodology to the facts that they are presented with. Ms. Hlebinsky has failed to do that.

To be clear, Ms. Hlebinsky could have easily interviewed customers at any of the numerous gun shows or firearm events that she regularly attends. She could have inducted -- conducted a informal survey at the firearms events that she attends. She could have done structured interviews, but she did none of these things. She simply failed to lay the necessary groundwork for her opinions.

THE COURT: And I think -- I think you're about at 15 minutes, and you're welcome --

MR. FADDEN: Yeah, I --

THE COURT: -- you're going to start cutting into your colleague's time --

MR. FADDEN: Yeah.

THE COURT: -- a little bit.

MR. FADDEN: Your Honor, the -- the testimony risks real prejudice to FN. As I said earlier, the danger is that the -- the jury will hear Ms. Hlebinsky's testimony and presume it to be valid and correct simply because she is an expert.

We ask that the Court exclude all of Ms. Hlebinsky's opinions on consumer perception and confusion and to permit Ruger to present her, if at all, within the bounds of her

actual experience as a firearm historian.

Thank you, Your Honor.

THE COURT: Thank you.

MR. RODGERS: Your Honor, may it please the Court, Patrick Rodgers for Ruger. FN's motion against Ms. Hlebinsky spites its face while -- while cutting off its nose.

FN itself has offered a firearms expert. This expert has no marketing expertise. This expert has no expertise in consumer perception. He, like Ms. Hlebinsky, is a firearms expert, yet Mr. O'Kelly, FN's expert, makes numerous opinions, just like Ms. Hlebinsky, as to consumer perceptions of firearms.

And I'd like to read you a few of them because I think they're illuminating as to what FN believes constitutes expertise for their own expert and for Ms. Hlebinsky, who they claim has no expertise.

THE COURT: And I -- I -- I want to maybe short circuit you a little bit. I mean, this -- this motion is not about their expert; it's about your expert. Right?

MR. RODGERS: I understand, Your Honor.

THE COURT: And so I -- and the -- and the standard is not necessarily do unto others as you -- as you do unto you, it's -- it's whether or not your expert meets the relevant legal standard.

And -- and certainly, you know, there may be

objections you could make at trial limiting whatever their expert testifies to or -- or grounds on that.

So my -- I would like you to focus today on how your expert meets the *Daubert* standard. And, in particular, I mean, I think some of the questions they relate to, okay, you know, is -- is -- is it enough to have knowledge of guns to be able to testify about, you know, consumer opinions or brand recognition or so on, and maybe in weighing in on that, you could just let me know a little bit about if -- if there's limitations on the scope that you expect this expert to testify to -- to -- to talk about that.

But I -- I don't really want to have a focus on how -- you know, on the similarities between this and FN's expert. You know, if -- if -- if you think that there's some limitations on -- on their expert that are appropriate under *Daubert* that's -- that -- that would be a separate motion.

MR. RODGERS: Absolutely, Your Honor.

I'll -- I will focus on Ms. Hlebinsky's qualifications, and she is well-qualified to opine on everything in her report.

First, I'd like to begin with the scope of FN's motion. FN does not move to exclude her entire opinion. It only seeks to exclude, as my colleague mentioned, opinions on purported trademark confusion and opinions about consumer perception.

I also would like to note that FN was incredibly specific with the statements in its brief that it claimed Ms. Hlebinsky was opining on as to trademark confusion and consumer perception.

FN identified 14 specific statements in its brief on pages 3 and 4, 15 and 17 -- 15 to 17, and 19. Those specific statements are the ones that are at issue in this case. Those are the only statements that would fall away if Ms. Hlebinsky's -- if the Court were to grant Ms. -- FN's motion.

And what does that leave? That leaves the bulk of Ms. Hlebinsky's --

THE COURT: Well, I -- I -- I'm not sure that's -- that's quite how I would interpret their motion. I mean, I -- I think that a better interpretation is probably that they're giving examples of the kinds of things that they think are -- are inappropriate.

I mean, I think you've correctly identified the categories, but certainly those categories could be a little broader than the specific examples that they've given.

And so -- but I -- but I think that -- that focus is good, you know, in terms of consumer perception. I mean, what -- what would be -- I mean, to the extent that -- that you think that -- that she is qualified to testify about those things and that her methodology is appropriate, tell me a little bit about that.

MR. RODGERS: Sure.

So FN takes a reductionist view of Ms. Hlebinsky's experience. They characterize her as a historian and a museum curator, and then they focus on a whole laundry list of things that they claim that she doesn't have, as opposed to digging into the extensive experience that she does throughout her nearly two-decade career in the firearms industry.

She has -- she is a renowned firearms historian who has spent her entire career studying firearm technology, cataloging it, and talking to consumers about that information.

Sorry, Your Honor. I lost my place in my outline.

THE COURT: And take your time. I know I've disrupted the -- the -- maybe the direction of your presentation, and so take -- that your time to -- to find your spot.

MR. RODGERS: So she has spent her entire career studying firearms technology, history, and the role in the marketplace. And FN doesn't appear to challenge her expertise in the firearms industry. They appear to focus only on this consumer perception side. So they recognize that she's very knowledgeable about firearms through her experience.

But her experience extends beyond the nuts and bolts of a firearm itself. Ms. Hlebinsky's varied experience over the years has allowed her to interact with thousands and thousands of firearms consumers over the course of her entire

career, making her well suited to provide the types of opinions that she provides in her report.

For instance, for a decade, Ms. Hlebinsky was a curator at the Cody National Firearms Museum. This is the largest firearms collection in the entire United States, and she was a curator for ten years, and she was a curator in charge for five years.

This collection has over 7,000 firearms, 20,000 related artifacts, all of which Ms. Hlebinsky managed. And not only did she manage it, she renovated the entire museum and all of the exhibit design.

FN tries to diminish this experience, just focusing on her as historian and calling her a curator without digging into what that actually means. But this misunderstands the role of a museum curator. A museum curator is not somebody that just oversees a collection of exhibits in a museum.

Museum curators are subject matter experts and public interpreters for those exhibiting. They research. They authenticate. They understand the artifacts in depth, and they decide how to present those to the public. They're not just preserving, but they're interpreting.

They design the exhibits and the narratives to shape how they're presented to the consumers. At their core, they're trained experts whose job it is to understand the artifacts and then communicate those with the public. And, importantly,

they're not just curating a collection; they're discussing them with people. And that is what Ms. Hlebinsky did here for years.

THE COURT: And let me -- let me ask a question. You know, the -- this museum or -- or the -- was it one museum or multiple museums that she --

MR. RODGERS: Cody Firearms Museum is the largest museum that she curated. She was there for ten years and in charge for five. But her CV identifies several other firearms museums that she was also a curator at and had these same types of experiences where she designed and also educated, gave tours, and interacted with consumers.

THE COURT: So -- so the museum that she was at for 15 years --

MR. RODGERS: Uh-huh.

THE COURT: -- was it a museum of historical firearms or did it also include modern? And -- and what's the -- what's kind of the time frame of the firearms? Because when I -- you know, I know that this isn't always right, but when I think of museum, I think of a lot of -- a lot of times there's a historical aspect to it and you're looking back 50 years or a hundred years or sometimes thousands of years.

And so tell me a little bit about the firearms that were -- that were there. And -- and, you know, the approximate ages of them and -- and so on.

MR. RODGERS: My understanding is that this museum, the Cody Firearms Museum, has historic rifles up to modern-day rifles. And this is actually --

THE COURT: So it's all -- it's specifically rifles --

MR. RODGERS: Oh, I --

THE COURT: -- it doesn't cover ri- --

MR. RODGERS: I'm -- I said, "rifles."

THE COURT: Sorry. Sorry.

MR. RODGERS: Firearms and other related firearms artifacts. So it could be handguns. It could be rifles. It could be ammunition. It is a firearms museum that has both guns, rifles, and other artifacts as well.

THE COURT: All kinds of guns?

MR. RODGERS: All kinds of guns.

And they had approximately 7,000 firearms and 20,000 artifacts, so there's approximately 13,000 other things on display that are not guns but are related to guns.

THE COURT: And how -- how far back in age do these guns go? Are we talking -- like, would we see Civil War guns? Would we see, you know -- you know, what -- what the -- what the Spaniards had when they came in, you know, to the -- to the new world? Like, how far back does it go?

MR. RODGERS: I'm not clear as to if it goes back that far as it relates to the parties in the case. And this is

actually on page 1 of her report where she's detailing her experience. They have a historic Ruger collection dating back to the founder of Ruger, William B. Ruger. They had his firearms. And then she also notes that they have modern Ruger firearms at the museum.

And the same is true for FN. They have historic FN firearms and they go through a modern collection.

THE COURT: And what was her specialty at the museum?

MR. RODGERS: Everything. So as the curator in charge -- and she testified about --

THE COURT: Well --

MR. RODGERS: -- this.

THE COURT: -- before she was -- so ten years as curator; right? So presumably she had curator in charge; right? Like, that sounds to me a little bit like a management position, and maybe it's not. But that's what I imagine it as. As a curator, did she have a specialty?

MR. RODGERS: Well, as a curator -- and I think this is where FN tries to fog what a curator does. A curator is not a managerial role. A curator is writing -- and Ms. Hlebinsky testified --

THE COURT: Well, the curator in charge sounds like it might be to some degree. Is that not true?

MR. RODGERS: She did this -- she testified that she did this throughout her whole career. And then the curator in

charge just broadened the -- the scope of it and added more managerial roles --

THE COURT: Sure.

MR. RODGERS: -- to it. But she was still responsible for these types of things.

Forward facing communication. So communication about the products to customers, public education, educating the consumer -- the firearms consumers coming into the museum about the artifacts, the guns.

Educational programming, other educational programming. Public tours, and arranging the exhibits in a way that tell a story about the firearms, meaning that she has to have a deep understanding about the artifacts that she's arranging and telling a story about.

And through this, she gained significant experience interacting with people about firearms, including Ruger and FN firearms, as she notes in her report.

And this is not a small number of consumers. This museum -- this one museum -- and we're talking about one museum that she worked at as part of her experience -- received 200,000 visitors annually. So that is a significant amount of opportunity to interact with consumers of firearms and to understand their perceptions.

And I --

THE COURT: And I -- I've -- I've -- I've been --

been to a lot of museums, and may- -- maybe this is different. But, you know, in -- in my experience with museums in general, the information flow is -- is more one-sided than two-sided.

You know, the museum is typically giving information to the patron coming in rather than the -- the patron giving information to the museum. Is -- so -- so I -- I think what I'm wondering a little bit -- and -- and so that's kind of number one.

Number two, I don't think as -- of a museum visitor as being a consumer; right? So the average person coming to a museum may not be the same group as the average consumer coming to a gun store. Do you -- do you disagree with that?

MR. RODGERS: So I'll take your questions in turn, so I'll start --

THE COURT: Sure.

MR. RODGERS: -- with the -- the first question about the flow of information.

And I think -- I think Mr. O'Kelly actually provided some interesting testimony on this very question. When questioned at his deposition about what qualifies him to be an expert, one of the points that he raised was that he visited museums. And, in fact, one of the museums he visited was the Smithsonian Museum where Ms. Hlebinsky worked.

And he said that his expertise, in part, stems from visits to museums where he was given tours by curators, and

through those tours was given the opportunity to interact with them and handle the firearms. If --

THE COURT: Well, it's a little more obvious that that would give you expertise about the guns themselves --

MR. RODGERS: Uh-huh.

THE COURT: -- than it -- than expertise about what consumers think about the guns.

Like, to the extent that those are -- are different things, I -- I don't think -- and -- and maybe -- and maybe FN will argue differently. I don't think there's a lot of doubt that someone who kind of has been a long-time curator of a museum would have some knowledge about the guns themselves and how they operate and the different specifics in those regards. I mean, that -- that seems intuitive. It's a little less intuitive how that person would be an expert as to what consumers think about those guns.

And then to the extent they are, I think that FN at least makes an interesting point about methodology of sort of is it more required of methodology than just, you know, I know a lot and I've talked to a lot of people, so this is what I'm going to tell you about what consumers think.

Like, what -- what exactly is her methodology and how does that, you know, support the opinions that she offers?

MR. RODGERS: Uh-huh. So going back to your last question about the people coming into museums, while some may

not be consumers, there are also going to be consumers coming into the museum.

And over a nearly two-decade career where she is constantly interacting with visitors to museums, and also in her other roles that she has as well outside of her curation -- her curation, where she is doing research at the Smithsonian, she's founding a firearms research center where she is working with others regarding firearms. She's advised major firearms companies, including Ruger. Published extensively.

And so through her whole career, she's had opportunities to interact with consumers of firearms and those interested in firearms to develop a deep understanding of not only the firearms themselves but also what those consumers over her career have relayed to her to develop an expertise in that.

THE COURT: So let -- let's just -- you know, I take -- I take FN's argument on this -- and -- and they can tell me if I'm misunderstanding it -- but I take part of their argument to be well, even -- even if you assume that's true and assume that a person has a lot of exposure to -- to consumers, that -- that doesn't mean that that's sort of a -- an expert methodology that then gives them the ability to -- to testify about what consumers think because you could imagine sort of a -- you know, a -- a haphazard exposure. I mean, you -- you -- you show up, people talk to you, you -- you develop opinions. Different people at different museums could develop

opposite opinions based on kind of the -- the random assortment.

Does *Daubert* require something a little more methodology -- method- -- metho- -- well, I'm going to butcher the term here. I think we're getting to the end of the day and I'm tired. But does *Daubert* require a better methodology than just, I've talked to a lot of consumers; therefore, this is what I think about these guns and these specific categories? You know?

And -- and maybe she's done more -- she has a more specific methodology, but how would you describe her methodology in analyzing this question?

MR. RODGERS: Sure.

So Ms. Hlebinsky is certainly an experiential expert. She's not a scientific expert taking the scientific method and applying it to a set of facts. She's an experiential expert. And the Fourth Circuit has discussed what type of methodology and experience is needed in order to offer an opinion. And this is in the *U.S. versus Smith* case, which I think is instructive for the framework to Your Honor's question.

And so, in that case, there was a former FBI agent who had experience in drug and gang investigations, and so he was qualified as an expert on drug and gang terminology.

And as part of his work on the case, he interpreted a call between alleged gang members. He was interpreting words

in the call. The expert based his interpretation -- his methodology in the case as an experiential expert, was his years of investigatory experience and exposure to thousands of gang and drug conversations. That was the experience and that was the methodology.

He was challenged on *Daubert* because he did not point to a more specific methodology. He didn't point to specific instances where he had encountered words that he was interpreting in the call.

The Court expressly noted that he did not need to point to specific experience in order for him to have a reliable methodology to apply his experience. The Court said,

(Reading): The Court expressly noted the expert did not point to specific experience that informed each opinion because, quote, "his expertise does not derive from any singular piece of information."

And the Court went even further,

(Reading): It would be impossible for such an expert to quote, "lay such a precise foundation for an opinion when his expertise was gained over extended, repeated exposure."

And so I think *Smith* sets the framework for the methodology that applies here for Ms. Hlebinsky. She has decades of experience in the firearms industry where she is interacting with thousands upon thousands of consumers, both interested in firearms and who are purchasers.

Through those communications, those educational sessions, and all other instances where she's interacting with them, she is gaining knowledge as part of her career dedicated to firearms. She has taken that -- and I -- I will also add with specific experience related to Ruger and FN, which she details some of in her report. She has taken that knowledge and she has applied it to this case, just as the expert did in *U.S. v. Smith*. And that's -- that's cited in page 7 of our opposition.

THE COURT: So -- so let me give you a hypothetical. Let's suppose you have a -- a -- a social media influencer and -- and they have -- you know, they have -- they're an influencer in the gun area and they attend gun shows and they have friends who -- who have, you know -- who -- who own guns. And, you know, they, you know, interview and talk to -- to people who have gun owner -- you know, who are -- who are gun owners and who have interest in this area.

Would -- would you -- would you say, okay, yeah, that -- and -- and let's suppose for -- you know, that -- that FN wants to call this person as -- as -- as their expert on consumer views. Good -- good enough? Would you -- would you agree that person passes the *Daubert* test?

MR. RODGERS: I wouldn't agree that that person passes the *Daubert* test. But I also don't believe that it's an apples-to-apples comparison with Ms. Hlebinsky.

THE COURT: Why not?

MR. RODGERS: Be- --

THE COURT: Why wouldn't -- if -- if the -- if the answer is well, it's enough to just have -- I -- I -- I took your argument to be that, well, it's enough to have exposure in this area. It's enough to have, you know, experience and -- and to interact with a lot of consumers and to -- you know, to have a sense of what they're doing and everything else.

If -- if you can get that through -- if you can get that through being a curator, why couldn't you also get that through being an influencer?

MR. RODGERS: Because I think, again, it misunderstands the additional experience that Ms. Hlebinsky brings to the table over an entire career dedicated to firearms. She's got --

THE COURT: Well, that additional experience, I think, goes to her knowledge of -- of firearms, not really her knowledge of what consumers think. Right?

MR. RODGERS: I would -- I would disagree with that characterization of her experience. She -- she is a unitary individual that has had nearly two decades of experience in the industry of firearms.

THE COURT: So you -- you take the position that the influencer would not be qualified, but it's distinguishable because --

MR. RODGERS: An -- an -- I -- I apologize, Your Honor.

THE COURT: Go ahead.

MR. RODGERS: An influencer with no other expertise related to firearms who's never been involved in the industry in any way, never attended gun shows or the amount of stores she has. Not published --

THE COURT: Well, let's --

MR. RODGERS: -- an article --

THE COURT: Let's assume that they've gone to gun shows. I mean, I'm assuming not just a random influencer, but a firearms influencer. Someone who goes to gun shows, has friends who owns guns, talks to people who owns guns. That's -- I'm assuming an influencer in the firearms area, but -- but not someone who's curated a museum or -- or anything like that.

MR. RODGERS: I may have misunderstood your hypothetical, then. In a situation where we're dealing with somebody who is dedicating themselves to firearms, whether they be an influencer or not, it is possible that that person could opine on consumer perception based on their extensive interactions in the firearms industry with relevant individuals. They are taking information that they're learning. They are reporting on it and really opining on it on a daily basis. And then they're distilling it down.

So I think it could be possible that that person would pass *Daubert* to opine on consumer perceptions.

THE COURT: Have any courts weighed in on kind of this question specifically in the firearms area where, you know, you've got someone who -- or -- or maybe -- maybe in the trademark area in general where you have someone with general exposure to consumers but without any sort of specific survey or methodology and -- and -- and the person is, like, well, I -- you know, I've had a lot of exposure to consumers and what they think and how they work. And so this is -- this is my opinion, but -- but I haven't done a specific survey.

Like, I -- I mean, I -- I am familiar with what you're talking about in the context of experts talking about -- law enforcement experts talking about what -- what specific code terms mean in -- in -- you know, in the drug trade or something along that -- that line. That doesn't feel to me like a completely apples-to-apples comparison when we're talking about trademark.

MR. RODGERS: So there's no case in the gun trademark world that I'm aware of that addresses this. But there is a Fourth Circuit case, the *Ashley Furniture* case, which is 187 F.3d 363, where the district court relied upon and then the Fourth -- the Fourth Circuit then referenced expert opinions a home furniture retailer with 25 years of experience -- and this was a trade dress case, so very closely related -- where the

expert was testifying about the appearance of two different trade dresses. They were room setups in this instance.

And the expert's ultimate opinion was that these two room setups were distinct. In other words, she's testifying that consumers would perceive them as distinct, and this is no different than a -- the testimony from Ms. Hlebinsky that Ruger and FN are distinct in their purchasing groups or their reputation in the marketplace, or that they offer distinct firearms.

FN tries to distinguish this case by saying that this expert was making a -- was offering an opinion, an objective opinion about the appearance of a bedroom suite. But that's not what was happening. The expert looked at the two, made a subjective call about whether that expert believed that the distinctions between the two would be significant to a consumer. And that expert determined that they would be distinct.

So that is a situation where we have an industry expert, somebody who worked in a retail store for 25 years encountering consumers on their daily basis, offers an opinion on consumer perception without a marketing study or survey.

THE COURT: And I -- I have -- I've asked you a lot of questions and I appreciate you answering them. I -- we've spent a fair amount of time. If there's anything else you want to say to wrap up, and I am going to give FN's attorney a

chance to briefly respond to some of the arguments you've made in response to my questions.

MR. RODGERS: Yeah, I think there are two final points that I want to emphasize.

We've focused a lot on Ms. Hlebinsky's experience as a museum curator and as a historian, but she's also been well-recognized in the industry through her major media work and as a public figure, appearing on the History Channel, Discovery Channel, National Geographic, Fox, PBS. Outdoor.

She's regularly interviewed for her expertise where she is discussing firearms and the marketplace generally. She co-hosts series about firearms and who they're sold to and the market for them. She has podcasts. She's published in various news publications like The New York Times.

And so this is not just a person who curated some museums and then --

THE COURT: So that's sounding pretty close to my social media influencer --

MR. RODGERS: Well --

THE COURT: -- hypothetical; right?

MR. RODGERS: And in part --

THE COURT: That part of it anyway.

MR. RODGERS: In part, yes. And that is why I misunderstood your hypothetical at first because somebody who is uninvolved in the firearms industry that comes in and says

consumers perceive this, then I -- then it -- perhaps FN's motion would have merit.

Here, that is not what Ms. Hlebinsky is doing. She's spent an entire career dedicated to this interacting with consumers, talking to them, giving interviews, learning about the market and learning what drives the market and how it's driven. And those are the types of opinions that she offers here.

I want to make one note -- because we jumped right over this at the start -- on their claim that Ms. Hlebinsky is opining on the ultimate issue of trademark confusion. They, FN, continuously misquotes a line --

THE COURT: And I'm not too concerned about that because I think the Court can always limit -- in -- in terms of an expert's testimony that seems like an objection that could be made closer to trial and the Court can limit the testimony on -- on the ultimate issue, so...

MR. RODGERS: And to clarify the -- the quote that FN is misquoting, they read that FN customers have not confused FN's unique SCAR with Ruger's new S-F-A-R rifle, or vice versa.

But what Ms. Hlebinsky actually says is the differences between the firearms explain why FN's consumers have not confused them. And so she is not giving an opinion on trademark confusion or the ultimate issue, simply that she's not seen evidence of it.

And that type of opinion is permissible, and that's the *Skiermont* case cited in our brief where an expert was permitted to state why they believe there's a likelihood of confusion.

THE COURT: Okay. Thank you.

So I -- I -- I will give you a chance to respond. Before you do, I was -- I was going to say, obviously, I am very interested, as I think my questions illustrated, in your methodology argument. And I -- I do think that there is kind of an interesting question as to how much methodology there needs to be, and -- you know, and can -- can someone who has, you know -- and -- and maybe you could start with my -- you know, my social media influencer.

You know, can somebody who has a significant amount of experience in an area, but that experience is -- is maybe more formal -- informal and doesn't have, like, sort of a -- a well-established methodology, can that person, you know, testify more generally as to, you know, what consumers think or would they be likely to be confused, or -- or do you -- you know, I -- I think I heard you say I think in your early ar- -- argument that you're not arguing that you have to have done a survey, that that's sort of one side of the -- the continuum.

But then on the other side, your argument is, well, what they've done here is not enough because it's -- it's -- doesn't have any methodology at all. Maybe help me understand

where you think the minimum level is, what methodology looks like in this area and -- and then respond to whatever arguments.

MR. FADDEN: Yeah.

THE COURT: And do all of that in -- in five minutes or so.

MR. FADDEN: Thank you, Your Honor.

Yeah, so with the experience point -- or, I'm sorry, the methodology point, I -- I think there's a couple good cases to reference. I think the *Yeti Coolers* case that we cite is a really good case to look at there. There you have someone opining that consumers do not confuse the Yeti cooler with the Arctic cooler. And that expert was -- ended up being excluded because they did not apply any methodology to that case.

And the experience that they claim to have relied on there was their years of being a journalist in the outdoor writing, having written for Outdoor Life and all these hook and garden or gun and garden magazines. The expert there was excluded.

Another case that we cite is the -- the *Warmack v. CBAC Gaming* case. That case, you have someone who has spent years in the casino security field trying to opine about the -- a specific scenario, and despite the years of experience they had in the field, they were excluded because they did not apply any methodology to the specific facts that are in the case.

And that -- that's really the issue here is just being in the field of -- or I say "in the field," surrounded by firearms and like is -- still doesn't explain how she reaches the consumer conclusions that she -- or the consumer perceptions conclusions that she reaches.

There has to be some type of testable methodology that we can cross-examine her on to say, how did you reach this? Who -- how did you -- how did this person determine this? You -- you say that consumers perceive this. What is the basis for that? There isn't any of that.

And to the extent that they try and rely on Ms. Hlebinsky's experience, again, the issue with that is the Fourth Circuit law is clear on that.

THE COURT: Well, and -- and one thing that make -- and I know it's not an apples-to-apples comparison, but, you know, when they talk about, you know, law enforcement experts who are testifying about sort of drug dealer terminology, for instance. Court -- courts do allow that kind of expert testimony regularly. There's not really a specific methodology to that.

And I know -- you know, obviously I don't know how to -- to make a comparison between a, you know, criminal expert case and -- and -- and a trademark, which is obviously more -- a much more specialized area in a lot of -- in a lot of ways.

But there are -- there -- that case is an example of

the general principle that sometimes experts do have kind of this more general knowledge and are allowed to testify based on it.

And so how do you -- how do you distinguish that? And then maybe how do you distinguish the *Ashley Furniture* case that -- that they talked about?

MR. FADDEN: Yeah. Thank you, Your Honor.

So, first point, both of those cases, what the expert is opining on are -- at the end of the day, they're objective facts. Right?

In the *Ashley Furniture*, and I -- I'm sitting here reading it right here. The expert is opining about the white molding and classic columns providing a unique experience -- appearance. They're saying -- and at the end, the expert concludes that has a unique appearance in the firearm -- or the furniture industry.

They're not saying consumers perceive that, consumers think that there's a unique appearance. They're saying, I believe, it is my opinion, that there is a unique appearance. That's the first point.

THE COURT: Is that -- is that -- is that a distinction -- does that distinction actually make a difference? So if they say I, the expert, think there's a difference in the appearance, I mean, isn't -- isn't that just essentially a saying of, hey -- hey, this difference in

appearance matters?

You know, let's -- let's suppose in -- in this case -- I mean, I think there was talk about -- and I -- I may get the exact details different -- but, you know, whether gas fired; right? Like, the -- the way in which sort of the firing mechanism works.

You know, saying that there's that difference, I -- are you saying she could testify at that -- about that difference, but she can't testify as to -- what? -- whether that difference matters to consumers?

MR. FADDEN: Exactly. Your Honor, we're not saying that she can't objectively say the FN SCAR has this type of system, this type of recoil system, and the SFAR has this type of recoil system.

But her --

THE COURT: And --

MR. FADDEN: -- saying --

THE COURT: And let's suppose that, you know, in her -- in her experience talking to consumers, and it -- it -- and -- and you can tell me if -- maybe -- maybe you disagree that she has experience talking to consumers, but let's -- and I'll let you tell me that in a second, but for purposes of my hypothetical, let's just assume that she has experience talking to consumers either through her curation experience or through her other experience.

If she has experience talking to consumers, and that's one of the things consumers talk about -- right? -- is the firing mechanism in these -- in these rifles. She's not allowed to say, hey, this is something that consumers do talk about, and so I think it's -- it's something that they care about with respect to this gun. That's -- that's not something you think that she could say?

MR. FADDEN: I think that's different than the scenario that we have here, though. Here we have her not pointing to any of those conversations that you just referenced, but still making those opinions as if that occurred.

And then when pressed at deposition about, where did that happen? How did you learn that? How did you -- where is your methodology? That -- that's the methodology that it goes to is talking to the consumers. Where did you ask them? What was the type of consumer you were asking about? Was this someone at the FN booth at the SHOT Show, or was this Joe Schmo at the gun store or at the gas station at the corner?

We don't have anything to test on that. Her just saying, this is -- this is how I know the firearms, and, therefore, everyone must agree that this is how it is. It's just not -- not proper to do, Your Honor.

THE COURT: Well, you know, a -- a law enforcement officer who testifies, hey, you know, baby is a term for a

kilogram of a particular kind of drug is not -- often does not testify to the specific conversations that -- that led to making him think that. He's -- he says, I've had a lot of conversations and I know from those conversations that that term is -- is sometimes used to mean that.

If she says, you know, I don't remember the specific conversations I've had, but I -- you know, from conversations I've had with consumers, I hear them talk about the firing mechanism as -- as being something that they care about. Is that -- is that not -- that -- are you saying it's got to be more specific than that? What -- what are you saying exactly?

MR. FADDEN: Yeah. So two points on that. First, the baby to kilogram argument that you -- you just proffered is still -- that's still an objective thing. Like, if it is known that people say that a kilogram is a baby, that is something that is in the record somewhere. That is an accepted phrasing that's used. That -- that's not kind of the case that we have here.

The second point that I was going to raise was that -- again, she doesn't point to any of those -- she -- she can't say that, I've heard people saying this in the past, and then also say I didn't interview anyone to ask about these firearms. Like you -- you can't have --

THE COURT: Well, you can have it -- you can have a general level of expertise. I mean, in some ways what we want

from expertise -- from experts is expertise that they haven't developed for litigation; right? Like, we want that. Do you agree?

MR. FADDEN: Yeah, I do agree, Your Honor.

THE COURT: And so if she's talked to people a lot in the past, even if she hasn't gone out specifically to gather information about a particular subject, if she's talked to them in the past and -- and has some expertise based on that, that would be allowed. Your point is just that there's not enough of a methodology to it. Is that -- is that right?

MR. FADDEN: My -- my point is if she's going to rely on her experience, which it sounds like you're saying that's experience -- right? -- being out in the field, there is a very specific set of factors that are in the *Noble* -- I'm sorry, the *Noble v. Gora* case that we cite where the expert must explicitly explain first how the experience leads to the conclusion that was reached; second, why the experience is a sufficient basis for the opinion; and, third, how the experience is reliably applied to the facts. None of those were met in the report or in her deposition. That...

THE COURT: And I -- I'll let you -- I -- I've asked a lot of questions, but I -- I do want to kind of wrap up this part. Do you have any kind of concluding remarks on -- on that, on the --

MR. FADDEN: Yeah, just a couple more cases that I

would -- I would invite you to review for your point about years of experience in the field. The *Warmack* case that we cite. Yeah, sorry. *Warmack v. CBAC*, CBAC Gaming. That's 2024WL22019. The *Valador* case, which I believe was referenced earlier. *Valador v. HTC Corp*. There the expert had 40 years of relevant experience and still excluded. It's 242 F.Supp. 3d 448. And then I -- I mentioned the *Yeti* case earlier, *Yeti v. Arctic*, and then the *Radiance Found v. NAACP* 27 F. Supp. 3d 671.

I think a review of those cases, Your Honor, you'll see that the Fourth Circuit is pretty clear that simply having experience in the field without either applying a methodology or explaining how that relevance -- or how that experience is relevant to the specific opinion that is being proffered, in this case, and in a lot of those cases, consumer perception, is not enough and must be excluded.

THE COURT: Okay.

MR. FADDEN: Thank you, Your Honor.

THE COURT: And I -- and I hope we can be efficient with our -- with our last argument. But before we begin, I will ask if anybody needs a break, including our -- our wonderful court personnel who've been very patient with me today.

(No response.)

THE COURT: Okay. Well, great. So I will -- I'll --

I'll hear from the plaintiff first.
MS. ALIPIO: Yes, Your Honor. And I understand the -- the -- the request to try to streamline this as much as possible. Your Honor, Carmelle Alipio on behalf of Plaintiffs. May it please --
THE COURT: And it's always a disadvantage to go last, so I apologize that you're in that boat.
MS. ALIPIO: So FN moves to exclude the apportionment testimony and opinions of Ruger's damages expert, W. Todd Schoettelkotte, because he failed to meet three of the four requirements under Rule 702.
First, they are not based on sufficient facts or data because he cherry-picked data. Second, they are not the product of reliable principles and methods because he used common sizing, an unreliable methodology for the context of this case. And third, because he failed to reliably apply the principles and methods to the facts of this case, which resulted in misleading calculations and apportionment percentages.
And, Your Honor, before I go deeply into my argument, I will be referencing some information that is filed under seal, so I'd ask if Ruger's witnesses could step out.
THE COURT: Well, I -- I think what would probably make more -- rather than having them step out, why don't you just approach sidebar and make your argument. And I'll ask

counsel for the defendant to come up too. And that way we don't have anybody --

MS. ALIPIO: Sure.

THE COURT: I'm -- I'm always hesitant to close the courtroom entirely.

MS. ALIPIO: I can -- I can -- would it be helpful if I stepped up when I got to that point?

THE COURT: Sure. Yeah. Just step up when you get to that point. And -- and I think if you could just file an appropriate motion to seal following the hearing so that -- that we have a clear record of what needs to be sealed when the -- when the transcript is made.

MS. ALIPIO: Yes, Your Honor.

THE COURT: Would that work?

MS. ALIPIO: So first, Your Honor, as a threshold matter, Ruger did not move to exclude any testimony or opinions of FN's damages expert, Dana Trexler, so their argument that, you know, Mr. Schoettelkotte's simply responding to her opinions has no basis under the Rules of -- 702 and *Daubert* and *Kumho*. However, both parties agree that neither damages expert should be able to opine on trademark confusion or likelihood of confusion in this case, so we ask the Court to formalize that restriction in its order.

The real dispute and the focus of our motion is Mr. Schoettelkotte's apportionment calculations. So as the

Court is aware, and Ruger agrees, Ruger has the burden to apportion out its profits, which it believes are not attributable to the infringement.

And to perform his apportionment calculations, he claims to have reviewed and considered witness depositions. He's spoken to Ruger witnesses, as well as reviewed documents that were produced in this case. However, he did not take into account all of the relevant evidence in his calculations, and, instead, relied on data from two slides -- from two studies that were provided to him.

The first study, the January 22, 2022, presentation prepared by FN called the SCAR Buyer Study, which you heard about earlier today. And second, an incomplete copy of the 2022 National Shooting Sports Foundation report.

So I'm going to come to -- permission to approach the bench, Your Honor.

THE COURT: Yeah, and we'll -- we'll bring counsel up to sidebar for anything that you deem to be confidential.

(Sealed sidebar conference held.)

THE COURT: And I -- I will let you finish -- finish your argument, but, obviously, in the -- in any motion to seal the transcript, just be specific about kind of -- about kind of what needs to be sealed and what doesn't so we maximize what's -- what's available to the public.

MS. ALIPIO: Yes, Your Honor.

Your Honor, as I was stating, Mr. Schoettelkotte's calculations are fundamental misapplication of common sizing. Common sizing is a method that can be properly used if applied to data that refers or represents parts of a defined whole, like line items on a financial statement.

Here, Mr. Schoettelkotte added up each of the individual data points and divided by the figure that he attributed to the house brand by that sum. So his use of the data distorts and changes the results from the studies. The figures were not meant to be part of a defined total.

Essentially it is an apples-to-oranges comparison. In the NSSF report slide, which is on the screen, the data involved a survey asking respondents to independently rate 21 factors on a scale from 1 to 10. The survey treats each factor independently and respondents were not asked to compare factors against each other.

The reputation of manufacturer factor was rated on average by respondents as an 8.1 out of 10, an 81 percent out of 100, so that demonstrates that this was an important consideration for consumers. And it's actually tied for the fifth most important among 21 other factors.

However, the calculation that Mr. Schoettelkotte performed resulted in only -- it resulted in a percentage that was much lower in importance compared to the other factors.

Mr. Schoettelkotte conceded that there's no category

labeled brand or product name. He assumed an arbitrarily selected reputation of manufacturer as the category that constituted perceived value of the house brand. By doing that, Mr. Schoettelkotte cherry-picked the data as well.

In this case, he did not perform his own survey or study. Instead, he picked the data points that he believed best would serve Ruger, rather than using the other relevant information to brand that are on the slides and in the record.

So, for example, on this specific slide, the recommended by retailer factor at the bottom, which has a 3.3 rating out of 10, there's no information going to explain what that means. So the recommendation from a retailer could very well be tied to brand. Similar to, my friends and family had one. We don't know information about why the friends and family recommended it. They could be very loyal to a certain brand. So these are examples of specific factors that Mr. Schoettelkotte did not include in his calculation when he picked reputation of manufacturer.

Ruger's own witnesses also testified that they have a process for coming up with product names, demonstrating that brand is important to the buying decision, but Mr. Schoettelkotte's calculation does not take into account that testimony in those numbers that he used.

This is not a weight issue. This is a -- this is an issue of reliability. Mr. Schoettelkotte's apportionment

calculations are unreliable because he ignored the record evidence, including data within these studies, and that he reviewed to perform the calculations.

Ruger has not demonstrated -- and it is their burden -- to show that Mr. Schoettelkotte's apportionment opinions are reliable and based on reliable principles and methods appropriate for the facts in this case.

Cross-examination will not cure the unreliable application of the common sizing calculations that Mr. Schoettelkotte performed, and because Mr. Schoettelkotte's apportionment calculations are based on ipse dixit, it cannot meet the reliability standard under *Daubert*.

I turn Your Honor's attention to the *Mission 1st Group, Inc.* case versus *Mission First, LLC,* 2024WL5058007. In that case, the Court excluded an expert where the expert asked the Court to take a leap that was not tied to the evidence. The expert reviewed evidence, including documents, and did not incorporate that information in his calculations.

They found that where there was evidence of some information that was relevant to the analysis, that does not equal none, which is what Mr. Schoettelkotte did here.

As this Court recognized in *Walz versus Ford Motor Co.*, numbers can be particularly persuasive as they imply a certain level of exactness and reliability, and that's exactly the case here. Mr. Schoettelkotte's percentage figures carry

an appearance of scientific precision that would mislead the jury, and no amount of cross-examination would undo that impression.

We respectfully ask -- further, Your Honor, the factors within the two studies that Mr. Schoettelkotte used in his calculations compared the factors against each other. The study -- excuse me, Mr. Schoettelkotte's calculations used those factors as comparisons against each other, but both studies did not do that in -- in their collection of their data.

We respectfully ask the Court to exclude Mr. Schoettelkotte's apportionment opinions and the specific percentages derived from this flawed methodology. Thank you.

THE COURT: Thank you.

MR. RODGERS: Thank you, Your Honor.

So first I want to address what Mr. Schoettelkotte's apportionment opinion is in whole. And there are three aspects to it, only one of which is at issue in FN's motion.

First, there is the opinion that Ruger's -- that Ruger's profits should be apportioned based on his experience as a financial analyst over many decades who has opined on apportionment numerous times in intellectual property case. That opinion has not been challenged.

Second, he gives opinions about the factors that would go into an apportionment analysis when considering what

profits a def- -- a plaintiff would be entitled to in the event a defendant is found infringing. You look at what other factors might have caused the purchase of the product, other than the allegedly infringing trademark. Things like price, quality, look, aesthetics, things like that. You look at other things other than the brand to figure out how much of the profits they should get that are actually attributable to the brand.

Mr. Schoettelkotte opines on those factors. That opinion is not challenged. The only thing about Mr. Schoettelkotte's apportionment opinion that is challenged is the specific calculations of the two percentages that I won't repeat in open court that counsel mentioned. Those are the only two pieces of his opinion that are at issue in FN's motion.

The remainder of his opinion has not been challenged, and this is important. Courts allow damages experts and financial experts like Mr. Schoettelkotte to opine on apportionment without providing a specific apportionment calculation. That's the *PayCargo* case that we cited in our brief. And, in fact, in a case I was just involved in recently, Mr. Schoettelkotte testified without a specific analysis -- without a specific number. So experts can opine on apportionment without a specific qualification.

So to the extent the Court believes that this

calculation is incorrect in any way, the remainder of his opinion is still -- should still be permitted on apportionment.

Turning to their arguments as to Mr. Schoettelkotte's specific calculations, they raised three issues. He ignored record evidence; he did not reply -- he did not apply a reliable methodology, and it was not helpful to the jury. I'll take each one in turn briefly.

The first is the record evidence. Mr. Schoettelkotte did not ignore record evidence. Far from it. Mr. Schoettelkotte undertook an extensive evaluation of the record to locate evidence that, based on his extensive experience, he believed relevant to calculate apportionment.

He did not rely on just two slides, as FN claims, over and over in its brief. Even in the studies that he looked at, he did not just rely on two slides. He testified in his deposition that he reviewed the entirety of each of the two studies that he relied upon. And, in doing so, it wasn't a cursory review. It was a review for information that he believed to be relevant. He was looking for information that could be relevant to apportionment.

Counsel mentioned information related to awareness of a certain brand in one of the studies, and that Mr. Schoettelkotte arbitrarily ignored that information and completely overlooked it. That's not true.

Mr. Schoettelkotte was asked about those -- that very

piece of information, the awareness statistics, and Mr. Schoettelkotte, he said he considered it, but it -- he did not believe awareness to be a driver of a purchasing decision. Somebody could be aware of a brand, but that awareness may not drive their decision. And that is why he ultimately did not rely on those awareness statistics.

And that is ripe for cross-examination. FN is free to cross-examine him as to why he did or did not select certain information to rely upon in his report, but whether or not he did rely upon something in his report is not a basis for exclusion. It goes to weight, not admissibility.

In addition to the reports themselves -- and I might add, he also cited other pages from these rep- -- these two studies throughout his report, which it directly contradicts the claim that he did not review or rely upon these other slides.

In addition to the reports themselves, for his apportionment analysis, he reviewed the entirety of each and every deposition -- fact deposition that had been taken prior to his expert report, and all of the exhibits. He had conversations with F- -- with Ruger's firearms expert, Ms. Hlebinsky, to discuss factors that people would consider when purchasing firearms.

And he had conversations with Mr. Dineen, Ruger's chief financial officer, to discuss the financial information

that Ruger had produced. And he had conversations with Ruger's product manager and chief marketing officer, Mark Burney and Robert Werkmeister, to again discuss the importance of brand when somebody is purchasing a Ruger firearm and the different considerations that somebody may take into account when purchasing a firearm, among other topics that he discussed with those individuals. And he testified to all of this, and he detailed it in his report.

He also reviewed written discovery. He reviewed 91 documents produced by both parties, and he reviewed other publicly available information that -- that he located on his own, which is, in fact, how he located the National Shooting Sports Foundation study that he relied upon for apportionment. That was through Mr. Schoettelkotte's own independent research to identify potentially relevant information on apportionment.

So it could not be farther from the truth that Mr. Schoettelkotte relied on only two slides for his apportionment analysis. He relied on far more, and that's detailed in his report where he not only cites to the -- where he not only cites the studies in his apportionment analysis, but he cites his conversations with Mr. Werkmeister. He cites testimony from Mr. Voss, one of FN's witnesses. He cites testimony from Mr. Hines, another of FN's witnesses, all to show that other factors are considered and to buttress his sound apportionment, opinion, and calculation.

And if FN is concerned about the factual underpinnings of his analysis, that goes to weight, not credibility. And that is the Fourth Circuit's *Bresler* case, 855 F.3d 178, where the Court said that questions regarding the factual underpinning of an expert witness's opinion affects the weight and credibility of the witness's assessment, not its admissibility.

Second, FN claims several issues with Mr. Schoettelkotte's methodology in calculating the two apportionment percentages that he puts in his report. First, they claim that Mr. Schoettelkotte arbitrarily selected reputation of manufacturer as the guide for his apportionment calculation on the NSSF study. Mr. Schoettelkotte expressly testified that he did not assume anything. He analyzed various factors in the report within the context of, quote, "what he understands from his discussions with the industry expert as well as individuals within Ruger," and that's at pages 167 to 168 of Mr. Schoettelkotte's deposition to determine that quote, "the category called 'reputation of manufacturer' relates to the goodwill of the manufacturer." That's in paragraph 74 of his report -- 76 of his report.

That Mr. Schoettelkotte likened the reputation of a manufacturer to the goodwill of a brand is also supported by courts. There are prior decisions that have inferred brand value based on the reputation of the plaintiff, and that's the

*All Star* case cited in our brief. So not only is Mr. Schoettelkotte's decision to choose reputation of manufacturer well-reasoned based on record evidence, it's also supported by prior cases.

And with decades of experience doing apportionment analyses in IP cases, including trademark cases like this one, Mr. Schoettelkotte is a qualified expert -- something FN doesn't challenge -- is permitted to make just that interpretive inference. And that's the *Vertellis* case that we cite in our brief.

And if FN disagrees, once again, it can cross-examine Mr. Schoettelkotte on the difference in FN's interpretation of FN -- of reputation of manufacturer. It can further cross-examine Mr. Schoettelkotte as to why he did not select other factors that were identified in either the NSSF study or the other study that he relied upon. Those are all issues ripe for cross-examination. They go to weight, not credibility.

Now, FN cites a case in its reply brief, the *Optilube* case, that says that Mr. Schoettelkotte's assumption on reputation of manufacturer is more than an interpretive dispute. It's an assumption resulting in a calculation that must be excluded. But *Optilube* doesn't support that argument. There, an expert offered a reasonable royalty opinion in a patent litigation. So, first, a very different context. And, second, he was excluded for failing to explain the bases for

his calculation or to provide any data whatsoever for his calculations.

Mr. Schoettelkotte didn't do that here. He explained precisely what he was relying upon, how he did it, and why he did it. Once again, FN can cross-examine him on that issue if they disagree with the things that he relied upon.

It seems that FN's true gripe with Mr. Schoettelkotte's calculations is his relative value common-sizing analysis. They take issue with how he actually calculated the figures he ultimately used for apportionment.

The relative analysis that Mr. Schoettelkotte did, also known as common sizing, is a specific type of financial analysis that is used to determine the relative value of a specific piece of data among a larger set. And Mr. Schoettelkotte explains this in his deposition multiple times. FN writes it off as a word salad in its brief, but that doesn't change that Mr. Schoettelkotte explained precisely why a relative analysis was appropriate for the two slides -- for the two studies that he relied upon.

He said that you could use the data in these slides to common size or look at the relative considerations of the parties, those being consumers who are seeking to purchase a firearm and types of things that play into that purchase decision.

He went on to say he performed his relative analysis

by assessing the relative value of reputation in the one -- in the NSSF study and brand in the other to determine the value of each of those amongst the larger data set. This is precisely what a common-size analysis is for. It's one that is regularly applied in the financial industry. It's one that, as a financial expert who has opined on these issues for three decades, is entitled to determine is useful here. He explained why he did it, and he applied that methodology.

And it makes perfect sense in this scenario why Mr. Schoettelkotte would apply that methodology to both of the studies at issue. Both of these studies -- both of these studies identified multiple different factors that individuals considered at or around the time of purchasing a firearm. The NSSF study asked respondents to rate how important each one of certain reasons are for selecting their most recently acquired MSR.

And the other study -- I just want to make sure that I'm not going to reveal confidential information if I say my next sentence without being under seal.

The other con- -- the other study dealt with research done prior to purchasing an MSR and dealt with various considerations that were done in that research, brand being one of them. By common sizing these data -- these data sources by finding the relative value of the ones of the factors that Mr. Schoettelkotte deemed most appropriate based on his

experience for apportionment, he was able to determine -- to determine, in his opinion, the relative value of those factors.

He found the percentage using that and then he applied it to Ruger's profits. That is a reliable methodology that is very clearly explained that is based on his financial expertise using a well-established financial method. And FN, again, is free to cross-examine him if it disagrees with his selection of a valid financial analytical method.

FN also seems to criticize this method because it is simple math. They frame it as adding everything up and dividing it by a number, which everybody's able to do. We all know how to add and divide, and so Mr. Schoettelkotte is not needed to provide that testimony. That is no basis to exclude.

Simply because the arithmetic may be simple, the topic is complex. This is a complex financial analysis related to the apportionment of profits. Simply because it is simple math does not change that complex analysis, and that's the *Mission 1st* case and the *Wounded Warrior* case that we cited in our brief where sim- -- simply because math was simple did not result in the exclusion of a financial expert because of the complex nature of things.

So, at the end of the day, Mr. Schoettelkotte's apportionment calculations are the result of a review of an extensive record, conversations with numerous witnesses, and Mr. Schoettelkotte's decades of experience. From that, he

identified the most pertinent evidence he could locate, demonstrating the value of a brand when purchasing a firearm, and he applied a commonly used financial analysis to those data sets to determine the relative value of one data point amongst those sets.

This type of complex financial analysis is regularly deemed helpful to a jury and is commonly permitted from experts like Mr. Schoettelkotte. And we cited several cases in our briefing on that, including the *Multiple -- Multiple Energy Tech's* case, *Maker's Mark Distillery* case, and the *PayCargo* case that I already mentioned to you.

The results should be no different here as it was in those cases. FN's motion should be denied. Mr. Schoettelkotte's entire apportionment analysis should be permitted and any criticisms FN has as to the information he relied upon, why he selected that information, or the methodology he chose to apply can be handled on cross-examination.

THE COURT: Thank you.

Anything further from the plaintiff today?

MS. ALIPIO: Your Honor, extremely briefly.

THE COURT: I -- I -- I don't think I need a response on that motion, but I -- but are there any other motions or matters we need to discuss today?

MR. VAN ARNAM: No, Your Honor.

THE COURT: Anything from defense?

MR. RETTEW: Nothing, Your Honor.

THE COURT: All right. Thank you. I will come down and -- and greet counsel after we adjourn for the day.

(Whereupon the proceedings concluded at 5:36 P.M.)

CERTIFICATE

I, Stacy Harlow, Realtime Verbatim Reporter-Master, Certified Verbatim Reporter-Master, Certificate of Merit, Registered Broadcast Captioner, Registered CART Provider, and Official Reporter of the United States District Court for the Middle District of North Carolina, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the above-styled action on May 28, 2026, as reported by me by stenomask.

I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Given under my hand this 8th day of July, 2026.

Stacy Harlow
______________________________
STACY HARLOW
Official Reporter, United States
Middle District of North Carolina