IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| FN HERSTAL, S.A., and<br>FN AMERICA, LLC,<br><br>Plaintiffs,<br>v.<br><br>STURM, RUGER & CO., INC.,<br><br>Defendant. | 1:24-CV-218 |

**<u>OPINION AND ORDER</u>**

Plaintiffs FN Herstal, S.A. and FN America, LLC (collectively, "FN") filed this action against Defendant Sturm, Ruger & Co., Inc. ("Ruger") alleging: (1) federal trademark infringement under 15 U.S.C. § 1114; (2) federal unfair competition under 15 U.S.C. § 1125(a); (3) violation of North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.*; and (4) trademark infringement under North Carolina common law. After completing discovery, FN moved for partial summary judgment, and Ruger filed a motion for summary judgment on all issues. Oral argument was held on May 28, 2026, and the motions were taken under advisement. For the reasons explained below, this Court grants Ruger's motion for summary judgment on all counts.

**FACTUAL BACKGROUND**

AR-15 and AR-10 rifles originated in the mid-1950s. *Declaration of Patrick Rodgers, Exhibit 1 – Expert Report of Ashley Hlebinsky*, D.E. 52-1, at p. 28 (April 11, 2025). After the patents covering the AR-15 expired in 1977, the market for this type of rifle expanded. *Id*. Today, AR-15– and AR-10–style rifles belong to a broader class of firearms commonly referred to as "assault weapon[s]" or "modern sporting rifle[s]." *Id*. This category encompasses a wide range of semi-automatic, typically centerfire rifles designed to accept detachable magazines. *Id*. at 28–29.

A. <u>FN</u>

FN, the manufacturer of the SCAR rifle, entered the United States firearms market to compete for government contracts. *Id*. at 20. In response to a solicitation issued by the United States Special Operations Command, FN developed the SCAR rifle and began supplying it to the military. *Id.* at 31. Although the SCAR rifle was

originally designed for military use, FN later introduced commercial versions for sale to law enforcement agencies and civilian consumers. *Id.*

To protect its rights in the SCAR mark, FN Herstal obtained federal registration of the word mark "SCAR" from the United States Patent and Trademark Office. *FN's Memorandum in Support of Motion for Partial Summary Judgment*, D.E. 44, at p. 9 (April 11, 2025). FN Herstal owns U.S. Trademark Registration No. 5,314,134 for the SCAR mark, which is registered for use in connection with firearms and related products, including assault rifles. *Id.* Although FN Herstal filed its application to register the SCAR mark on April 22, 2008, the registration did not issue until October 24, 2017, due to intervening litigation. *Id.* at 10.

Today, FN manufactures a variety of firearms bearing the SCAR mark.



D.E. 52-1, at p. 39.[1] These firearms are considered modern sporting rifles.[2]

B. Ruger

Ruger, a firearm manufacturer founded in 1949, sought to develop a rifle chambered for the larger calibers typically associated with AR-10-style platforms while maintaining the size and weight of a smaller modern sporting rifle. *Ruger's Memorandum in Support of Motion for Summary Judgment*, D.E. 39, at p. 7 (April 11, 2025). Those efforts resulted in the introduction of the SFAR (Small-Frame Autoloading Rifle) in 2022. *Id*. at 19.




*Id*. Unlike the SCAR, the SFAR has a direct gas impingement design based on the AR-10 and AR-15 platforms. *Declaration of Patrick Rodgers, Exhibit 106 – Pages 273–274 to Benjamin Voss Deposition*, D.E. 45-26 (April 11, 2025). The SFAR combines the AR-10 and AR-15 to create a firearm that is small and lightweight, like the AR-15, but chambered in larger calibers, like the AR-10. D.E. 52-1, at p. 51. While the SCAR and the SFAR are both modern sporting rifles, they differ in design.

On October 6, 2022, FN sent Ruger a cease-and-desist letter arguing that its newly released SFAR rifle would likely confuse consumers who overlap between FN and Ruger. *Declaration of Patrick Rodgers, Exhibit 163 – October 6, 2022, Letter*, D.E. 45-82 (April 11, 2025). Ruger responded on October 21, denying liability. *Declaration of Patrick Rodgers, Exhibit 164 – October 21, 2022, Letter*, D.E. 45-83 (April 11, 2025). On March 12, 2024, FN filed its Complaint against Ruger. *Complaint*, D.E. 1. FN filed a motion for partial summary judgment, *FN's Motion for Partial Summary Judgment*, D.E. 43 (April 11, 2025), and Ruger filed a motion for summary judgment on all counts, *Ruger's Motion for Summary*

[1] In October 2024, FN added the SCAR 15P, a pistol. D.E. 52-1, at p. 31.

[2] At oral argument, FN stated that its SCAR rifles are modeled after AR-style rifles. Conversely, Ruger's expert states that the SCAR rifles are modern sporting rifles but not AR-style rifles. D.E. 52-1, at p. 29. For purposes of summary judgment, the Court accepts FN's claim.

*Judgment*, D.E. 38 (April 11, 2025). FN has also filed motions to exclude certain evidence. *See Motion to Exclude Daubert Motion to Exclude Certain Opinions and Testimony of Ruger's Expert Ashley Hlebinsky*, D.E. 48 (April 11, 2025); *Motion to Exclude Daubert Motion to Exclude Certain Opinions and Testimony of Defendant's Expert W. Todd Schoettelkotte*, D.E. 53 (April 11, 2025).

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Zahodnick v. Int'l Bus. Machines Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). Because substantive law determines materiality, only facts that "might affect the outcome of the suit under the governing law" are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating "the absence of any genuine issues of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (citation modified). Once that burden is met, the nonmoving party must "present evidence from which a jury might return a verdict in his favor." *Anderson*, 477 U.S. at 257. When making a summary judgment determination, the court must view the evidence and all justifiable inferences in the light most favorable to the non-moving party. *Zahodnick,* 135 F.3d at 913. While all justifiable inferences are drawn in the favor of the non-movant, they "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248.

## ANALYSIS

### I. Federal Trademark Infringement under 15 U.S.C. § 1114

"To establish trademark infringement under the Lanham Act, a plaintiff must prove: (1) that it owns a valid mark; (2) that the defendant used the mark 'in commerce' and without plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012) (citing 15 U.S.C. § 1114(a)).

In this case, the only issue in dispute is whether Ruger's use of the mark was likely to confuse consumers.

#### A. Likelihood of Confusion Factors

"A likelihood of confusion exists between two marks if the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question." *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d

150, 158 (2014) (citation modified). Nine factors are relevant to the "likelihood of confusion" inquiry. Those factors include: "(1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public." *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009). However, these factors are not exhaustive or mandatory and "are not always weighted equally." *Rosetta Stone Ltd.*, 676 F.3d at 154; *see Anheuser-Busch, Inc. v. L. & L. Wings, Inc.*, 962 F.2d 316, 320 (4th Cir. 1992) (describing the factors as "a catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion."); *RXD Media, LLC v. IP Application Dev. LLC*, 986 F.3d 361, 373 (4th Cir. 2021) ("These factors are not always weighted equally, and consideration of all the factors is not mandatory.").

### *1. Strength of the Mark*

The first factor courts consider is the strength of the plaintiff's mark as actually used in the marketplace. *George & Co. LLC*, 575 F.3d at 393. Strength of the mark consists of conceptual and commercial strength. *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006). The conceptual strength "focuses on the linguistic or graphical 'peculiarity' of the mark, considered in relation to the product, service, or collective organization to which the mark attaches." *Id*. (citation omitted). While "the commercial-strength inquiry, by contrast, looks at the marketplace and asks if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." *Id*. (citation modified).

#### a. Conceptual Strength

"A mark's conceptual strength is determined in part by its placement into one of four categories of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful." *George & Co. LLC*, 575 F.3d at 393–394. A suggestive mark is "inherently distinctive." *Moke Am. LLC v. Moke Intl. Ltd.*, 126 F.4th 263, 270 (4th Cir. 2025). However, for a descriptive mark to be distinctive, the trademark must have acquired secondary meaning. *See George & Co. LLC,* 575 F.3d at 394.

"'Descriptive' marks merely describe a function, use, characteristic, size, or intended purpose of the product, such as YELLOW PAGES telephone directories

and 5 MINUTE glue." *Moke Am. LLC*, 126 F.4th at 270 (citation modified). "'[S]uggestive' marks are those that 'connote, without describing, some quality, ingredient, or characteristic of the product, such as L'EGGS pantyhose and GLASS DOCTOR window repair.'" *Id*. "Suggestive marks . . . do not describe a product's features but merely suggest them, requiring some imagination on the part of the viewer. Examples of suggestive marks include Coppertone, Orange Crush, and Playboy." *Grayson O Co. v. Agadir Intl. LLC*, 856 F.3d 307, 315 (4th Cir. 2017) (citation modified). Therefore, "if the mark imparts information directly, it is descriptive, but if it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." *George & Co. LLC*, 575 F.3d at 394. (citation modified). Further, "an abbreviation of a descriptive term which still conveys to the buyer the descriptive connotation of the original term will still be held to be descriptive." *Id*. at 395.

Here, the evidence shows that the SCAR mark has been viewed as an acronym associated with "Special Operations Forces Combat Assault Rifle" and "S.O.F. Combat Assault Rifle," as well as a stand-alone mark. *See Declaration of Patrick Rodgers, Exhibit 27 – Pages 364–65 and 369–77 and Exhibits 41 to 43 from Daniel Hines Deposition*, D.E. 41-27 (April 11, 2025); *Declaration of Patrick Rodgers, Exhibit 28 – Facebook Posts re SCAR*, D.E. 41-28 (April 11, 2025); *Declaration of Patrick Rodgers, Exhibit 29 - X Posts re SCAR*, D.E. 41-29 (April 11, 2025). Based on the evidence presented, the Court is unable to determine whether the mark is used as an acronym or stand-alone mark in the marketplace today.

If used as a stand-alone mark, SCAR is suggestive because the term does not describe the firearm itself but instead evokes qualities such as ruggedness, toughness, or durability. If used as an acronym, however, "Special Operations Forces Combat Assault Rifle" contains both descriptive and suggestive elements. Ruger relies on *FN Herstal, S.A. v. Clyde Armory, Inc.* for the proposition that "Special Operations Forces Combat Assault Rifle" is "merely descriptive of the type of firearm requested by the SOCOM program." 123 F. Supp. 3d 1356, 1371 (M.D. Ga. 2015), *aff'd sub nom. FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071 (11th Cir. 2016).

Although "Special Operations Forces Combat Assault Rifle" may have been descriptive of the military firearm developed in the early 2000s in response to the SOCOM program, FN now manufactures numerous firearms that bear the SCAR mark. D.E. 52-1, at p. 39. The record contains no evidence comparing the firearm developed in response to the SOCOM program with the SCAR firearms produced today. Without such evidence, the Court cannot determine whether the acronym remains descriptive of the type of firearm requested by the SOCOM program over

twenty years ago. If the acronym does not describe the type of firearm, the acronym may instead be suggestive, evoking qualities of the firearm without describing a function, use, characteristic, size, or intended purpose. Accordingly, on the present record, the Court cannot determine whether SCAR is descriptive or suggestive and therefore cannot determine the mark's conceptual strength.

b. Commercial Strength

The second step considers the mark's commercial strength. To determine the mark's commercial strength, courts consider: (1) the plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark. *See George & Co. LLC,* 575 F.3d at 395.

FN argues that it has spent "millions over the past two decades to advertise its SCAR Mark;" however, the evidence it cites does not clearly show that it has spent millions specifically on the SCAR mark. *Compare FN's Response in Opposition to Motion for Summary Judgment,* D.E. 80, at p. 30 (May 16, 2025) *with FN's Response in Opposition to Motion for Summary Judgment, Exhibit P – FN Second Supplemental Responses*, D.E. 80-16, pp. 3–9 (May 16, 2025). Additionally, while FN completed a SCAR Buyer Study, the study asked respondents whether they were aware of "FN" and "FN SCAR." *Memorandum in Support of FN's Motion to Exclude Daubert Motion to Exclude Certain Opinions and Testimony of Defendant's Expert W. Todd Schoettelkotte, Exhibit C – FN SCAR Buyer Study*, D.E. 58-3, at pp. 7–8 (April 11, 2025). The survey therefore does not answer the central question—whether consumers associate the SCAR mark, standing alone, with FN. *See George & Co. LLC*, 575 F.3d at 396 ("The strength of a mark ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source." (citation modified)). FN has presented evidence of sales success. *See* D.E. 77-16; *FN's Response in Opposition to Motion for Summary Judgment, Exhibit N – Trexler Report,* D.E. 80-14. FN has also presented evidence of unsolicited media coverage of the SCAR rifle, efforts to enforce its rights against third parties seeking to trade on the goodwill associated with the SCAR mark, and continuous use of the mark since the mid-2000s. *FN's Response in Opposition to Motion for Summary Judgment, Exhibit Q - Media Recognition,* D.E. 77-17 (May 16, 2025); D.E. 77, at p. 32. However, because the evidence does not clearly establish that consumers associate the SCAR mark, standing alone, with FN, the Court cannot determine at this stage whether the mark is commercially strong.

The SCAR mark could be found to be suggestive or descriptive, and the record does not clearly establish its commercial strength. Accordingly, a question of fact remains as to the strength of the mark as actually used in the marketplace.

### 2. *Similarity of the Two Marks to Consumers*

Second, courts consider the similarity of the two marks. But because "every triable case of trademark infringement involves marks that are similar at some level," the inquiry focuses on whether the similarity would confuse consumers. *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 94 (4th Cir. 1997). In considering whether the similarity of the marks would confuse, courts focus on the "similarity in sight, sound, and meaning." *RXD Media, LLC v. IP Application Dev. LLC*, 986 F.3d at 374 (citation modified). This inquiry focuses on how the marks appear to consumers in the marketplace. *See Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d at 160; *see also Anheuser–Busch, Inc. v. L & L Wings, Inc.,* 962 F.2d at 319 (holding that courts "must examine the allegedly infringing use in the context in which it is seen by the ordinary consumer[.]").

In the marketplace, the SCAR and SFAR marks are different in sight, sound, and meaning.

First, the SCAR and SFAR marks are different in sight. SCAR is an English word understood by almost all Americans to mean a mark left on the body after an injury or burn. SFAR is not an English word and means nothing outside of its acronym. This difference makes it easy to distinguish between the two. It is not likely that someone would see SFAR and think it was the same thing as SCAR.

In addition, the Fourth Circuit has consistently held that "accompaniments to marks and the manner in which they are presented in connection with goods can significantly reduce the likelihood of confusion between similar marks." *Swatch AG,* 739 F.3d at 160; *see also CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d at 271 ("If one of two similar marks is commonly paired with other material, that pairing will serve to lessen any confusion that might otherwise be caused by the textual similarity between the two marks."). The parties agreed at oral argument that all SCAR and SFAR firearms include the applicable house mark beside the mark on the firearm. Additionally, FN has not produced any evidence that Ruger promoted the SFAR without the Ruger house mark. FN points to *FN's Response in Opposition to Motion for Summary Judgment, Exhibit B - Compilation of Ruger Advertisements,* D.E. 80-2 (May 16, 2025) to argue that SFAR is being used without the Ruger house mark. D.E. 80, at pp. 11–15. However, Ruger correctly points out that, in each of these images, the house mark is either displayed or cropped out. *See Ruger's Reply*

*in Support of Motion for Summary Judgment*, D.E. 84, pp. 7–11 (June 3, 2025). Therefore, the evidence shows that Ruger promotes Ruger with SFAR.

FN argues that there is only one different letter between SFAR and SCAR, but the Fourth Circuit has held that "[w]e compare whole words, not parts." *Swatch AG,* 739 F.3d at 159. In addition, two of the four letters are AR, letters used to describe a type of modern sporting rifle. In this way, both SCAR and SFAR help gun buyers to categorize the general type of firearm.

Further, the fonts and colors used in advertising for the SCAR and SFAR are different. *See Petro Shopping*, 130 F.3d at 94 (recognizing color when describing the dissimilarity of two marks). A majority of Ruger's SFAR advertisements feature a bright red, black, and white color scheme with prominent all-capital lettering. *See FN's Response in Opposition to Motion for Summary Judgment, Exhibit T – Ruger Brand Guide,* D.E. 80-20 (May 16, 2025); D.E. 80-2. Conversely, FN's SCAR advertisements have a muted blue, tan, black, and grey color scheme with less prominent all-capital lettering. *See FN's Response in Opposition to Motion for Summary Judgment, Exhibit A – FN Ad Compilation,* D.E. 77-1 (May 16, 2025).







D.E. 39, at pp. 10, 15. Furthermore, the fonts used for the marks on the firearms differ.






D.E. 1, at p. 5; *Declaration of Robert Werkmeister*, D.E. 40, at p. 9 (April 11, 2025). Similarly, both marks are right next to their manufacturer—FN or Ruger. *Id*. Therefore, the public presentation of the marks significantly reduces any likelihood of confusion.

As to pronunciation, even if there is a genuine dispute over whether SFAR is pronounced SFAR, S-F-A-R, or S-FAR, none of the pronunciations sound the same as SCAR.[3] Indeed, it is hard to imagine letters with more different sounds than an "F" and a hard "C." Additionally, since SCAR is a common word, it is easy to pronounce. SFAR is not.

Third, the meanings are different. SCAR is an acronym for Special Operations Forces Combat Assault Rifle. *See* D.E. 41-27; D.E. 41-28; D.E. 41-29. SFAR is an acronym for Small-Frame Autoloading Rifle. D.E. 39, at p. 37. These are undoubtedly different meanings. Similarly, SCAR is a real word that means a mark left on the body after an injury or burn, while SFAR has no meaning apart from its acronym.

Accordingly, because the marks are different in sight, sound, and meaning in commerce, this Court finds that the two marks are not similar. Therefore, this factor does not support a likelihood of confusion.

---

[3] FN has produced little evidence that SFAR is pronounced SFAR. It seems most likely that it was pronounced either S-FAR or S-F-A-R. A survey conducted by Mr. Halstead found that six out of eleven retailers surveyed pronounced it S-F-A-R and five of the retailers pronounced it S-FAR. *Declaration of Patrick Rodgers, Exhibit 130 – Deposition of Adam Halstead*, D.E. 45-50 (April 11, 2025). Mr. Halstead also attended three gun shows, and only one individual at those gun shows pronounced it S-FAR. *Id*. No one that Mr. Halstead surveyed pronounced it SFAR. *Id*.

### 3. *Similarity of Goods*

Next, courts consider the similarity of the goods. In determining whether goods are similar, the Fourth Circuit considers whether (1) the products provided by the two companies serve the same purpose and (2) the class of goods is the same. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th Cir. 1984); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 465–466 (4th Cir. 1996) (finding similarity of goods when both are associated with women's hosiery); *see also RXD Media, LLC*, 986 F.3d at 374 (finding similarity of goods when the marks were both used "in connection with computer goods and services."). Notably, "the goods in question need not be identical or in direct competition with each other" to be similar. *George & Co. LLC*, 575 F.3d at 397.

While the SCAR and SFAR firearms have technical and operational differences, both are modern sporting rifles. Accordingly, like the goods in *Sara Lee Corp.* and *RXD Media, LLC*, these modern sporting rifles are part of the same general category of goods: firearms.

Ruger cites *Petro Stopping* for the proposition that "analysis of the parties' goods does not end after considering the category in which they fall—an analysis into the specifics of those goods is needed." D.E. 39, at p. 44. However, the differences between the two travel centers in *Petro Stopping* were extensive, with the court noting that "[b]esides the sale of fuel, the two parties' services and facilities differ in virtually every respect." 130 F.3d at 95. Additionally, because of the type of payment accepted, "it would be nearly impossible for a person seeking a Petro Stopping facility to be lured into purchasing fuel at a James River station." *Id*. That is not the case here.

Ruger also points to *CareFirst* to support its argument that the goods are dissimilar. D.E. 39, at p. 38. In *CareFirst*, the Fourth Circuit emphasized the "significant differences between how consumers encounter the parties' respective marks in [their] facilities[.]" 434 F.3d at 273. However, in *CareFirst*, the defendant displayed their mark outside each of its offices and provided medical services under its name, while the plaintiff did not directly market its mark. *Id*. Therefore, *CareFirst* likewise does not support Ruger's argument.

Therefore, the goods here are similar, and this factor supports FN. However, the strength and relevance of this factor is limited by significant differences in appearance and functionality between the SCAR and SFAR firearms. Those differences include:

- The SCAR was released in the color flat dark earth and is primarily marketed in that color: [redacted]. D.E. 52-1, pp. 37–38. Ruger's SFAR is offered only in black. *Id.* at 58.

- The SCAR's recoil spring and reciprocating carrier group are completely contained within the receiver, allowing the stock to be folded and collapsed. *Id.* 39–40, 58–59. The Ruger SFAR does not have a foldable stock.

- The SCAR rifles have a unique-looking buttstock, which the gun community has lightheartedly compared to an Ugg boot. *Id.* at 39–48.




- The SCAR uses a gas piston operating system; the Ruger SFAR uses a direct gas impingement system. *Id.* at 9, 56, 64.

- On the SCAR, the upper receiver is legally the firearm; on the Ruger SFAR, it is the lower receiver. *Id.* at 56.

- The SCAR's upper receiver is one piece that extends forward to comprise the handguard. *Id.* at 61. The Ruger SFAR uses a separate handguard attached to the smaller separate upper receiver. *Id.*

- The SCAR's handguard is more rectangular and extends partially down the barrel. The SFAR's handguard is octagonal and extends across most of the barrel for the 16-inch variant. *Id.* at 62.

- The SCAR comes with sights while the SFAR does not. *Id.* 62.

- The SCAR is much more individually designed and has far fewer aftermarket options than the SFAR. *Id.* at 62–64.

- The SCAR is a much higher-end rifle, costing around $3,000 to $5,000, compared to the SFAR's $1,000 to $1,300 range. *Id.* at 64.

4. *Similarity of Facilities*

The fourth factor is the similarity of facilities. Ruger does not dispute that the SFAR and SCAR firearms are sold in the same places. *See* D.E. 84, at p. 20. Therefore, this factor supports a likelihood of confusion.

5. *Similarity of Advertising*

Fifth, courts consider the similarity of the parties' advertising. "In comparing advertising, we look at a variety of factors: the media used, the geographic areas in which advertising occurs, the appearance of the advertisements, and the content of the advertisements." *CareFirst*, 434 F.3d at 273. As discussed above, the visual appearance of Ruger's SFAR advertisements differs from that of FN's SCAR advertisements. FN's SCAR advertisements are muted with a blue, tan, black, and grey color scheme, while Ruger's SFAR advertisements are bright and use a red, black, and white color scheme. *See* D.E. 80-20; D.E. 80-2; D.E. 77-1.














*See* D.E. 77-1; D.E. 39, at pp. 21–23. However, the remaining considerations weigh in the opposite direction. The parties advertise similar products—firearms—using comparable media, including videos, photographs, and graphics, and both direct their advertising to consumers in the United States. *See* D.E. 77-1; D.E. 39, at pp. 21–23; D.E. 80-2. This factor favors FN, but its strength and relevance are affected by the significant differences in advertising style.

### 6. *Defendant's Intent*

Sixth, "[t]he intent of the defendant is sometimes a major factor in infringement cases." *Pizzeria Uno Corp*., 747 F.2d at 1535. As FN notes, the Fourth Circuit has stated that a junior user's knowledge of the senior user's trademark *may* support a finding of an intent to infringe. *See Variety Stores, Inc. v. Wal-Mart Stores, Inc*., 888 F.3d 651, 665 (4th Cir. 2018) ("Dineen testified that Walmart knew about Variety's registration, which could support an intent to infringe."). However, the Fourth Circuit has previously held that "the failure to conduct a trademark search or contact counsel shows carelessness at most, but is in any event irrelevant because *knowledge of another's goods is not the same as an intent to mislead and to cause consumer confusion*." *George & Co. LLC*, 575 F.3d at 398 (citation modified) (emphasis added); *Swatch AG,* 739 F.3d at 161–62 (holding that a defendant's knowledge of an allegedly infringed mark, coupled with their failure to conduct a trademark analysis, did not establish an intent to mislead consumers).[4]

[4] While *Swatch* is a relevant case and has many similarities to the facts here, it was in a different procedural posture. In *Swatch*, Beehive applied to register its mark, SWAP; Swatch AG filed a notice of opposition. 739 F.3d at 154. The Trademark Trial and Appeal Board denied the opposition. *Id*. Swatch then filed suit in the Eastern District of Virginia for, among other things, trademark infringement.

*Variety Stores* did not overrule *George*; therefore, the holding in *Variety Stores* must be read in context. Viewing the cases collectively, a defendant's knowledge of a senior user's mark can be relevant circumstantial evidence of intent, but knowledge alone does not establish an intent to infringe or to cause consumer confusion. *See Variety Stores, Inc.*, 888 F.3d at 665, *George & Co. LLC*, 575 F.3d at 398. Rather, the intent inquiry turns on the totality of the circumstances, including whether the defendant's conduct reflects an effort to capitalize on the plaintiff's goodwill or deliberately induce consumer confusion. *See, e.g., Swatch AG,* 739 F.3d at 161; *see also Trojan Battery Co. v. Golf Carts of Cypress, L.L.C*, 175 F.4th 582, 596 (5th Cir. 2026) ("Although not necessary to a finding of likelihood of confusion, a defendant's intent to confuse may alone be sufficient to justify an inference that there is a likelihood of confusion." (citation modified)); *M Welles and Assocs., Inc. v. Edwell, Inc.*, 69 F.4th 723, 733 (10th Cir. 2023) ("[I]t would be misguided to presume that a defendant intended to deceive the public solely because the defendant was aware of the plaintiff's mark when the evidence shows that defendant had no intent to derive benefit from the plaintiff's existing mark." (citation modified)).

Here, the question is why *George* was able to resolve this issue under a summary judgment standard while *Variety Stores* was not. The distinction between *Variety* and *George* is the similarity of the marks. In *Variety Stores*, there was a genuine dispute of material fact regarding whether the marks at issue were similar. 888 F.3d at 664. Conversely, in *George*, the Fourth Circuit affirmed the district court's finding that the marks were not similar. 575 F.3d at 396. Therefore, knowledge of a similar mark could create an inference of intent to infringe under the summary judgment standard, while knowledge of a dissimilar mark does not. This distinction is reasonable because a party's knowledge of a dissimilar mark would not be concerning if there is no reason for them to believe the mark would be infringing.

Here, the marks are dissimilar; therefore, Ruger's knowledge of the dissimilar mark is not sufficient to create an inference of intent to infringe. In addition, other undisputed evidence shows Ruger lacked the intent to infringe. Specifically, Ruger marketed and sold the SFAR with its house mark. It also advertised using a different style than FN. Therefore, there is no evidence that Ruger intended to mislead or cause consumer confusion, so this factor weighs against a likelihood of confusion.

*7. Actual Confusion*

"The seventh and most important factor is actual confusion." *George & Co. LLC*, 575 F.3d at 393 (describing actual confusion as "often paramount"). "Actual confusion can be demonstrated by both anecdotal and survey evidence." *Id.* at 398. However, neither type of evidence is necessarily required. *Tools USA & Equip. Co.*

*v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654, 661 (4th Cir. 1996); *Rosetta Stone Ltd.*, 676 F.3d at 156. Further, "[e]vidence of only a small number of instances of actual confusion may be dismissed as *de minimis*." *George & Co. LLC*, 575 F.3d at 398. In *George & Co. LLC*, the Fourth Circuit found that four instances of consumer confusion were *de minimis* when the company sold 500,000 games per year. *Id*. at 399; *see also Petro Stopping Centers, L.P.,* 130 F.3d at 95 ("In light of its huge volume of commerce, Petro Stopping's meager evidence of actual confusion is at best *de minimis*.").

FN provides three pieces of evidence of actual confusion. D.E. 80, at pp. 33–35. First, FN's Sales and Marketing Vice President and Marketing Director both testified that people generally get confused between the SFAR and SCAR. *FN's Response in Opposition to Motion for Summary Judgment, Exhibit E – Hines Deposition Transcript,* D.E. 77-5; *FN's Response in Opposition to Motion for Summary Judgment, Exhibit G – Cole Deposition Transcript,* D.E. 77-7. However, neither person gave any specific instances of this confusion. This evidence, apparently based on what other people told the Sales and Marketing Vice President and Marketing Director, would be inadmissible as hearsay. It is also too ambiguous to provide actual support.

Second, a witness heard someone else ask for a "Ruger SCAR." *FN's Response in Opposition to Motion for Summary Judgment, Exhibit I – Lydic Deposition Transcript,* D.E. 77-9. This evidence is insufficient because the witness who overheard the conversation knew very little about the context and walked away before the transaction was complete. *Id*.

Third, FN cites online examples and video games where SCAR and SFAR are confused. *FN's Response in Opposition to Motion for Summary Judgment, Exhibit S – Confusion Evidence,* D.E. 77-19. FN has not presented any evidence that the guns in the game model are actual SCAR guns rather than a futuristic imagining of them. As a result, FN has not shown that this evidence, which involves perhaps a completely different audience than the gun-purchasing public, has any relevance.

Conversely, Ruger's consumer survey demonstrated that confusion is highly unlikely. *See Ruger's Motion for Summary Judgment, Exhibit 165 – Hal Poret Expert Report*, D.E. 46-1. The survey consisted of U.S. consumers 18 or older who have purchased a semi-automatic rifle in the past two years or are likely to do so in the next two years and are willing to pay between $1,000 and $1,999. *Id.* at 23.

The survey had three test groups. *Id.* at 8. The first test group was shown an image of the SFAR gun as depicted in an online advertisement. *Id.* at 9.

Home > Shooting > Guns > Ruger SFAR Semi-Auto Rifle

Ruger SFAR Semi-Auto Rifle



.

*Id.* The second group was exposed to the same online image along with a product description. *Id.* at 10–11. Notably, this one also had the Ruger logo, as well as details about the gun. *Id.* at 11.

Home > Shooting > Guns > Ruger SFAR Semi-Auto Rifle

Ruger SFAR Semi-Auto Rifle



DESCRIPTION

RUGER

The Ruger® SFAR Semi-Auto Rifle is a streamlined, slimmed-down version of an AR-10. With the size reductions, Ruger brings this large-caliber autoloader close to an AR-15 in size. The 15" handguard rail is a Free-Floated for accuracy with M-LOK® slots. A 4140 chrome-moly barrel features 5R rifling and keeps this package small and versatile. Ruger tops this barrel off with their Boomer muzzle brake, which helps to mitigate recoil. The mid-length, direct gas impingement system keeps this Ruger running consistently. Due to the extended mid-length gas system, recoil gets even more manageable. The 4-position gas block allows user adjustment on the fly. CNC-machined receivers add strength and beautiful aesthetics to this compact design. A Magpul® SL® stock gives you the support you need while maintaining a slim profile.

- Small-frame self-loading rifle
- CHF barrel with 5R rifling
- Boomer Muzzle Brake
- Mid-length, gas operated system
- 4-position adjustable gas block
- CNC machined receiver group
- Includes Magpul PMAG
- Magpul SL stock

*Id.* at 11. Lastly, the third group, intended to simulate a store experience, was shown a picture of the SFAR gun with Ruger's tag and a close-up of the logo on the gun. *Id.* at 12–13.







*Id*. The control group was also divided into three groups corresponding to the three test groups, with one difference: the rifle was labeled "SFSR" rather than "SFAR." *Id*. at 17.

The participants viewed the images for at least ten seconds and were instructed to consider the images as if they were contemplating purchasing a firearm. *Id*. at 14–15. After proceeding to the next screen, the image disappeared, and participants were asked a series of survey questions. *Id*. 14–15. Among them was the question: "What company makes or puts out the rifle you were just shown, if you know." *Id*. at 39.

"None of the 300 Test Group respondents gave any answer that could be interpreted as referring to FN or its SCAR Mark." *Id.* Indeed, while most participants identified the gun as made by Ruger, about 45 mistakenly identified it with other manufacturers, including Smith & Wesson, Remington, Colt, Beretta, Mossberg, and SIG Sauer. *Id.* The participants were also asked, "Do you think the rifle you were shown is licensed or approved by, or affiliated with, any other company or brand?" *Id.* at 41. Out of 300 participants, 78 (26%) answered yes. *Id.* Those participants identified Smith & Wesson, Remington, Magpul, Colt, Sig Sauer, Glock, Marlin, Mossberg, Browning, Beretta, and AR15. *Id.* at 42. None identified FN. *Id.*

Although FN criticizes various aspects of the study, the survey supports no likelihood of confusion, and FN has no evidence to the contrary. This factor indicates no likelihood of confusion.

*8. Quality of the Defendant's Product*

On the eighth factor, "[c]onsideration of the quality of the defendant's product is most appropriate in situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods." *Sara Lee Corp*., 81 F.3d at 467. "If a defendant markets a product under a mark similar to that affixed by a competitor to a commodity of like nature but superior manufacture, that the defendant's product is markedly inferior is likely to be highly probative of its reliance on the similarity of the two marks to generate undeserved sales." *Id*.

Here, the only evidence of quality offered is that the SFAR is cheaper than the SCAR and a compilation of complaints about the SFAR. *See FN's Response in Opposition to Motion for Summary Judgment, Exhibit W – SFAR Quality Issues,* D.E. 80-23. There is no evidence that the SFAR is a knockoff of SCAR. Instead, the evidence shows that the SCAR and SFAR are different guns with different features and different advertising. Therefore, this factor is not relevant.

*9. Sophistication of Consumer*

Ninth, the sophistication of the consuming public is relevant "when the relevant market is not the public at-large." *Sara Lee Corp*., 81 F.3d at 467. "[I]n a market with extremely sophisticated buyers, the likelihood of consumer confusion cannot be presumed on the basis of the similarity in trade name alone, particularly without the benefit of trial." *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 128 (4th Cir. 1990). However, in *Rosetta Stone*, the Fourth Circuit cautioned that inferences about consumer sophistication based solely on the nature of the product or its price are not appropriate for summary judgment. 676 F.3d at 160.

The evidence shows that consumer purchasing behavior varies: some consumers conduct research before making a purchase, while others make impulse purchases. *See* D.E. 80, pp. 43–44; D.E. 39, pp. 39–41. Therefore, contrary to Ruger's contention, based on *Rosetta Stone*, the Court cannot evaluate the significance of the products' price, standing alone, without additional evidence regarding how price affects the purchasing decisions of the relevant consumers. Since that evidence is lacking, there is not enough evidence to suggest that customers are sophisticated. Therefore, this factor is neutral and does not favor either party.

B. Balancing the Likelihood of Confusion Factors

The likelihood of confusion factors help evaluate the central legal standard: "A likelihood of confusion exists between two marks if the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question." *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d at 158 (citation modified). If there is no dispute of material fact relevant to this issue, the Court may grant summary judgment.

In balancing these factors, the Fourth Circuit has identified the strength of the mark, the parties' intent, and actual confusion as the most important factors. *See Swatch AG,* 739 F.3d at 160; *Grayson O Co.,* 856 F.3d at 320. In *George*, the Fourth Circuit stated, "we are aware of no case where a court has allowed a trademark infringement action to proceed beyond summary judgment where two weak marks were dissimilar, there was no showing of a predatory intent, and the evidence of actual confusion was *de minimis*." 575 F.3d at 400.

Additionally, other circuits have recognized the importance of the similarity of the marks. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 216–17 (3d Cir. 2000) ("The single most important factor in determining likelihood of confusion is mark similarity."); *Bos. Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 26–27 (1st Cir. 2008) ("Where the parties are direct competitors, the most important factor in the [likelihood-of-confusion] analysis is the similarity-of-marks inquiry."); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1091 (10th Cir. 1999) (affirming summary judgment and finding "similarity of the marks" to be the "most important factor"). This emphasis is well founded because the marks themselves are what consumers rely on to identify and distinguish the source of competing goods. Thus, the more similar the marks, the greater the potential for consumers to perceive the parties' products as coming from the same source. And where the similarity inquiry accounts not only for the marks themselves but also for how those marks are used in connection with the parties' respective products and advertising, it provides an even more direct measure of whether consumers are likely to be confused.

Dissimilarity of marks is also important because many of the other factors may be satisfied even where the marks themselves are dissimilar. If the marks are plainly and materially different, it would be anomalous to permit a case to proceed to trial merely because factors: (1) strength of the mark, (3) similarity of goods, (4) similarity of facilities, and (5) similarity of advertising were met or at least had issues of material fact. Indeed, the greater the dissimilarity between the marks, the greater weight that factor should carry in the overall analysis.

Here, the marks are quite dissimilar. Although they differ by only one letter, the "F" materially changes the pronunciation and appearance of the marks. Moreover, the consistent use of "Ruger" with "SFAR" and "FN" with "SCAR" on the firearms and in advertising further diminishes any potential for confusion. Tellingly, the only survey in the record found that consumers were more likely to confuse the SFAR with products from Smith & Wesson, Remington, Colt, Beretta, Mossberg, and SIG Sauer than FN. There is also no evidence of an intent to infringe or of any actual confusion. In short, three of the most important factors weigh decisively in Ruger's favor.

Of course, the strength of the mark is also an important factor, and this Court cannot resolve that factor on summary judgment based on disputed facts. But even if the Court assumes that the mark is conceptually and commercially strong, the other factors overcome it. Given the dissimilarity of the mark, the lack of actual confusion, the lack of intent, and the other evidence in this case, there is no "likelihood of confusion." *Swatch*, 739 F.3d at 158. Even if the SCAR mark is strong, Ruger's SFAR is not "likely to produce confusion in the minds of consumers about the origin of the goods or services in question." *Id.* While the strength of the mark is an important factor, it is not material here given the strength of three other important factors.

Most of the remaining factors carry little weight here. Although the similarity of the goods, facilities, and advertising may be satisfied at a broad level, the similarities disappear upon closer examination. Both parties' products are modern sporting rifles, but they differ significantly in appearance and design. Likewise, while the parties use similar advertising media, their advertising differs in style and presentation. These differences also mean that the guns being sold in the same facilities carry less weight.

These factors would carry greater weight if the marks themselves were similar. But where, as here, the marks are materially different, the general similarity of the goods, facilities, and advertising does not meaningfully increase the likelihood of confusion. Conversely, if the products were identical or nearly identical, or if the parties' advertising were confusingly similar in style and substance, those factors would weigh more heavily even where the marks were dissimilar.

The fact that SCAR and SFAR are both firearms, sold through gun stores, and advertised online through similar media does not make it more "likely to produce confusion in the minds of consumers about the origin of the goods or services in question." *Swatch*, 739 F.3d at 158. Those surface-level similarities are insufficient to overcome the fundamental dissimilarity of the marks. Accordingly, the Court finds, based on the undisputed facts, that it is unlikely that Ruger's actual practice is

likely to produce confusion in the minds of consumers about the origin of the SFAR. As such, the Court grants Ruger's motion for summary judgment as to FN's federal trademark infringement claim.

II. Federal Unfair Competition under 15 U.S.C. § 1125(a); Violation of North Carolina's Unfair and Deceptive Trade Practices Act; and Trademark Infringement under North Carolina law

At oral argument, FN agreed that if the Court granted summary judgment on the federal trademark infringement claim, that ruling would also be dispositive of the other claims. Accordingly, the Court also grants Ruger's motion for summary judgment on FN's federal unfair competition claim, North Carolina's Unfair and Deceptive Trade Practices Act claim, and North Carolina's trademark infringement claim.

## CONCLUSION

Accordingly, Ruger's Motion for Summary Judgment on All Counts, D.E. 38, is GRANTED; FN's Motion for Partial Summary Judgment, D.E. 43, is DENIED as MOOT; FN's Motion to Exclude Certain Opinions and Testimony of Ruger's Expert Ashley Hlebinsky, D.E. 48, is DENIED as MOOT; and FN's Motion to Exclude Certain Opinions and Testimony of Ruger's Expert W. Todd Schoettelkotte, D.E. 53, is DENIED as MOOT.

This the 25th day of September, 2026.

*/s/ David A. Bragdon*
United States District Judge